5

**United States District Court**
**Western District of Virginia**

CLERK'S OFFICE U.S. DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED

JUN 2 / 2025

LAURA A. AUSTIN, CLERK
BY: _____
DEPUTY CLERK

**Moon Young Kim**
530 Lincoln St, NW
Vienna, VA 22180
**Plaintiff,**

**v.**

Case No. 3:25cv54

**The Rector and Visitors of**
**The University of Virginia**
The Rotunda
P.O. Box 400222
Charlottesville, VA 22904-4222
**Defendant**

## VERIFIED COMPLAINT FOR PRELIMINARY INJUNCTIVE RELIEF AND EXPEDITED HEARING REQUESTED

### TO THE HONORABLE COURT:

COMES NOW Plaintiff MOON YOUNG KIM, proceeding pro se, and respectfully moves this Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction to prevent her constructive removal from the University of Virginia's (hereinafter "the University" or "UVA") Systems and Information Engineering (hereinafter "SIE") Ph.D. program pending resolution of her federal civil rights complaint. Plaintiff further requests an expedited hearing given the time-sensitive nature of her academic standing and the July 30, 2025 deadline imposed by Defendant.

### I. LEGAL FRAMEWORK

1. This civil action arises under the following federal statutes and constitutional provisions:

- **Title IX of the Education Amendments of 1972**, 20 U.S.C. § 1681 et seq., which prohibits discrimination and retaliation based on sex in any education program or activity receiving federal financial assistance.

- **Section 504 of the Rehabilitation Act of 1973**, 29 U.S.C. § 794, which prohibits discrimination and retaliation against qualified individuals with disabilities or those associated with them by recipients of federal funds.

- **Title II of the Americans with Disabilities Act of 1990**, 42 U.S.C. § 12132, which prohibits public entities from discriminating against or excluding qualified individuals with disabilities from participation in the services, programs, or activities of a public entity.

- **The Due Process Clause of the Fourteenth Amendment**, enforceable through 42 U.S.C. § 1983, which protects individuals from deprivation of life, liberty, or property without due process of law by persons acting under color of state law.

- **The Equal Protection Clause of the Fourteenth Amendment**, also enforceable through 42 U.S.C. § 1983, which guarantees equal protection under the law and prohibits discrimination by state actors.

- **The Declaratory Judgment Act**, 28 U.S.C. §§ 2201–2202, which authorizes this Court to declare the rights and legal relations of parties where an actual controversy exists.

2. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiff's claims arising under federal statutes and the United States Constitution.

3. This Court has jurisdiction to award declaratory relief under 28 U.S.C. § 2201 and injunctive relief under 28 U.S.C. § 1343 and the Court's inherent equitable powers.

4. Venue is proper in this District under 28 U.S.C. § 1391(b), as Defendant is a public institution located within this judicial district and the events giving rise to this action occurred therein.

5. Plaintiff seeks declaratory and injunctive relief to redress ongoing violations of federal civil rights law by a federally funded public institution with respect to her academic standing, civil rights complaints, and procedural protections.

## II. INSTITUTIONAL PATTERN OF CIVIL RIGHTS VIOLATIONS

### II.A. Prior Federal Findings

6. In OCR Review No. 11-11-6001, OCR found that UVA violated Title IX by failing to provide prompt and equitable resolution of sexual harassment complaints. Specific violations included:

- Failure to adopt compliant grievance procedures under 34 C.F.R. § 106.8(b);
- Failure to promptly and equitably resolve complaints (34 C.F.R. §§ 106.8(b), 106.31(a)-(b));
- Maintenance of sexually hostile environment in violation of 34 C.F.R. § 106.31;
- Inadequate coordination of Title IX compliance (34 C.F.R. §§ 106.8(a), 106.9). (Exhibit

1, August 31, 2015, *Letter of Finding*-University of Virginia)

7. UVA entered a Resolution Agreement requiring three years of federal monitoring—demonstrating a historical pattern of reactive compliance. (Exhibit 2, August 31, 2025, *OCR Resolution Agreement- University of Virginia*)

8. In OCR Complaint No. 11-17-2144, OCR concluded that UVA's uniform housing pricing policy likely imposed an unlawful surcharge on students needed disability accommodations, in violation of Section 504 and Title II. (Exhibit 3, September 7, 2019, OCR Resolution Letter)

**9.** In OCR Complaint No. 11-20-2345, OCR investigated UVA's Women's Leadership Program and found that its female-only admissions policy constituted unlawful sex-based exclusion under Title IX. UVA entered a Voluntary Resolution Agreement on January 14, 2021, agreeing to remove gender-based restrictions and revise all promotional and administrative materials. (Exhibit 4, January 14, 2015, *OCR Resolution Letter*)

### *II.B. Pattern and Relevance to Plaintiff*

10. These three federal enforcement actions—cover sex-based and disability-related violations as well as procedural deficiencies—demonstrates a consistent institutional failure to maintain compliant civil rights practices.

11. UVA's reactive compliance posture, history of regulatory intervention, and ongoing use of unlicensed personnel in compliance roles support the inference that the adverse actions taken against Plaintiff—following her May 10, 2025 OCR filing—are part of an entrenched pattern of retaliation and noncompliance. (Exhibit 5, May 10, 2025, *Department of Education Discrimination Complaint Form*)

12. This convergence of past findings, current adverse actions, and procedural failures illustrates systemic deficiencies in UVA's civil rights enforcement mechanisms—particularly when protected disclosures intersect with internal risk management and reputational control.

## III. PRELIMINARY STATEMENT

13. This motion seeks narrowly tailored equitable relief to prevent the constructive removal of a federal civil rights complainant from her doctoral program while federal oversight remains pending. The relief is procedural and maintains the status quo without interfering in academic discretion. Plaintiff seeks only to complete her degree on equitable terms—free from retaliatory obstruction or selective policy enforcement—while her complaint remains under active review by the U.S. Department of Education's Office for Civil Rights.

## IV. BACKGROUND AND FEDERALLY PROTECTED CIVIL RIGHTS ACTIVITY LEADING TO ESCALATING RETALIATION

### *IV.A. Personal and Academic Status*

14. Plaintiff is a Ph.D. student within University's School of Engineering and Applied Science (SEAS). She is fully self-funded.

Her academic background includes:

- o A Bachelor of Arts, *summa cum laude*, from the University of Pennsylvania;
- o A Master of Arts from Harvard University; and
- o A Master of Engineering from the University of Virginia.

In addition to her formal degree programs, Plaintiff is enrolled in advanced computer science continuing education courses at Stanford University, with a focus on deep learning and natural language processing. She has also earned:

- o   A Certificate in UX/UI Design for AI Products from Stanford,

- o   An AWS Certified Cloud Practitioner credential (valid through December 2025);
     and

- o   An Advanced Python Programming Certificate from Northern Virginia
     Community College. (Exhibit 6, June 27, 2025, *Plaintiff's LinkedIn Profile and
     Certifications)*

15. In May 2024, Plaintiff was asked to provide deliverable for the Center for a New
American Security (CNAS), for a Seoul-based event coordinated with the Asan Institute of
Policy Studies. The related cybersecurity conference, held on June 27, 2024, featured former
cybersecurity officials from the United States, a prominent international technology executive,
and representatives from the South Korean Presidential Office. *(Exhibit 7, May 29-June 28,
2024, Plaintiff's brief for US representatives for the ASAN-CNAS Cybersecurity Forum
webpage).*

16. Plaintiff earned a 3.67 GPA in UVA's graduate engineering program—an objectively
strong performance reflecting sustained academic rigor across quantitative systems coursework.
This academic record affirms her technical competence and directly rebuts any suggestion that
subsequent adverse actions were rooted in academic deficiency. She has remained in consistently
good standing, with no history of remediation or academic warnings prior to her protected
disclosures (Exhibit 8, June 27, 2025, *Plaintiff's UVA unofficial transcripts*).

16. Plaintiff's record further demonstrates objective, third-party validation of her academic
and technical competence. Her work has been positively evaluated by Stanford faculty in
professional education coursework in AI system design. (Exhibit 6, April 6, 2025, *Feedback
from Stanford Faculty in UX/UI of AI Design certification class)*

18. These achievements reflect a sustained trajectory of academic excellence, technical advancement, and policy-relevant specialization.

20.Plaintiff has a documented disability—Attention Deficit/Hyperactivity Disorder (ADHD)—and serves as the primary caregiver to two permanently disabled children. These dual roles place her within protected classes under Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act (ADA), entitling her to heightened protection from discrimination and retaliation based on both her disability status and her caregiver responsibilities.

### *IV.B. National Security Data and Policy Institute (NSDPI)*

21. On January 13, 2025, Plaintiff met with Jonathan Hathaway, Director of Research Programs at the National Security Data and Policy Institute (NSDPI), to discuss potential collaboration. During this meeting, Plaintiff disclosed her caregiver status. Mr. Hathaway introduced himself as a "systems engineer." However, he lacked formal academic training in systems engineering and was enrolled in a Geoinformation Science Ph.D. program at George Mason University. He also disparaged Plaintiff's UVA engineering degree, referring to it as a "weekend education program" in the presence of Dr. John Robinson, NSDPI's Director of Academic Programs and Hathaway's friend. During the same meeting, Dr. Philip Potter, NSDPI's Director, stated that the Institute operated directly under the supervision of the Vice Provost. This representation informed Plaintiff's later decision to escalate concerns through the Vice Provost's office. (See ¶36.)

22. From the outset, Plaintiff was fully transparent about her status as a disabled, self-funded doctoral student and primary caregiver to multiple dependents with permanent disabilities. Despite this, she was subjected to escalating coercion, including pressure to alter her dissertation topic based on protected characteristics and was ultimately deprived of authorship credit and academic stability for raising ethical and procedural concerns.

23. On March 13, 2025, Mr. Hathaway emailed Plaintiff asking for South Korean research partners for the federally governed Bilateral Academic Research Initiative (BARI) proposal, involving potential funding from the U.S. Department of Defense (DoD) and the Republic of Korea's Ministry of Trade, Industry, and Energy (MOTIE). Plaintiff successfully secured interest from POSTECH's Artificial Intelligence of Things (AIoT) laboratory. (Exhibit 9, March 13, 2025, *Email titled "OSD/MOTIE"*)

24. On March 20, 2025, during a follow-up call, Jonathan Hathaway acknowledged NSDPI's lack of Korean policy expertise and expressed interest in retaining Plaintiff for the full term of the BARI project. At the time, Plaintiff was the only team member with formal academic training in engineering and prior professional experience in Indo-Pacific security cooperation, having worked at defense-focused think tanks. After Plaintiff reiterated her limited availability due to caregiver responsibilities, Hathaway suggested that she revise her dissertation to align with BARI deliverables.

25. On April 2, 2025, Hathaway met with Plaintiff's then-academic advisor and Graduate Student Director of the Systems and Information Engineering Department, Dr. Matthew Bolton, to discuss her potential project role. Dr. Bolton later confirmed, during a meeting on April 25, that Hathaway had requested Plaintiff's involvement and had implied a full-time position would

be offered. (Exhibit 10, March 31, 2025, *Email titled "BARI Project – Dr. Bolton and Dr. Bezzo introduction*)

26. Dr. Matthew Bolton has spent nearly his entire academic and professional career at the University of Virginia, earning his B.S., M.S., and Ph.D. there and returning to a tenured role after brief external appointments at structurally similar public institutions (Exhibit 11, *Dr. Matthew Bolton's UVA faculty webpage).* This predominantly internal trajectory may reflect and reinforce the perception of a University-wide mono-culture shaped by administrative insularity and soft-power-based influence —marked by internal loyalty, hierarchical conformity, and limited engagement with individuals from federally protected classes or nontraditional backgrounds.

27. In the days leading up to April 23, 2025, which included a projecting meeting of NSDPI and SEAS faculty members including Dr. Bolton, Dr. Seokhyun Chung, Dr. B. Brian Park, and Dr. Steve Baek, and Plaintiff, Mr. Hathaway circulated his BARI research concept, "Distributed Neuromorphic Intelligence for Recomposable Drone Swarms (DIRECTS)." (Exhibit 12, April 18, 2025, *Attachment to Calendar Invite*)

28. During that meeting, she contributed original content situating BARI within the Joint All-Domain Command and Control (JADC2) framework *(Exhibit 13, March 25, 2025, Email to Mr. Hathaway, Clarifying Research Direction and ROK Partner Search) (Exhibit 14, April 15, 2025, Email to Mr. Hathaway titled, "BARI Project Direction")* and helped align the proposal with emerging technological domains and rapidly-evolving strategic capabilities. Her contribution emphasized U.S.–ROK defense industrial cooperation, particularly POSCO (the South Korean

steel conglomerate that founded POSTECH) and its ongoing negotiations to partner with Hyundai Steel's Louisiana-based manufacturing plant.

29. During the meeting, the faculty jointly decided that the proposal would focus on the following: (1) optimizing human-machine interaction for trust and decision-making; (2) advancing Manned-Unmanned Teaming (MUM-T) for distributed airpower; and (3) enabling autonomous systems to operate in contested environments. (Exhibit 15, April 23, 2025, *Plaintiff's email titled "post-meeting follow-up")*

30. Plaintiff began researching the topics discussed in the faculty meeting and began a brainstorm working paper on those three topics (Exhibit 16, April 23-28, 2025, *Architecting Decision Superiority Through Integrated Systems Engineering: Advancing Software Defined, AI-Enabled, Human-Centric Force Design)*

31. The morning of April 25, 2025, Dr. Potter described Plaintiff as "the glue holding the project together" *(Exhibit 15, April 25, 2025, Email from Dr. Philip Potter Re: post-meeting follow-up).*

32. Later that day, Plaintiff met with Mr. Hathaway and raised concern to Mr. Hathaway about NSDPI's ongoing failure to meaningfully engage with POSTECH, despite her efforts in securing the partnership. Shortly thereafter, Mr. Hathaway informed Plaintiff that she would be receiving a short-term contract.

33. During that meeting, Mr. Hathaway reiterated that Plaintiff's dissertation would need to align with BARI deliverables to satisfy the educational component of the application. At the time, Plaintiff's research focused on smishing detection and AI UX/UI design for vulnerable

user, general population and cyber experts. Hathaway framed the dissertation shift as necessary for UVA's BARI proposal eligibility and further justified the request by referencing Plaintiff's role as caregiver to disabled children.

34. Following that meeting, Plaintiff emailed Dr. Bolton to seek guidance on the feasibility of a mid-program dissertation shift, noting that Hathaway had presented the educational deliverable as mandatory for UVA's participation (Exhibit 16, April 25, 2025, *Plaintiff's email titled "Question Regarding Proposal Alignment to BARI Project" to Dr. Bolton).*

35. On April 29, 2025, Plaintiff forwarded an email from POSTECH requesting an update on UVA's internal deliverables. She noted to Mr. Hathaway that she had drafted the faculty outline he had failed to provide but declined to send it without a formal contract. Mr. Hathaway responded that there had been "crossed wires." (Exhibit 18, April 29, 2025, Plaintiff's email to NSDPI)

### *IV.C. Protected Disclosure to Vice Provost Dr. Philip Trella, Dr. Bolton, and Inaction*

36. Relying on Dr. Potter's representation on January 13, 2025 that NSDPI operated directly under the Vice Provost's supervision (see ¶21), Plaintiff submitted a good-faith disclosure to the Vice Provost's office on April 30, 2025. (Exhibit 19, April 30, 2025; *Email to Dr. Trella*) Her communication detailed coercive, retaliatory, and mismanaged conduct by NSDPI personnel and expressly requested appropriate institutional oversight. Plaintiff acted with the specific intent of ensuring accountability and restoring integrity to a deteriorating academic and research environment. Despite this direct disclosure to the supervising authority, no protective or

corrective action was taken, and retaliatory measures against Plaintiff escalated shortly
thereafter.

37. On April 30, 2025, Plaintiff participated in a recorded call with Dr. Bolton, her advisor
and the Graduate Director of Systems Engineering. With Dr. Bolton's consent, the call was
recorded to document protected disclosures of academic coercion, retaliation, disability-related
interference, and misuse of federally affiliated research appointments (Exhibit 22, *Transcript of
Call with Dr. Bolton)*.

38. During the call, Plaintiff described coercive conduct by Hathaway, including pressure to
alter her dissertation, intellectual appropriation, credential misrepresentation, and failure to
engage with POSTECH. She noted Hathaway invoked her caregiver status to frame the shift as
"more manageable." Dr. Bolton did not dispute her account, affirmed the concerns, and
acknowledged Hathaway's lack of qualifications, his pattern of "strategic ambiguity," and that
NSDPI operated under the Vice Provost. The transcript corroborates Plaintiff's claims of
retaliation, breach of duty of care, and institutional failure to act after notice. Additional
recordings and contemporaneous notes are undergoing transcription.

39. When Plaintiff raised concerns about retaliation, authorship exclusion, and coercion to
realign her dissertation with a federally governed project, Dr. Bolton, acknowledging the
seriousness of her concerns. However, he initiated no safeguards.

40. Later that day, Mr. Hathaway issued a contract covering only prospective work—
excluding authorship guarantees and retroactive compensation, or academic recognition for

contributions already made, despite Plaintiff's documented involvement dating back more than a month. (Exhibit 18, April 30, 2025; Email from Mr. Hathaway)

41. Plaintiff withdrew from the project and disavowed future use of her intellectual contributions, informing Hathaway, Dr. Potter, and POSTECH of her decision. She also issued a correction for having previously referred to Hathaway as "Dr." in external communications. This withdrawal—prompted the University's failure to uphold clear professional standards in research governance—resulted in the collapse of the UVA–POSTECH partnership, as POSTECH had no alternate point of contact and the bilateral initiative could not proceed without Plaintiff's leadership. Her departure underscored her centrality to the project and highlighted how unclear roles, unqualified oversight, and institutional ambiguity jeopardized federally affiliated international research infrastructure. Dr. Potter subsequently terminated the BARI project and stated that NSDPI would not use Plaintiff's work, which she then documented and forwarded to Dr. Bolton and Dr. Chung.

42. After Dr. Trella deflected responsibility, Plaintiff submitted a follow-up request on May 2, 2025, asking the matter to be referred to appropriate Provost leadership *(Exhibit 20, May 2, 2025, Request for Internal Referral to Supervising Provost for NSDPI).* She noted that UVA's failure to investigate placed its external partnerships at risk.

43. Despite the disclosures, Dr. Bolton took no remedial action. After Plaintiff filed formal complaints with EOCR and HR, she reiterated her concerns. Dr. Bolton instead redirected her to non-investigatory offices (the Ombuds and Office of Research Integrity) and expressed skepticism that the University would intervene—referencing prior Title IX failures. His inaction reflects procedural redirection and passive institutional indifference.

44. On May 10, 2025, Plaintiff filed a formal federal civil rights complaint with the U.S.

Department of Education's Office for Civil Rights (OCR), alleging violations of Title IX and

Section 504. (Exhibit 5)

45. Around the same time, Plaintiff received eight unsolicited outreach attempts and one

voicemail from a representative of Red Hat, a regional technology company with documented

presence in UVA's engineering and research ecosystem. The timing—shortly after Plaintiff's

protected disclosures and before formal civil filing—combined with the sudden cessation of

contact following a legally styled disclaimer, supports a reasonable inference that affiliated third

parties had been alerted to potential reputational exposure. (Exhibit 21, May 13- June 26, 2025;

Email Exchange with Red Hat). This episode illustrates broader reputational containment

behaviors consistent with UVA's internal pattern of preemptive distancing and risk management.

### *IV.E. Post-Complaint Escalation and Adverse Institutional Shifts*

46. Concurrent to the disclosure, Plaintiff lost the opportunity to apply for a nationally

competitive, Google-sponsored fellowship due to faculty disengagement during the period of

escalating retaliation. In a professional email introducing another student, Plaintiff noted her

intent to contact Dr. Matthew Burkett regarding the opportunity. Dr. Burkett did not respond

until after the application deadline had passed(Exhibit 22, April 9, 2025- May 6, 2025, Email

from Dr. Laura Burkett and Dr. Matthew Bolton). While he had previously exhibited inconsistent

responsiveness, the timing of his silence—following Plaintiff's protected disclosures and amid

broader faculty isolation—raises a reasonable inference of institutional reprisal. This fellowship

represented a rare and transformative career opportunity. The inability to apply, precipitated by

retaliatory withdrawal of faculty support, caused long-term reputational and economic harm that
cannot be adequately redressed through monetary damages alone.

47. On May 30, 2025, Plaintiff informed Dr. Bolton that Dr. Rupa Valdez had agreed to join
her dissertation committee. Dr. Bolton responded by questioning whether Dr. Valdez's work on
disability systems "counted" as engineering, describing it as mere "problem identification" and
expressing disbelief that scholars could "get away with" such work without building systems
(Exhibit 24, May 30, 2025, *call with Dr. Matthew Bolton*).[1] These remarks echoed prior
dismissals of Plaintiff's desire to include vulnerable populations in her research and appear to
reflect a pattern of internal gatekeeping aimed at Plaintiff's disability-focused research, which
falls under federally protected subject matter.

48. Dr. Bolton's comments—documented contemporaneously by Plaintiff with his consent—
suggest a devaluation of participatory, user-centered systems research, particularly that focused
on marginalized populations. He contrasted such work with his own tradition of technical design,
implying that disability-related scholarship lacked legitimacy. In a subsequent email, he further
cited Plaintiff's modest demographic shift—from a general public user group to one centered on
vulnerable populations including disabled users and caregivers—as having "the potential to

---

[1] Dr. Rupa S. Valdez is a nationally recognized scholar whose research on disability, health equity, and human
factors engineering is foundational within the field. She serves as a tenured professor in both Systems and
Information Engineering and Public Health Sciences at the University of Virginia and is a leading voice in
participatory design for marginalized communities. Her Google Scholar profile reflects a substantial academic
footprint with an h-index of 22 and over 2,300 citations. She is the co-lead on a \$2.9 million NIH-funded
investigation into systemic barriers affecting people with disabilities, and has testified before Congress regarding
equitable healthcare access. Her editorial and advisory roles span top-tier journals and national agencies, including
the National Academy of Medicine, AHRQ, and PCORI. That Dr. Bolton dismissed her work as "not really
engineering" raises serious questions about whether Plaintiff's disability-related research faced similar bias from
faculty leadership, particularly after she disclosed her intent to include Dr. Valdez on her committee (Exhibit XX,
*Dr. Rupa Valdez's University Profile and her featured articles on UVA's website*).

cause delays." (Exhibit 25, June 7-8 *email exchange with Dr. Bolton on Advising Structure).* This

post hoc framing, made after Plaintiff reaffirmed her commitment to disability-centered research,

supports a reasonable inference that Dr. Bolton's subsequent withdrawal was motivated, at least

in part, by unlawful discrimination in violation of Section 504 and Title II of the ADA.

### *IV.E. Post-Complaint Escalation and Destabilization*

49. On June 2, 2025, Dr. Matthew Panzer, Associate Dean for Graduate Education, circulated

a school-wide policy announcement stating that, effective immediately, all MS and Ph.D.

students within the School of Engineering and Applied Sciences (SEAS) must have an active

faculty advisor in order to enroll. (Exhibit 25, Email from Dr. Panzer). This communication

formally clarified an academic advising requirement that had not previously been enforced as a

condition of enrollment. The timing of this announcement—shortly after Plaintiff's protected

disclosures and immediately before departmental actions targeting her enrollment—raises

concerns about whether the policy was administratively positioned to justify subsequent

retaliatory actions, including Plaintiff's threatened removal from the Ph.D. program.

50. On June 7, Plaintiff notified Dr. Bolton in writing that "the overall pattern has contributed

to what I now experience as a hostile environment," citing shifting timelines, delayed responses,

and abrupt post-registration changes that threatened to delay her graduation. [Exhibit XX] Dr.

Bolton later denied awareness of these delays and stated that no procedural changes had

occurred. He further disclaimed the existence of any agreement regarding Plaintiff's intended

Spring 2026 graduation—contradicting prior Fall 2024 discussions in which he acknowledged

her inability to self-fund beyond that semester.

51. On June 9, 2025, Dr. Bolton informed Plaintiff that Dr. Seokhyun Chung—her last remaining supportive committee member—would be leaving UVA at the end of the summer. This introduced additional academic instability following an earlier faculty withdrawal and occurred in the context of Plaintiff's protected civil rights disclosures. Dr. Chung had consistently supported Plaintiff's federally protected, disability-centered research trajectory. His impending departure, combined with the absence of any academic justification or proposed replacement, raised concerns that his removal may have been influenced by internal pressure or institutional retaliation. The loss of Dr. Chung further destabilized Plaintiff's dissertation committee and deepened the chilling effect on faculty willingness to engage with her research.

52. On June 10, Plaintiff notified Dr. Bolton that, due to the deteriorating conditions—including the recent credit reduction—she would henceforth limit communication to written format. At the time, Plaintiff's request for written communication reflected her concern for documentation and safety amid escalating retaliation and deteriorating internal stability, including the recent removal of her only remaining supportive committee member.

53. On June 11, 2025, Plaintiff received notice from the Dean of Graduate and Postdoctoral Affairs regarding the enforcement of a mid-semester credit reduction. (Exhibit 27, June 2, 2025, Email from Dr. Panzer) Although the underlying policy was not new, its timing—shortly after Plaintiff's OCR filing and the withdrawal of faculty support—strongly suggests retaliatory application. The decision was made without individualized review, notice, hearing, or accommodation. At the time, Plaintiff had informed her then-advisor of her intent to complete her degree within the shortest feasible timeframe given financial and caregiving constraints. She implied that her summer enrollment was intended to establish a credit buffer as a safeguard

against potential administrative disruption related to her pending civil rights complaint. The selective mid-semester enforcement of this policy directly frustrated those efforts and materially harmed Plaintiff's academic continuity.

53. On June 13, Plaintiff submitted revised dataset labels for her supervised machine learning pipeline in accordance with IRB protocol (Exhibit 28, June 13, 2025, Shared document with Dr. Bolton). This submission reflected ongoing academic engagement and scholarly progress, despite the lack of faculty support and mounting procedural obstructions.

54. On June 17, 2025, Dr. Bolton unilaterally terminated Plaintiff's advising relationship, citing her request to conduct all future communications in writing and her contact with external funders and ethics entities (Exhibit 29, June 17, 2025, Email from Dr. Bolton terminating advising relationship). Her communications to external funders were made in good faith, with the goal of ensuring transparency and protecting her federally affiliated research project. [2] Dr. Bolton's abrupt withdrawal—without notice, mediation, or inquiry—was a disproportionate and punitive response that materially jeopardized Plaintiff's academic standing. The timing, severity, and lack of procedural process support a reasonable inference that his decision was retaliatory in nature and aimed at silencing Plaintiff's protected disclosures.

55. Later that same day, Dr. Gerling issued a formal departmental notice *(Exhibit 30, June 17, 2025, Email from Dr. Gerling)* requiring Plaintiff to secure a new advisor by July 31, 2025 or face removal from the Systems Engineering Ph.D. program. This directive immediately followed Dr. Bolton's retaliatory withdrawal and invoked the same June 2 SEAS-wide policy further

---

[2] Plaintiff notified federal agencies and professional organizations, including: NSF, DoD, OCR, DOJ, IEEE, HFES, and NDMS. These disclosures were made in good faith to ensure accountability, prevent further harm, and uphold the professional and legal standards expected in federally governed research environments.

reinforced the institutional pattern of adverse academic action in response to Plaintiff's protected
civil rights disclosures.

### IV.E. Pattern of Procedural Misconduct and Apparent Coordination by UVA's EOCR, HR, and Office of General Counsel

56. Following Plaintiff's protected filing, the University's Equal Opportunity and Civil
Rights (EOCR) office, in coordination and other administrative units, engaged in a sustained
pattern of procedural and legal misconduct. These actions exceeded basic noncompliance under
Title IX, Section 504, and the ADA, and collectively reflect a coordinated effort to obstruct
Plaintiff's civil rights participation through retaliation and procedural irregularity. Specific
examples include:

(a) Refusal to allow a Virginia-licensed mediator to observe EOCR interviews and denial
of Plaintiff's request to respond exclusively in writing. These were request to provide legal
accountability in an asymmetric power dynamic to safeguard her civil rights;

(b) Rejection of Plaintiff's request to hold the EOCR interview at a neutral third-party
location; instead, the interview was required via Zoom—despite Plaintiff's prior negative
experience with remote EOCR engagement involving Mr. Demetrice Baskerville (Exhibit 31
and Exhibit 35);

(c) Mischaracterization of Plaintiff's EOCR complaint as mental health or care concern
issue, including having the Dean of Student Care reach out shortly after Plaintiff raised
technical vulnerabilities involving the University's DMARC/DKIM authentication settings,

which had enabled the Vice Provost's office to spoof an email using her then-advisor's name
(exhibit 32);

(d) Redirection by her then advisor and Dr. Trella to non-investigatory offices (including
HR Respect@UVA, student conduct, and the Ombuds) despite facially credible
allegations(exhibit 33);

(e) Selective and decontextualized evaluation by HR of Plaintiff's prior statements,
devoid of contemporaneous context or broader institutional patterns of retaliation (Exhibit
34);

(f) Postdating of Plaintiff's internal civil rights complaints, potentially affecting federal
timelines and violating due process (Exhibit 36);

(g) Governance failures involving personnel without Virginia licensure exercising quasi-
legal authority under Title IX, Section 504, and the ADA, in violation of Va. Code § 54.1-
3904 and the Virginia Rules of Professional Conduct, including Rules 5.5(a) and 8.4(c);

(h). FOIA non compliance under Va. Code § 2.2-3704(F), including lack of cost estimate
sand rolling production necessary to substantiate Plaintiff's claims.

i. On May 13, 2025, while actively enrolled as a Ph.D. student, Plaintiff submitted a
lawful request to access her educational records under the Family Educational Rights
and Privacy Act (FERPA), 20 U.S.C. § 1232g. The request sought documentation
concerning academic and administrative actions taken against her following protected
civil rights disclosures. Rather than processing the request in accordance with FERPA's

statutory mandates, the University Registrar's Office improperly declined to proceed and redirected Plaintiff to file under the Virginia Freedom of Information Act (FOIA)—despite her active student status and the clear applicability of FERPA.

ii. This denial violated Plaintiff's federally guaranteed right to access her own educational records and materially obstructed her ability to obtain time-sensitive documentation relevant to her pending civil rights complaint. The refusal occurred shortly after Plaintiff's disability-related civil rights reports, reinforcing the pattern of institutional reprisal. The University's redirection away from FERPA, a student-centered federal privacy statute, toward a more burdensome FOIA process aligned with a broader pattern of restricting access to internal records following protected activity.

iii.  Contemporaneous email correspondence and screenshots confirm Plaintiff's good-faith efforts to obtain these records, as well as the University's noncompliant response. This action constitutes both a substantive FERPA violation and further evidence of systemic obstruction in response to Plaintiff's protected civil rights activity. These twin denials—of federal educational access and state transparency—functioned as a coordinated obstruction effort across institutional lines, materially impeding Plaintiff's ability to gather evidence relevant to her civil rights complaint.

iv. These cumulative actions by SFS and the FOIA office contributed to an environment of institutional retaliation, administrative opacity, and continued harm to Plaintiff's academic standing, financial status, and ability to access relevant records for defense of her civil rights.

v. Simultaneously, Plaintiff submitted multiple FOIA requests related to the BARI project, NSDPI appointment records, and her academic file. The University's FOIA Office failed to meet its statutory obligations under Va. Code § 2.2-3704(F), including by failing to provide cost estimates and rolling production. These delays materially impeded Plaintiff's ability to gather evidence relevant to her civil rights complaint. The procedural failures described above—in both the FERPA and FOIA contexts—further illustrate how institutional retaliation extended into administrative offices, including the Registrar, FOIA Office, and Student Financial Services.

vi. Plaintiff submitted a formal petition under Va. Code § 2.2-3713 in response to UVA's failure to comply with FOIA obligations. The University has not offered a lawful justification for the delay or lack of production, further reinforcing the pattern of suppression following Plaintiff's protected activity.

vii. In addition to obstructing access to records, Defendant caused significant financial harm through institutional ambiguity and retaliation. Student Financial Services (SFS) failed to provide timely or transparent communication regarding the tuition and refund implications of Plaintiff's disrupted research enrollment, despite repeated inquiries following her advisor's withdrawal. Although the Registrar acknowledged that summer refund procedures differ from fall and spring terms, no individualized guidance or equitable accommodation was provided to reflect the involuntary nature of the disruption, which stemmed from protected civil rights activity. As a result, Plaintiff faced avoidable financial risk despite having paid tuition in good faith and committed to program completion.

viii. These actions reflect a coordinated pattern of reputational risk management rather than mere bureaucratic delay. Plaintiff pursued internal remedies in good faith until those systems proved structurally compromised.

ix. These patterns raise serious due process concerns. UVA used unlicensed personnel to conduct legal and procedural gatekeeping functions. Under Virginia law, these functions require proper licensure and accountability.

## IV.F. Chronology and Procedural Consequences of Retaliation

57.The chronology of events supports an inference that procedural irregularities and academic retaliation escalated in direct response to Plaintiff's protected disclosures.

(a) Plaintiff's January–April 2025 collaboration with NSDPI, where her work was appropriated without authorship or contract;

(b) April 30, 2025; Plaintiff disclosed academic coercion and retaliation to the Vice Provost;

(c) May 10, 2025: Plaintiff filed a federal civil rights complaint with the U.S. Department of Education's Office for Civil Rights (OCR).

These disclosures were quickly followed by:

- abrupt faculty disengagement;
- refusal to accommodate protected procedural requests;
- mid-semester credit reductions;
- selective enforcement.

This sequence, cross-referenced in ¶103 supports a strong causal link between Plaintiff's protected activity and adverse academic action.

58. On May 9, 2025, Plaintiff met with EOCR's Demetrice Baskerville, who refused to
process her complaint without a specific webpage form or specific email address submission and
suggested a mental health explanation. On May 10, she filed a formal OCR complaint citing
Title IX and Section 504 violations. Shortly thereafter, she experienced faculty withdrawal,
denial of safeguards, and redirection away from investigatory pathways. She contemporaneously
notified OCR.

59. The procedural denials listed in ¶ 57(a)–(g), as well as HR's inaction, followed her OCR
filings and reinforces the causal timeline.

60. Plaintiff's protected activity was met with:

(a) EOCR's refusal to allow written-only participation or oversight by a Virginia-licensed
    neutral;

(b) Characterization of her legal objections as care-related, including mental health framing
    and care concern outreach from the Dean of Student Care immediately after Plaintiff
    raised DMARC/DKIM vulnerabilities that allowed a forged academic advisory email to
    be sent in her advisor's name;

(c) HR's decontextualized review of past communications, omitting context of retaliatory
    pattern.

61. Upon information and belief:

    o  Ms. Emily Auld Springston, licensed in Indiana, exercised discretionary legal
       authority under Title VI, IX, and Section 504;

    o  Ms. Victoria Lee Hinton, licensed in Mississippi, participated in procedural
       determinations without Virginia licensure;

    o   Ms. Nicole Thompson, who does not appear to be the same Nicole Thompson
listed in Virginia State Bar directory, who is listed as working in Northern
Virginia, made decisions affecting Plaintiff's rights. (Exhibit 40)

62. These roles were not ministerial. The absence of licensed legal oversight reflects
systemic failures in UVA's civil rights infrastructure.

63. According to publicly available information, Barry T. Meek, a graduate of the University
of Richmond School of Law, has served for over two decades in UVA's Office of General
Counsel (OGC). His responsibilities include legal support for EOCR, which routinely conducts
compliance functions under Title VI, IX, Section 504, and the ADA. (Exhibit 41)

64. Plaintiff submitted good-faith concerns of unauthorized practice of law (UPL) to the
Virginia State Bar (VSB), including bar records, emails, and citations to Va. Code § 54.1-3904
and Rules 5.5(a) and 8.4(c) (Exhibit 42).

65. After the VSB declined to investigate, Plaintiff submitted a professional misconduct
complaint against intake official James Bodell. Despite being the subject of one of the
complaints, Bodell responded to both matters on June 20, 2025, without recusal, referral to
independent review, or acknowledgement of conflict. He stated, "The VSB is not the
appropriate forum to determine whether certain lawyers had a duty to intervene," raising serious
oversight and ethical concerns.

66. The VSB's failure to initiate independent review—despite facially credible
documentation and live federal civil rights context—underscores a broader accountability
vacuum. Intake official James Bodell responded that he had reviewed the matter and found no
wrongdoing, despite previously being the subject of a separate complaint for dismissing the

original submission without initiating an inquiry. Although he stated that the matter would be

passed along, he ultimately responded himself without naming an independent reviewer or

indicating that any external evaluation occurred. This raises material concerns about procedural

integrity and institutional accountability. While Plaintiff does not allege intentional shielding, the

response reflects structural deference towards UVA as the Commonwealth's flagship institution

and leaves no meaningful avenue for state-level oversight.

67. This regulatory breakdown exacerbated Plaintiff's procedural disadvantages and rendered

institutional remedies unavailable. Judicial review is now the only viable forum to ensure lawful

redress.

### *IV.H. Final Exhaustion of Internal Remedies (June 23-30, 2025)*

68. On June 24, 2025, Plaintiff submitted a fiduciary titled, "*Formal Civil Rights Retaliation

Notice—Request for Intervention Before Fiscal Year Close*" to Visitors member Leonard W.

Wood, a fellow University of Pennsylvanian alumnus. The letter summarized her active OCR

complaint (filed May 10, 2025) and detailed escalating retaliation, including postdated EOCR

complaints, mid-semester credit reduction despite full self-funding, advisor withdrawal, FOIA

noncompliance, and program removal threats absent new academic supervision. It cited 28

contemporaneous exhibits evidencing protected activity followed by adverse action and raised

concerns about unauthorized legal practice, supervisory failures within UVA's legal office, and

potential Rule 8.4 violations (exhibit 43).

69. Plaintiff requested: (1) a legal briefing by University Counsel or independent counsel, (2)

record preservation under litigation hold; and (3) formal Board review prior to the end of

FY2024–2025. The letter was submitted in good faith to promote proactive governance and prevent reputational and legal harm during an active civil rights investigation. This was Plaintiff's penultimate internal escalation, followed day later by a final written notice to Graduate Registrar Jayne Weber.

70. On June 23, Plaintiff notified Weber—copied to the U.S. Department of Education and Department of Justice—of the procedural and financial consequences of her advisor's withdrawal, clarifying that the disruption stemmed from retaliation, not academic performance. She requested: (a) appointment of an interim advisor, (b) allowance of continued participation of Dr. Chung as a nominally "UVA faculty" for the purposes of her qualification paper and dissertation defense, and (c) evaluation of tuition reimbursement for involuntary disruption. Weber replied on June 24 with a generic referral back to the department, offering no meaningful response, proposed safeguards, or acknowledgement of retaliation. As of this filing, UVA has issued no corrective action. (Exhibit 44, June 23-25, 2025, *email exchange with Jayne Weber requesting interim academic protections and tuition adjustment following advisor withdrawal*)

## VI. Application of the Winter Preliminary Injunction Standard

71. Before seeking judicial intervention, Plaintiff exhausted all graduate-student-accessible internal remedies that did not require waiver of federally protected rights or participation in procedurally imbalanced forums—specifically those lacking transparency, adversarial safeguards, or the availability of Virginia-licensed mediator oversight. Her decision to seek relief from this Court followed a sustained, good-faith effort repeatedly met with procedural redirection, conditional remedies, or outright non-responsiveness. Judicial intervention is now the only forum capable of safeguarding her federal civil rights.

72. The relief sought does not ask this Court to override academic judgement, but ot ensure that federally protected rights are not undermined by procedural misconduct, retaliatory actions, or institutional noncompliance—particularly at a university with a documented history of federal civil rights enforcement actions.

73. Under Federal Rule of Civil Procedure 65 and the Supreme Court's decision in Winter v. Natural Resources Defense Council, 555 U.S. 7 (2008), a preliminary injunction is warranted when the movant shows: (a) likely success on the merits; (b) a likelihood of irreparable harm without relief; (c) that the balance of equities favors the movant; and (d) that an injunction is in the public interest.

### VI.A. LIKELIHOOD OF SUCCESS ON THE MERITS

74. Title IX Retaliation Claim: Plaintiff filed a protected OCR complaint on May 10, 2025, and immediately experienced adverse actions—including advisor withdrawal, credit reductions, and removal deadlines. This temporary proximity combined with UVA's record of civil rights violations, establishes a strong prima facie case. Relevant OCR findings include:

(a). 2015 (OCR Review No. 11-11-6001): Title IX violations due to failure to address sexual harassment complaints;

(b). 2017 (OCR Complaint No. 11-17-2144): Unlawful disability-related housing charges;

(c). 2021(OCR Complaint No. 11-20-2345): Sex-based exclusion from a leadership program.

These actions illustrate UVA's recurring noncompliance and bolster Plaintiff's claims.

75. Section 504 and ADA Retaliation: Plaintiff's federal complaint alleged disability-based and caregiver-based retaliation under Section 504 and the ADA. She was targeted shortly after disclosing her role as primary caregiver to two disabled children. These adverse actions constitute retaliation.

76. As detailed in ¶¶39-40, on May 30, 2025, Plaintiff informed Dr. Bolton that Professor Rupa Valdez—an expert in disability systems—would join her committee. In response, Dr. Bolton he questioned whether Dr. Valdez's disability-oriented work "counted" as engineering and disparaged research that did not involve building systems. These remarks, coupled with later withdrawal of academic support, reflect possible bias against disability-centered research and strengthen the inference that Plaintiff's protected research direction was a partially motivating factor in subsequent adverse actions.

77. Due process Violation under the Fourteenth Amendment, enforceable through 42 U.S.C. § 1983 through the use of unlicensed personnel to make procedural legal determinations affecting her civil rights, and by the arbitrary imposition of deadlines (university favoring restrictions) without adequate process. The Virginia State Bar's refusal to independently and seemingly impartially investigate these concerns further demonstrates the systemic breakdown in legal oversight.

### *VI.B. IRREPARABLE HARM*

78. Plaintiff faces imminent, irreparable harm in the form of constructive expulsion by July 30, 2025. This exclusion would permanently damage her career trajectory and cannot be adequately remedied by monetary relief.

79. Under Goss v. Lopez, 419 U.S. 565, 576 (1975), the loss of educational opportunity for a doctoral student nearing completion constitutes irreparable harm.

80. As a fully self-funded student, Plaintiff has made substantial financial and time investments that would be irreversibly lost upon dismissal.

81. Plaintiff made extensive, good-faith efforts to preserve professional relationships and protect reputations of University personnel, choosing internal resolution over external exposure. However, as retaliation escalated and protective measures failed to materialize, Plaintiff was compelled to seek federal and ethical oversight to prevent further harm.

82. Only after the unexplained departure of her sole remaining supportive faculty member and UVA's failure to act that Plaintiff notified external research sponsors. This step was protective—not retaliatory—and underscores the absence of meaningful internal remedy.

### VI.C. BALANCE OF EQUITIES

83. The equities weigh in Plaintiff's favor. She seeks only to preserve her academic standing during ongoing federal review. Defendant faces minimal burden by maintaining the status quo.

### VI.D. PUBLIC INTEREST

84. The public interest supports protecting civil rights complainants from retaliation, particular in institutions with repeat federal violations. UVA has a documented pattern of noncompliance under Title IX and Section 504, necessitating judicial oversight.

85. The institutional use of unlicensed legal actors and VSB's refusal to investigate amplify the systemic risks to public accountability, especially when the complainant is a member of multiple protected classes.

86. Plaintiff's case affects not just her, but all underrepresented students—particularly disabled students and caregivers to disabled family members —who often face discrimination in academia.

87. This intersectional nature of her experience —gender, disability, and caregiver status— creates compounded disadvantages, not merely additive harm. These factors require a more nuanced legal remedy.

88. Institutional failure to support individuals with intersecting marginalized identities reinforces exclusionary norms and suppresses diversity in academic and leadership pipelines.

89. In defense and engineering fields, which are historically male-dominated, such exclusion further limits innovation and equity in sectors of national importance.

90. Remedying intersectional discrimination is essential to creating inclusive academic spaces that uphold legal rights and contribution of all community members.

## X. CLAIMS FOR RELIEF:

## COUNT I: Title IX Retaliation
## 20 U.S.C. § 1681

91. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

92. Title IX prohibits retaliation against individuals who file complaints of sex discrimination or participate in civil rights proceedings. 20 U.S.C. § 1681(a).

93. Plaintiff filed a Title IX and Section 504 complaint with the U.S. Department of Education's OCR on May 10, 2025.

94. Defendant, with knowledge of the filing, subjected Plaintiff to the following adverse actions:

    (a). Advisor withdrawal and termination of academic supervision;

    (b). Mid-semester credit reductions despite full tuition payment;

    (c). Imposition of a July 30, 2025, removal deadline absent new advisement;

    (d). Selective enforcement of policies that disproportionately impacted Plaintiff as a self-funded student with an active federal civil rights complaint without evidence of consistent application across similarly situated students or contextual consideration of Plaintiff's financial and academic position.

95. The temporal proximity to Plaintiff's protected OCR filing supports a prima facie case of retaliation.

96. Defendant's conduct violated Title IX and denied Plaintiff's equal access to education free from sex-based discrimination.

## COUNT II: Section 504 Retaliation and Discrimination
## 29 U.S.C. § 794

97. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

98. Section 504 prohibits retaliation and discrimination against qualified individuals and their associates.

99. Plaintiff has a documented disability (ADHD) and is the caregiver to two permanently disabled children.

100. Defendant receives federal funding and is subject to Section 504's requirements.

101. Plaintiff's OCR complaint included protected activity based on disability-related and caregiver bias claims.

102. Defendant retaliated with adverse actions described in Count I.

103. These acts denied Plaintiff equal educational access in violation of Section 504.

## COUNT III: Americans with Disabilities Act Discrimination
## 42 U.S.C. § 12132

104. Plaintiff re-alleges and incorporates all preceding paragraphs.

105. Title II of the ADA prohibits public entities from discriminating against qualified individuals with disabilities.

106. Defendant is a public entity subject to Title II requirements.

107. Plaintiff meets the eligibility criteria for UVA's Ph.D. program and is protected under the ADA both individually and as a caregiver.

108. Plaintiff's Spring 2024 research involved federally protected disability-centered UX/UI design for AI systems. Dr. Bolton pressured her to remove this focus, undermining both her research and disability scholarship.

109. Defendant's subsequent adverse actions constitutes unlawful discrimination under Title II.

110. These actions intensified after Plaintiff sought to include national disability scholar on her committee. Dr. Bolton dismissed the legitimacy of this work, undermining Plaintiff's research and protections under the ADA. He withdrew his support after Plaintiff engaged in good-faith protected activities intended to stop the escalating harm.

## COUNT IV: Deprivation of Due Process
## 42 U.S.C. § 1983

111. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

112. Plaintiff has a constitutionally protected property interest Ph.D. progress.

113. Defendant deprived her of this intent without adequate process by:

    (a). Retroactive and selectively enforcing policy after allowing 12-credit registration;

    (b). Mandating a credit reduction despite full payment and good-faith registration;

(c). Imposing arbitrary deadlines post-OCR filing;

(d). Delegating compliance determinations to non-Virginia-licensed personnel.

114. Specific actors— Ms. Springston, Ms. Hinton, and Ms. Thompson—exercised legal discretion affecting Plaintiff's rights without Virginia licensure.

115. In a June 12, 2025 email, Ms. Thompson confirmed that EOCR staff operated without licensed oversight while making quasi-adjudicative determinations. (Exhibit XX, June 12, email titled *"UVA EOCR: Response to Request for Mediated and Ethically Structured Interview"*).

116.  UVA's General Counsel failed to intervene despite notice of unlawful conduct.

117.  This non-intervention constituted deliberate indifference under color of law.

118. The cumulative conduct violated Plaintiff's procedural due process rights.

119. These due process violations are actionable under 42 U.S.C. § 1983.

### COUNT V: Equal Protection Violation
### 42 U.S.C. § 1983

120. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

121. The Equal Protection Clause prohibits differential treatment by state actors without rational basis.

122. Defendant treated Plaintiff differently from similarly situated students based on her protected status and civil rights engagement.

123. These acts are actionable under 42 U.S.C. § 1983.

### COUNT VI: Declaratory Relief
### 28 U.S.C. §§ 2201-2202

124. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

125. An actual controversy exists as to Defendant's violations of Title IX, Section 504, the
ADA, and the Fourteenth Amendment.

126. Declaratory relief is warranted to prevent further harm and clarify the legal obligations
owed to Plaintiff.

## XI. PRAYER FOR RELIEF

WHEREFORE, this Court having jurisdiction over these matters, Plaintiff MOON
YOUNG KIM, requests that this Court issue declaratory and injunctive relief sufficient to restore
her academic status, protect her civil rights during the pendency of federal investigation, and
ensure institutional compliance with applicable law. Preserving Plaintiff's academic status
through temporary injunctive relief would also promote judicial economy by minimizing
downstream disputes over transcript corrections, re-admission, or monetary damages, and by
allowing for orderly resolution of the federal civil rights claims now under review.

Plaintiff respectfully submits this motion under exigent conditions to prevent imminent
irreparable harm, including constructive removal from her doctoral program as of July 30, 2025.
Given the time-sensitive nature of the relief sought and the volume of evidentiary material

involved, Plaintiff respectfully reserves the right to submit a supplemental memorandum and supporting exhibits upon the Court's request or in response to Defendant's filing.

## A. IMMEDIATE INJUNCTIVE RELIEF

1. Schedule an expedited hearing on this motion prior to July 30, 2025;

2. Issue a preliminary injunction enjoining Defendants and their agents from:

3. Removing Plaintiff from her Ph.D. program, either directly or constructively, during the pendency of this litigation and ongoing federal civil rights proceedings;

4. Taking any retaliatory action against Plaintiff based on her protected civil rights activities;

5. Implementing selective or discriminatory administrative measures that would impede Plaintiff's reasonable academic progress;

## B. ACADEMIC SUPPORT AND CONTINUITY

6. Order preservation of the status quo by:

(a). Maintaining Plaintiff's enrollment status and academic standing as they existed prior to the alleged retaliatory conduct;

(b). Tolling all academic deadlines, milestones, and time-to-degree requirements affected by Defendants' conduct until resolution of this matter;

(c). Preventing implementation of any policy changes that would materially affect Plaintiff's academic status during litigation;

(d). Direct Defendants to provide Plaintiff with qualified academic support by:

i. Appointing an interim faculty advisor who is not involved in the alleged discriminatory conduct;

ii. Ensuring Plaintiff has access to a complete and functional dissertation
committee;

iii. Permit Dr. Seokhyun Chung —the sole supportive faculty of Plaintiff
during a period— whose departure occurring near the protected activity and under
unclear circumstances— raises concern that his separation may have been
indirectly influenced by his willingness to support Plaintiff's academic standing
during this time.

iv. Plaintiff respectfully requests that Dr. Seokhyun Chung be permitted to
continue serving on her dissertation and qualification paper committees in full
capacity, grandfathered in as a UVA faculty member notwithstanding his
anticipated departure. Plaintiff further asserts that Dr. Chung's support served as
the final stabilizing force amid faculty withdrawals following her protected civil
rights activity, and that his departure—occurring in that same timeframe—raises
serious concern that institutional conditions may have indirectly contributed to his
exit. Given this context, Plaintiff requests that the Court ensure his continued role
be preserved to protect academic continuity and procedural fairness.

## C. PROCEDURAL PROTECTIONS

7. Require Defendants to provide:

(a). Written notice at least sixty (60) days prior to any proposed changes to Plaintiff's
academic status, funding, or committee composition;

(b). Written documentation of all material communications regarding Plaintiff's
academic standing;

8. Order Defendants to:

   (a). Reimburse tuition paid for Summer 2025 coursework rendered inaccessible due

to faculty withdrawal during the federal investigation;

   (b). Take judicial notice of Plaintiff's May 10, 2025 OCR complaint as federally

protected civil rights activity;

## D. GENERAL RELIEF

9. Award Plaintiff her costs and reasonable expenses incurred in bringing this action;

10. Grant such other relief, both legal and equitable, as this Court deems just, proper, and

necessary to remedy the violations alleged herein and prevent their recurrence.

MOON YOUNG KIM
Plaintiff, Pro Se
530 Lincoln St, NW
(240) 364-4435
moonjun1@gmail.com

June 27, 2025