**United States District Court**

for the

Western District of Virginia

CLERK'S OFFICE U.S. DISTRICT. COURT
AT CHARLOTTESVILLE, VA
FILED

JUL 09 2025

LAURA D. AUSTIN, CLERK
BY: _____
DEPUTY CLERK

**MOON YOUNG KIM,**
530 Lincoln St, NW
Vienna, VA 22180
**Plaintiff,**

v.

**The Rector and Visitors of**
**The University of Virginia**
The Rotunda
P.O. Box 400222
Charlottesville, VA 22904-4222
**Defendant**

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No.** 3:25-cv-00054-JHY-JCH

## FIRST AMENDED COMPLAINT

(Filed as a Matter of Right Under Fed. R. Civ. P. 15(a)(1)(A))

Plaintiff Moon Kim, proceeding pro se, respectfully submits this First Amended Complaint to supplement the original filing with new factual developments that further support her civil rights claims under Title IX, Section 504 of the Rehabilitation Act, the Americans with Disabilities Act (ADA), and 42 U.S.C. §1983.

## I. INTRODUCTION

1. This action arises from a sustained pattern of discrimination, retaliation, and procedural obstruction that Plaintiff experienced while pursuing her self-funded Ph.D. at the University of Virginia ("UVA" or "the University"). In Spring and Summer 2025, Plaintiff engaged in protected civil rights activity, including filing a formal complaint with the U.S. Department of Education's Office for Civil Rights (OCR). Within days, she was subjected to adverse academic actions, including the withdrawal of her faculty advisor, denial of academic credit, and refusal to

issue a full tuition refund, despite partial reimbursement. These actions reflect a retaliatory response to her protected activity. Plaintiff seeks a preliminary injunction under Federal Rule of Civil Procedure 65 to prevent constructive removal from UVA's Systems and Information Engineering (SIE) Ph.D. program. An expedited hearing is requested given a July 30, 2025 removal deadline and irreparable academic harm.

2.   Plaintiff now amends her complaint to incorporate key facts that have arisen since the original filing, including the resignation of UVA President Jim Ryan and related statements, public faculty protests regarding federal interference, and further retaliatory denial of academic support.

## II. PRELIMINARY STATEMENT

3.   Plaintiff seeks narrowly tailored, procedural relief to preserve her academic standing during the pendency of federal rights review. The requested injunction does not interfere with academic discretion but ensures Plaintiff may continue her degree on equitable terms—free from retaliatory obstruction and selective policy enforcement—while federal oversight remains ongoing.

## III. JURISDICTION AND VENUE

4.   This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiff's claims arising under federal statutes and the United States Constitution.

5.   This Court has jurisdiction to award declaratory relief under 28 U.S.C. § 2201 and injunctive relief under 28 U.S.C. § 1343 and the Court's inherent equitable powers.

6.  Venue is proper in this District under 28 U.S.C. § 1391(b), as Defendant is a public

institution located within this judicial district and the events giving rise to this action occurred

therein.

## IV. LEGAL BASIS FOR RELIEF

7.  This civil action arises under the following federal statutes and constitutional provisions:

    A.  Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

    B.  Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

    C.  Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132

    D.  The Due Process Clause of the Fourteenth Amendment, via 42 U.S.C. § 1983

    E.  The Equal Protection Clause of the Fourteenth Amendment, via 42 U.S.C. § 1983

    F.  The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202

8.  Plaintiff's complaint is supported by a clear timeline of protected activity followed by

escalating adverse actions.  A self-funded doctoral, high-performing doctoral candidate with

documented disability and disabled-family caregiver responsibilities, Plaintiff raised internal and

external concerns about procedural misconduct and civil rights compliance.  Days later, she lost

her advisor, was denied credit and tuition reimbursement, and faced pending removal from her

program.  These harms are neither speculative nor isolated—they are procedurally substantiated

and temporally linked to her protected activity.  Preliminary relief is essential to prevent further

harm and ensure continued access to due process during active federal investigation.

## V.  FACTUAL ALLEGATIONS

## A. INSTITUTIONAL PATTERN OF CIVIL RIGHTS VIOLATIONS

### (i). Prior Federal Findings

9. In OCR Review No. 11-11-6001, OCR found that UVA violated Title IX by failing to provide prompt and equitable resolution of sexual harassment complaints. Specific violations included:

- Failure to adopt compliant grievance procedures under 34 C.F.R. §106.8(b);

- Failure to promptly and equitably resolve complaints (34 C.F.R. §§106.8(b), 106.31(a)-(b));

- Maintenance of sexually hostile environment in violation of 34 C.F.R. §106.31;

- Inadequate coordination of Title IX compliance (34 C.F.R. §§ 106.8(a), 106.9).  (Exhibit 1, August 31, 2015, *Letter of Finding*-University of Virginia)

10. UVA entered a Resolution Agreement requiring three years of federal monitoring—demonstrating a historical pattern of reactive compliance. (Exhibit 2, August 31, 2025, *OCR Resolution Agreement- University of Virginia)*

11. In OCR Complaint No. 11-17-2144, OCR concluded that UVA's uniform housing pricing policy likely imposed an unlawful surcharge on students needed disability accommodations, in violation of Section 504 and Title II. (Exhibit 3, September 7, 2019, *OCR Resolution Letter)*

12. In OCR Complaint No. 11-20-2345, OCR investigated UVA's Women's Leadership Program and found that its female-only admissions policy constituted unlawful sex-based exclusion under Title IX. UVA entered a Voluntary Resolution Agreement on January 14, 2021, agreeing to remove gender-based restrictions and revise all promotional and administrative materials. (Exhibit 4, January 14, 2015, *OCR Resolution Letter*)

**(ii). Pattern and Relevance to Plaintiff**

13. These three federal enforcement actions—cover sex-based and disability-related violations as well as procedural deficiencies—demonstrates a consistent institutional failure to maintain compliant civil rights practices.

- UVA's reactive compliance posture, history of regulatory intervention, and ongoing use of unlicensed personnel in compliance roles support the inference that the adverse actions taken against Plaintiff—following her May 10, 2025 OCR filing—are part of an entrenched pattern of retaliation and noncompliance. (Exhibit 5, May 10, 2025, *Department of Education Discrimination Complaint Form*)

- This convergence of past findings, current adverse actions, and procedural failures illustrates systemic deficiencies in UVA's civil rights enforcement mechanisms—particularly when protected disclosures intersect with internal risk management and reputational control.

## VI. BACKGROUND AND FEDERALLY PROTECTED CIVIL RIGHTS ACTIVITY LEADING TO ESCALATING RETALIATION

### A. Personal and Academic Status

14. Plaintiff is a doctoral candidate in the Systems and Information Engineering Department at the University of Virginia's School of Engineering and Applied Sciences (SEAS). She is fully self-funded and has maintained strong academic standing throughout her enrollment. Her academic credentials include:

- A Bachelor of Arts, *summa cum laude*, from the University of Pennsylvania;
- A Master of Arts from Harvard University; and
- A Master of Engineering from the University of Virginia.

These qualifications demonstrate Plaintiff's longstanding commitment to academic excellence and technical mastery. Her self-funded status underscores her independence and determination, and places her within a class of students particularly vulnerable to retaliatory and unsupported academic disruption. Defendant's failure to provide equitable procedural safeguards for a student of Plaintiff's caliber—particularly after she engaged in federally protected activity—raises serious concerns under Title IX, Section 504, and Due Process Clause of the Fourteenth Amendment.

15. In parallel with her formal degree programs, Plaintiff has pursued advanced continuing education courses to maintain technical fluence in emerging fields. She is currently enrolled in Stanford University's graduate-level computer sciences courses, focusing on deep learning and natural language processing. She has also earned:

- A Certificate in UX/UI Design for AI Products from Stanford,
- An AWS Certified Cloud Practitioner credential (valid through December 2025); and

o   An Advanced Python Programming Certificate from Northern Virginia
    Community College. (Exhibit 6, June 27, 2025, *Plaintiff's LinkedIn Profile and
    Certifications)*

These credentials reinforce Plaintiff's professional alignment with current industry
and academic standards and demonstrate her proactive efforts to remain competitive
within the field of AI systems design.

16. Plaintiff has maintained an objectively strong academic record within UVA's
graduate engineering program, earning a cumulative GPA of 3.67 GPA. This record
reflects consistent success in rigorous, quantitatively intensive systems engineering
coursework and confirms her technical aptitude. Plaintiff has never been placed on
academic probation, issued a warning, or referred for remediation at any point prior to
engaging in protected civil rights activity.  This unbroken pattern of academic
performance directly rebuts any post hoc inference that adverse actions taken against her
were the result of academic insufficiency. (Exhibit 7, June 27, 2025, *Plaintiff's UVA
unofficial transcripts*).

17. In May 2024, Plaintiff was invited by the Center for a New American Security
(CNAS) to write a policy brief for a Seoul-based cybersecurity forum co-hosted with
Asan Institute of Policy Studies. The June 27, 2024 event featured a senior former U.S.
cybersecurity official, a leading international technology executive, and a representative
from the South Korean Presidential Office. Plaintiff's role reflects external validation of
her expertise in Indo-Pacific technology policy. *(Exhibit 8, May 29-June 28, 2024,
Plaintiff's brief for US representatives for the ASAN-CNAS Cybersecurity Forum
webpage).*

18. Plaintiff's technical competence has also been affirmed through external academic evaluation. In April 2025, Stanford University's faculty provided positive written feedback on her performance in a professional education course on AI systems design, specifically in UX/UI for AI products. (Exhibit 6, April 6, 2025, *Feedback from Stanford Faculty in UX/UI of AI Design certification class*)

19. Plaintiff's academic and professional record reflects a consistent trajectory of excellence and relevance to emerging policy and technology fields.

20. Plaintiff is a qualified individual with a documented disability—Attention Deficit/Hyperactivity Disorder (ADHD)—and serves as the primary caregiver to two permanently disabled children. These dual roles place her within multiple protected classes under Section 504 and Title II of the Americans with Disabilities Act (ADA), entitling her to heightened legal protection from discrimination, retaliation, and institutional exclusion.

## B. National Security Data and Policy Institute (NSDPI)

21. On January 13, 2025, Plaintiff met with Jonathan Hathaway, Director of Research Programs at the National Security Data and Policy Institute (NSDPI), to discuss potential collaboration. During this meeting, Plaintiff disclosed her caregiver status. Mr. Hathaway introduced himself as a "systems engineer," though he lacked formal academic training in the field, and was, in fact, pursuing a Ph.D. in Geoinformation Science at George Mason University. Although it is presumed that Mr. Hathaway has since obtained a doctorate by the end of the 2024-2025 academic year, there is no public record indicating he held a Ph.D. during the event described herein. Moreover, no publication record can be verified under his name reflecting a notable H-index or peer-reviewed contribution consistent

with his title. A "Jonathan Hathaway" appears in Google Scholar, but the listed works do not appear to correspond to the NSDPI-affiliated individual. During the same meeting, Mr. Hathway disparaged Plaintiff's UVA Masters of Engineering degree as a "weekend education program," in the presence of Dr. John Robinson, NSDPI's Director of Academic Programs and Hathaway's friend. Additionally, Dr. Philip Potter, NSDPI's Director, stated that the Institute operated under the direct supervision of the Vice Provost—a representation that informed Plaintiff's later decision to escalate concerns through that office. (See ¶36.)

22. From the outset, Plaintiff was transparent about her status as a disabled, self-funded doctoral student and caregiver to multiple children, including two with permanent disabilities and others who are neurotypical. Despite this disclosure, she faced escalating coercion—including pressure to alter her dissertation topic in ways tied to her protect status—and was ultimately denied attribution, academic credit and continuity after raising ethical and procedural concerns. These adverse actions reflect a broader pattern of exclusion and retaliation in response to her protected disclosures.

23. On March 13, 2025, Mr. Hathaway emailed Plaintiff requesting assistance in identifying South Korean research partners for the Bilateral Academic Research Initiative (BARI), a federally governed program involving potential funding from the U.S. Department of Defense (DoD) and the Republic of Korea's Ministry of Trade, Industry, and Energy (MOTIE). Plaintiff successfully secured interest from POSTECH's Artificial Intelligence of Things (AIoT) laboratory. (Exhibit 9, March 13, 2025, *Email titled "OSD/MOTIE"*)

24. During a March 20, 2025 follow-up call, Mr. Hathaway acknowledged NSDPI's lack of Korean policy expertise and expressed interest in retaining Plaintiff for the full term of the BARI project. At the time, Plaintiff was the only team member with formal academic training in engineering and prior professional experience in Indo-Pacific security cooperation. When Plaintiff reiterated her limited availability due to caregiver responsibilities, Mr. Hathaway responded by suggesting that she revise her dissertation to align with BARI deliverables—raising early concerns that academic direction was being shaped by non-academic factors tied to her protected caregiver status.

25. On April 2, 2025, Mr. Hathaway met with Plaintiff's academic advisor, Dr. Matthew Bolton—who also served as Graduate Student Director of the Systems and Information Engineering Department—to discuss her potential project role in the BARI project. Dr. Bolton later confirmed, during a meeting on April 25, 2025, that Mr. Hathaway had requested Plaintiff's involvement and indicated that a full-time position would likely be offered. (Exhibit 10, March 31, 2025, *Email titled "BARI Project – Dr. Bolton and Dr. Bezzo introduction*)

26. Dr. Bolton has spent nearly his entire academic and professional career at the University of Virginia, having earned his B.S., M.S., and Ph.D. at UVA and returning to a tenured faculty role after brief appointments at structurally similar public institutions (Exhibit 11, *Dr. Matthew Bolton's UVA faculty webpage).* This predominantly internal trajectory may reflect and reinforce a broader culture of administrative insularity— marked by internal loyalty, hierarchical conformity, and limited engagement with individuals from federally protected classes or nontraditional academic backgrounds.

27. On April 14, 2025, Mr. Hathaway emailed Plaintiff stating that it "would be great if [the project] could align with your PhD work and you could support the project through its duration." (Exhibit 14, April 14, 2025, Email from Mr. Hathaway titled "RE: Weekend Availability and Conference Schedule") This was the first written instance in which Hathaway suggested redirecting Plaintiff's dissertation to support a federally affiliated proposal. The statement preceded any formal discussion of authorship, compensation, or academic oversight and raised early concerns about non-academic influence over Plaintiff's research direction.

28. In the days leading up to the April 23, 2025 faculty meeting, Mr. Hathaway circulated a draft concept for the BARI proposal, titled "Distributed Neuromorphic Intelligence for Recomposable Drone Swarms (DIRECTS)," to a group of faculty participants, including Dr. Bolton, Dr. Seokhyun Chung, Dr. B. Brian Park, Dr. Steve Baek, and Plaintiff. During the April 23 meeting, Plaintiff contributed original research framing the BARI project within the Joint All-Domain Command and Control (JADC2) framework. She also proposed aligning the proposal with key strategic and technical priorities, including human-machine teaming, an overarching integrative system of systems for improved command and control, and U.S.–ROK dual-use defense industrial cooperation. Her contribution highlighted the role of POSCO—the South Korean steel conglomerate that founded POSTECH—and its potential partnership with Hyundai Steel's Louisiana-based manufacturing operations. (Exhibit 12, April 18, 2025, *Attachment to Calendar Invite*; Exhibit 13, March 25, 2025, *Email to Mr. Hathaway clarifying research direction and ROK partner search*; Exhibit 15, April 15, 2025, *Email to Mr. Hathaway titled "BARI Project Direction"*)

29. During the meeting, the faculty jointly decided that the proposal would focus on the following: (1) optimizing human-machine interaction to enhance trust and decision-making; (2) advancing manned-unmanned teaming (MUM-T) for distributed airpower; and (3) enabling autonomous systems to operate in contested environments.  (Exhibit 16, April 23, 2025, *Plaintiff's email titled "post-meeting follow-up"*)

30. Following the meeting, Plaintiff developed a preliminary working paper synthesizing early-stage research concepts related to the agreed-upon project themes. Her exploratory research efforts integrated systems engineering principles with strategic force design, resulting in the *Architecting Decision Superiority Through Integrated Systems Engineering; Advancing Software-Defined, AI-Enabled, Human-Centric Force Design.* (Exhibit 17, April 23-28, 2025, *Plaintiff's Preliminary Working Paper*)

31. The morning of April 25, 2025, Dr. Potter, Director of NSDPI, described Plaintiff as "the glue holding the project together," in written correspondence following the April 23rd faculty meeting. This acknowledgement affirms Plaintiff's central role in the BARI proposal and facilitating its interdisciplinary coordination. *(Exhibit 16, April 25, 2025, Email from Dr. Philip Potter Re: post-meeting follow-up).*

32. Later that day, Plaintiff met with Mr. Hathaway and raised concern regarding NSDPI's ongoing failure to engage substantively with POSTECH, despite her efforts in securing the partnership. Shortly thereafter, Mr. Hathaway informed Plaintiff that she would be receiving a short-term contract. However, he also reiterated that in order to fulfill UVA's eligibility for the BARI program, Plaintiff would need to realign her dissertation to match project deliverables—a shift he justified on the basis of her

caregiver status, suggesting that her protected role influenced the academic redirection he proposed.

33. At the time, Plaintiff's research focused on smishing detection and AI UX/UI design for vulnerable user, cyber experts, and the general population—topics that were both technically rigorous and federally protected under disability-centered design principles. This request, made outside formal academic channels, compromised Plaintiff's scholarly independence and raised ethical concerns regarding undue influence by a non-faculty actor.

34. Following the April 25th meeting, Plaintiff emailed Dr. Bolton to request guidance on the feasibility of modifying her dissertation mid-program. She noted that Hathaway had presented the realignment as a mandatory condition for UVA's participation in the BARI proposal. Plaintiff further stated that she would only consider such a shift if NSDPI agreed to fund the resulting academic costs, including delays caused by changing research direction. Her inquiry reflected a good-faith effort to clarify academic expectations and protect her research integrity amid growing pressure from NSDPI personnel. (Exhibit 18, April 25, 2025, *Plaintiff's email titled "Question Regarding Proposal Alignment to BARI Project" to Dr. Bolton*).

35. On April 29, 2025, Plaintiff forwarded an email from POSTECH requesting an update on UVA's internal progress on project deliverables. Although she had already drafted the faculty outline Mr. Hathaway had failed to produce, Plaintiff stated she would not submit the document without a formal contract in place. Mr. Hathway offered a short-term contract for future work, but the proposal did not include tuition reimbursement, compensation, or academic credit for Plaintiff's prior contribution to the BARI project.

Plaintiff's response reflected a reasonable effort to secure professional safeguards before continuing to support federally affiliated research. Mr. Hathaway replied that there had been "crossed wires," but failed to address the core issue: that Mr. Hathaway had relied on Plaintiff's labor without formal acknowledgement, contract, or attribution. This lack of institutional remedy for exploitative and unattributed labor raised serious ethical concerns and foreshadowed the retaliatory conduct that followed. (Exhibit 19, April 29, 2025, *Plaintiff's email to NSDPI.*

### C. Protected Disclosure to Vice Provost Dr. Philip Trella, Dr. Bolton, and Inaction

36. Relying on Dr. Potter's January 13, 2025 representation that NSDPI operated directly under the Vice Provost's supervision (see ¶21), Plaintiff submitted a formal, good-faith disclosure to the Vice Provost's office on April 30, 2025. (Exhibit 20, April 30, 2025; *Plaintiff's email to Dr. Trella*) Her communication detailed coercive pressure to alter her dissertation, misuse of her intellectual contributions without authorship or compensation (despite not being a UVA employee), and broader research mismanagement by NSDPI personnel. Plaintiff expressly requested appropriate institutional oversight to protect academic integrity and prevent further harm. Despite the seriousness of the concerns and their direct bearing on federally affiliated research, no protective or corrective action was taken. Retaliatory measures against Plaintiff escalated shortly thereafter.

37. On April 30, 2025, Plaintiff participated in a recorded call with Dr. Bolton, her advisor and the Graduate Director of Systems Engineering. With Dr. Bolton's consent, the call was recorded to document protected disclosures of academic coercion, retaliation, and research mismanagement. Plaintiff detailed the pressure she experienced to realign her dissertation for purposes unrelated to her academic trajectory, the use of her work without

authorship or compensation and the improper use of federally affiliated research roles. (Exhibit 21, April 30, 2025, *Transcript of Call with Dr. Bolton*).

38. During the call, Dr. Bolton did not dispute Plaintiff's account. He affirmed the seriousness of her concerns, acknowledged that Mr. Hathaway lacked appropriate qualifications, and recognized Hathaway's pattern of "strategic ambiguity." The transcript corroborates Plaintiff's account of coercion, breach of academic norms, and institutional failure to act after being placed on notice.

39. When Plaintiff raised concerns about retaliation, authorship exclusion, and coercive pressure to restructure her dissertation around federally governed project deliverables, Dr. Bolton, acknowledged the seriousness of her concerns. However, he initiated no safeguards.

40. Later that day, Mr. Hathaway issued a short-term contract that covered only prospective work. The agreement excluded retroactive compensation and any acknowledgement of Plaintiff's prior contributions to the BARI project, despite her documented involvement over the preceding month. This response reinforced the pattern of exploitative labor practices and failure to uphold professional standards in research governance. (Exhibit 19, April 30, 2025; *Email from Mr. Hathaway*)

41. In response to Mr. Hathaway's inadequate contract and the absence of appropriate safeguards, Plaintiff formally withdrew from the BARI project. She notified Mr. Hathaway, Dr. Potter, and POSTECH that she would no longer participate and disavowed future user of her intellectual contributions. She also issued a correction for having previously referred to Mr. Hathaway as "Dr." in external communications. Plaintiff's withdrawal led to the collapse of the UVA-POSTEC partnership, as the bilateral initiative could not proceed

without her leadership. Dr. Potter subsequently confirmed the termination of the project and stated that the NSDPI would not use Plaintiff's work. Plaintiff documented this outcome and shared it with Dr. Bolton and Dr. Chung. (Exhibit 22, May 2, 2025, *Dr. Potter's email with the subject "Withdrawing from Project Involvement"*)

42. After Dr. Trella deflected responsibility, Plaintiff submitted a follow-up request on May 2, 2025, asking the matter to be referred to appropriate Provost leadership *(Exhibit 23, May 2, 2025, Request for Internal Referral to Supervising Provost for NSDPI)*. She emphasized that UVA's failure to intervene placed its external partnerships—at risk. No corrective action followed.

43. After Plaintiff filed formal complaints with EOCR and HR, Dr. Bolton redirected her to non-investigatory offices such as the Ombuds and Office of Research Integrity. He also expressed doubt that UVA would intervene, referencing prior Title IX failures. This pattern of redirection and passive indifference further undermined Plaintiff's access to institutional protection. (Exhibit 24, May 8, 2025, *Dr. Trella's email to Plaintiff titled, "BARI closure"*); (Exhibit 25, May 24, 2025, *Dr. Bolton's email to Plaintiff titled, "BARI Project Closure"*)

44. On May 10, 2025, Plaintiff filed a formal civil rights complaint with the U.S. Department of Education's Office for Civil Rights (OCR), alleging violations of Title IX and Section 504. (Exhibit 5, May 10, 2025, *Office of Civil Rights Discrimination Complaint Form*) The complaint followed weeks of internal disclosures, faculty inaction, and procedural obstruction, and marked a critical turning point in the escalation of retaliatory conduct.

45. Shortly after Plaintiff filed her federal OCR complaint, she received a series of unsolicited outreach attempts from Ms. Keegan Plocki, a representative of Red Hat—a

technology company with documented ties to UVA's engineering and research ecosystem. Between May 13 and June 26, 2025, Plaintiff received eight outreach attempts and one phone call. Plaintiff issued a legally styled notice informing Red Hat of her civil rights claims, and notified the University of pending legal action, Ms. Plocki abruptly disavowed any formal involvement with UVA's civil rights case and agreed to cease all communication. The timing of the initial contact—closely following Plaintiff's protected OCR filing—and Ms. Plocki's final email—following Plaintiff's notice of legal intent to the University—supports a reasonable inference that Ms. Plocki may have been alerted to pending reputational exposure.

(Exhibit 26, May 13- June 26, 2025; *Email Exchange with Red Hat*).

### E. Post-Complaint Escalation and Adverse Institutional Shifts

46. Around the time of her protected disclosures, Plaintiff lost the opportunity to apply for a nationally competitive, Google-sponsored fellowship due to faculty disengagement. In a professional email introducing another student, Plaintiff noted her intent to contact Dr. Matthew Burkett regarding the opportunity. Although Dr. Burkett had written letters of recommendation for Plaintiff in the past, he did not respond until after the application deadline had passed. (Exhibit 27, April 9, 2025- May 6, 2025, *Email from Dr. Laura Barnes and Dr. Burkett and copy of his prior recommendation of Plaintiff from 2024*). Given the context of Plaintiff's escalating disclosure and broader faculty disengagement, this silence supports a reasonable inference of retaliatory reprisal.

47. On May 30, 2025, Plaintiff informed Dr. Bolton that Dr. Rupa Valdez had agreed to join her dissertation committee. Dr. Bolton responded by questioning whether Dr. Valdez's work on disability systems "counted" as engineering, describing it as mere "problem identification" and expressing disbelief that scholars could "get away with" such work

without building systems (Exhibit 28, May 30, 2025, *call with Dr. Matthew Bolton*).[1] These remarks echoed prior dismissals of Plaintiff's desire to include vulnerable populations in her research and appear to reflect a pattern of internal gatekeeping aimed at Plaintiff's disability-focused research, which falls under federally protected subject matter.

48. Dr. Bolton's comments—documented contemporaneously by Plaintiff with his consent—suggest a devaluation of participatory, user-centered systems research, particularly that focused on marginalized populations. He contrasted such work with his own tradition of technical design, implying that disability-related scholarship lacked legitimacy. In a subsequent email, he further cited Plaintiff's modest demographic shift—from a general public user group to one centered on vulnerable populations including disabled users and caregivers—as having "the potential to cause delays." (Exhibit 29, June 7-8 *email exchange with Dr. Bolton on Advising Structure)*. This post hoc framing, made after Plaintiff reaffirmed her commitment to disability-centered research, supports a reasonable inference that Dr. Bolton's subsequent withdrawal was motivated, at least in part, by unlawful discrimination in violation of Section 504 and Title II of the ADA.

**E. Post-Complaint Escalation and Destabilization**

49. On June 2, 2025, Dr. Matthew Panzer, Associate Dean for Graduate Education, circulated a school-wide policy announcement stating that, effective immediately, all MS and Ph.D. students within the School of Engineering and Applied Sciences (SEAS) must have an active faculty advisor in order to enroll. (Exhibit 30, June 2, 2025, *Email from Dr. Panzer*)

---

[1] Dr. Rupa S. Valdez is a nationally recognized scholar and tenured Professor in Systems and Information Engineering, whose research on disability, health equity, and human factors engineering is foundational within the field.

This communication formally clarified an academic advising requirement that had not previously been enforced as a condition of enrollment. The timing of this announcement—shortly after Plaintiff's protected disclosures and immediately before departmental actions targeting her enrollment—raises concerns about whether the policy was administratively positioned to justify subsequent retaliatory actions, including Plaintiff's threatened removal from the Ph.D. program.

50. On June 7, Plaintiff notified Dr. Bolton in writing that "the overall pattern has contributed to what I now experience as a hostile environment," citing shifting timelines, delayed responses, and abrupt post-registration changes that threatened to delay her graduation. (Exhibit 29, June 7, 2025, *Plaintiff's email to Dr. Bolton titled, "Advising Structure and Academic Environment – Formal Documentation")*. Dr. Bolton later denied awareness of these delays and stated that no procedural changes had occurred. He further disclaimed the existence of any agreement regarding Plaintiff's intended Spring 2026 graduation—contradicting prior Fall 2024 discussions in which he acknowledged her inability to self-fund beyond that semester. (Exhibit 31, June 11, 2025, *Email from Dr. Bolton titled, "Request for Policy Citation and Clarification on Summer Credit Limitation")*

51. On June 9, 2025, Dr. Bolton informed Plaintiff that Dr. Seokhyun Chung—her last remaining supportive committee member—would be leaving UVA at the end of the summer. (Exhibit 22, May 2, 2025, *Dr. Chung's email titled, "Re: Withdrawing from Project Involvement")*; (Exhibit 32, June 9, 2025, *Email from Dr. Bolton titled, "a couple of things")*

This introduced additional academic instability following an earlier faculty withdrawal and occurred in the context of Plaintiff's protected civil rights disclosures. Dr. Chung had consistently supported Plaintiff's federally protected, disability-centered research trajectory.

His impending departure, combined with the absence of any academic justification or proposed replacement, raised concerns that his removal may have been influenced by internal pressure or institutional retaliation. The loss of Dr. Chung further destabilized Plaintiff's dissertation committee and deepened the chilling effect on faculty willingness to engage with her research.

52.  On June 10, Plaintiff notified Dr. Bolton that, due to the deteriorating conditions—including the recent credit reduction—she would henceforth limit communication to written format. At the time, Plaintiff's request for written communication reflected her concern for documentation and safety amid escalating retaliation and deteriorating internal stability, including the recent removal of her only remaining supportive committee member. (Exhibit 33, June 10, 2025, *Plaintiff's email to Dr. Bolton titled, "Request to Conduct Communication in Writing"*)

53.  On June 11, 2025, Plaintiff received notice from the Dean of Graduate and Postdoctoral Affairs regarding the enforcement of a mid-semester credit reduction. (Exhibit 31, June 11, 2025, *Email from Dr. Panzer titled, "Re: Request for Policy Citation and Clarification on Summer Credit Limitation"*) Although the underlying policy was not new, its timing—shortly after Plaintiff's OCR filing and the withdrawal of faculty support—strongly suggests retaliatory application. The decision was made without individualized review, notice, hearing, or accommodation. At the time, Plaintiff had informed her then-advisor of her intent to complete her degree within the shortest feasible timeframe given financial and caregiving constraints. She implied that her summer enrollment was intended to establish a credit buffer as a safeguard against potential administrative disruption related to her pending

civil rights complaint. The selective mid-semester enforcement of this policy directly frustrated those efforts and materially harmed Plaintiff's academic continuity.

54. On June 13, Plaintiff submitted revised dataset labels for her supervised machine learning pipeline in accordance with IRB protocol. (Exhibit 34, June 13, 2025, *Plaintiff's shared document with Dr. Bolton*) This submission reflected ongoing academic engagement and scholarly progress, despite the lack of faculty support and mounting procedural obstructions.

55. On June 17, 2025, Dr. Bolton unilaterally terminated Plaintiff's advising relationship, citing her request to conduct all future communications in writing and her contact with external funders and ethics entities.  In the termination email—titled "Termination of Advising Relationship" —Dr. Bolton acknowledged Plaintiff's prior communication and cited it as justification for ending his role. (Exhibit 35, June 17, 2025, *Email from Dr. Bolton to Plaintiff terminating advising relationship*) Plaintiff's outreach to external funders was made in good faith to ensure transparency and protect her federally affiliated research. (Exhibit 36, June 11, 2025, *Plaintiff's email titled, "Notice of Procedural Concerns and Documentation - Protected Activity, Committee Retaliation, and Governance Interference"*)

Dr. Bolton's abrupt withdrawal—without prior notice, mediation, or inquiry—was a disproportionate and punitive response that materially jeopardized Plaintiff's academic standing. The timing, severity, and lack of procedural process support a reasonable inference that his decision was retaliatory in nature and aimed at silencing Plaintiff's protected disclosures.

56. Later that same day, Dr. Gerling issued a formal departmental notice (Exhibit 37, June 17, 2025, *Email from Dr. Gerling*) requiring Plaintiff to secure a new advisor by July 31, 2025 or face removal from the Systems Engineering Ph.D. program. This directive immediately followed Dr. Bolton's retaliatory withdrawal and invoked the same June 2 SEAS-wide policy further reinforced the institutional pattern of adverse academic action in response to Plaintiff's protected civil rights disclosures.

## E. Pattern of Procedural Misconduct and Apparent Coordination by UVA's EOCR, HR, and Office of General Counsel

57. Following Plaintiff's protected filing, the University's Equal Opportunity and Civil Rights (EOCR) office, in coordination and other administrative units, engaged in a sustained pattern of procedural and legal misconduct. These actions exceeded basic noncompliance under Title IX, Section 504, and the ADA, and collectively reflect a coordinated effort to obstruct Plaintiff's civil rights participation through retaliation and procedural irregularity. Such examples include

**Protected Disclosures:**

(a) Plaintiff disclosed technical vulnerabilities related to the University's DMARC/DKIM authentication systems and raised broader institutional concerns tied to IT policies and civil rights compliance. (Exhibit 38, May 13, 2025, *Survey Email Metadata with Authentication Headers*)

(b) She submitted written complaints under Title IX and Section 504 and made related disclosures to the U.S. Department of Education, and internal university stakeholders, including the Vice Provost and EOCR.

(c) These disclosures included documentation of staff coercion, research appropriation without clear attribution, and disability caregiver-related justification for research topic coercion.

**Subsequent Adverse Actions:**

(d) Refusal to allow a Virginia-licensed mediator to observe EOCR interviews and denial of Plaintiff's request to respond exclusively in writing. These requests were made to provide legal accountability in an asymmetric power dynamic and to safeguard her civil rights;

(e)  Rejection of Plaintiff's request to hold the EOCR interview at a neutral third-party location; instead, the interview was required via Zoom—despite Plaintiff's prior negative experience with remote EOCR engagement involving Mr. Demetrice Baskerville (Exhibit 38, June 16, 2025, *Plaintiff's forwarded email to OCR and DOJ titled, " FW: UVA EOCR: Response to Request for Mediated and Ethically Structured Interview");* (Exhibit 30, May 12, 2025, Plaintiff's Email to Mr. Baskerville titled, "*Re: Request for Reassignment and Procedural Concerns*");

(f) Plaintiff's civil rights complaint was mischaracterized by the University as a mental health or care concern. This mis-framing was followed by outreach from the Dean of Student Care shortly after Plaintiff raised concerns about email spoofing and authentication vulnerabilities.

(f.1) Plaintiff had discovered that an email impersonating her advisor, "Matthew Bolton, Associate Professor," had been sent through UVA's internal systems. Technical email header metadata confirms that the message failed SPF

validation—meaning the sender's IP address was not authorized to send mail from the domain. Although DKIM and DMARC passed, the SPF failure indicated that UVA's email infrastructure permitted spoofed communications using official university accounts.

(f.2) These vulnerabilities were subsequently reported to federal agencies, including CISA and OCR. (Exhibit 41, May 27, 2025, Plaintiff's Email to CISA and OCR titled "FW: Mischaracterization of Disability-Related Concerns in Institutional Outreach")

(g) Institutional redirection to non-investigatory offices—such as HR Respect@UVA, student conduct, and the Ombuds—despite Plaintiff's credible civil rights concerns. These actions, described in ¶43, diverted her away from investigatory review and delayed appropriate intervention.

(h) Selective and decontextualized evaluation by HR of Plaintiff's prior statements, devoid of contemporaneous context or broader institutional patterns of retaliation (Exhibit 42, May 20, 2025, Plaintiff's email to *Ms. Harmon's email titled, "Clarification of Reputational Signaling and Institutional Context");*

(i) Postdating of Plaintiff's internal civil rights complaints, potentially affecting federal timelines and violating due process (Exhibit 43, May 19, 2025, *UVA EOCR: Acknowledgement of Written Complaint and Supporting Documents*);

(j) Governance failures involving personnel without Virginia licensure exercising quasi-legal authority under Title IX, Section 504, and the ADA, in violation of Va. Code

§ 54.1-3904 and the Virginia Rules of Professional Conduct, including Rules 5.5(a) and
8.4(c);

(k). FOIA non-compliance under Va. Code § 2.2-3704(F), including lack of cost
estimate sand rolling production necessary to substantiate Plaintiff's claims.

i. On May 13, 2025, while actively enrolled as a Ph.D. student, Plaintiff submitted
a lawful request to access her educational records under the Family Educational
Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g. The request sought
documentation concerning academic and administrative actions taken against her
following protected civil rights disclosures. Rather than processing the request in
accordance with FERPA's statutory mandates, the University Registrar's Office
improperly declined to proceed and redirected Plaintiff to file under the Virginia
Freedom of Information Act (FOIA)—despite her active student status and the clear
applicability of FERPA. (Exhibit 44, May 13, 2025, *Registrar's Email to Plaintiff*)

(i.a) This denial violated Plaintiff's federally guaranteed right to access her
own educational records and materially obstructed her ability to obtain time-
sensitive documentation relevant to her pending civil rights complaint. The
refusal occurred shortly after Plaintiff's disability-related civil rights reports,
reinforcing the pattern of institutional reprisal. The University's redirection away
from FERPA, a student-centered federal privacy statute, toward a more
burdensome FOIA process aligned with a broader pattern of restricting access to
internal records following protected activity.

(i.b) Contemporaneous email correspondence and screenshots confirm Plaintiff's good-faith efforts to obtain these records, as well as the University's noncompliant response. This action constitutes both a substantive FERPA violation and further evidence of systemic obstruction in response to Plaintiff's protected civil rights activity. These twin denials—of federal educational access and state transparency—functioned as a coordinated obstruction effort across institutional lines, materially impeding Plaintiff's ability to gather evidence relevant to her civil rights complaint.

(i.c) These cumulative actions by SFS and the FOIA office contributed to an environment of institutional retaliation, administrative opacity, and continued harm to Plaintiff's academic standing, financial status, and ability to access relevant records for defense of her civil rights.

(i.d) Simultaneously, Plaintiff submitted multiple FOIA requests related to the BARI project, NSDPI appointment records, and her academic file. The University's FOIA Office failed to meet its statutory obligations under Va. Code § 2.2-3704(F), including by failing to provide cost estimates and rolling production. These delays materially impeded Plaintiff's ability to gather evidence relevant to her civil rights complaint. The procedural failures described above—in both the FERPA and FOIA contexts—further illustrate how institutional retaliation extended into administrative offices, including the Registrar, FOIA Office, and Student Financial Services. (Exhibit 45: May 19- June 30, 2025, *Plaintiff's FOIA Request V004606-051925, V004607-051925, V004610-051925, V004612-052025, V004641-060225, V004645-060225*)

(i.e) Plaintiff submitted a formal petition under Va. Code § 2.2-3713 in response to UVA's failure to comply with FOIA obligations. (Exhibit 46, June 23,2025, *Virginia FOIA Council email response to request for guidance on UVA's Non-Disclosure)* The University has not offered a lawful justification for the delay or lack of production, further reinforcing the pattern of suppression following Plaintiff's protected activity.

(i.f) In addition to obstructing access to records, Defendant caused significant financial harm through institutional ambiguity, delay, and retaliatory disruption. Following the withdrawal of Plaintiff's advisor — which stemmed from protected civil rights activity — Student Financial Services (SFS) failed to provide timely or transparent communication regarding the tuition and refund implications of Plaintiff's disrupted research enrollment. Despite multiple inquiries, SFS and the Registrar's Office provided no individualized guidance or equitable accommodation reflecting the involuntary nature of the disruption. While the Registrar acknowledged that summer refund procedures differ from fall and spring terms, Plaintiff's status remained in limbo for several weeks, during which her financial risk exposure escalated. (Exhibit 47, May 27-June 13, 2025, *Emails to Student Financial Services*)

(i.g) These actions reflect a coordinated pattern of reputational risk management rather than mere bureaucratic delay.  Plaintiff pursued internal remedies in good faith until those systems proved structurally compromised.

(i.h) These patterns raise serious due process concerns.  UVA used unlicensed personnel to conduct legal and procedural gatekeeping functions.  Under Virginia law, these functions require proper licensure and accountability.

### F. Chronology and Procedural Consequences of Retaliation

58. The chronology of events supports an inference that procedural irregularities and academic retaliation escalated in direct response to Plaintiff's protected disclosures.

(a) Plaintiff's January–April 2025 collaboration with NSDPI, where her work was appropriated without authorship or contract;

(b) April 30, 2025; Plaintiff disclosed academic coercion and retaliation to the Vice Provost;

(c) May 10, 2025: Plaintiff filed a federal civil rights complaint with the U.S. Department of Education's Office for Civil Rights (OCR).

These disclosures were quickly followed by:
- abrupt faculty disengagement;
- refusal to accommodate protected procedural requests;
- mid-semester credit reductions;
- selective enforcement.

This sequence, cross-referenced in ¶103 supports a strong causal link between Plaintiff's protected activity and adverse academic action.

59. On May 9, 2025, Plaintiff met with EOCR's Demetrice Baskerville, who refused to process her complaint without a specific webpage form or specific email address submission and suggested a mental health explanation.  On May 10, she filed a formal OCR complaint citing Title IX and Section 504 violations.

60. The procedural denials listed in ¶ 57(a)–(g), as well as HR's inaction, followed her OCR filings and reinforces the causal timeline.

61. Plaintiff's protected activity was met with:

(a)    EOCR's refusal to allow written-only participation or oversight by a Virginia-licensed neutral;

(b)    Characterization of her legal objections as care-related, including mental health framing and care concern outreach from the Dean of Student Care immediately after Plaintiff raised DMARC/DKIM vulnerabilities that allowed a forged academic advisory email to be sent in her advisor's name;

(c)    HR's decontextualized review of past communications, omitting context of retaliatory pattern.

62. Upon information and belief:

o    Ms. Emily Auld Springston, licensed in Indiana, exercised discretionary legal authority under Title VI, IX, and Section 504;

o    Ms. Victoria Lee Hinton, licensed in Mississippi, participated in procedural determinations without Virginia licensure;

o    Ms. Nicole Thompson, who does not appear to be the same Nicole Thompson listed in Virginia State Bar directory, who is listed as working in Northern Virginia, made decisions affecting Plaintiff's rights. (Exhibit 50, June 27, 2025, *VSB Search Results*)

63. These roles were not ministerial. The absence of licensed legal oversight reflects systemic failures in UVA's civil rights infrastructure.

64. According to publicly available information, Mr. Barry T. Meek, a graduate of the University of Richmond School of Law, has served for over two decades in UVA's Office of General Counsel (OGC). His responsibilities include legal support for EOCR, which routinely conducts compliance functions under Title VI, IX, Section 504, and the ADA. (Exhibit 49, June 27, 2025, *Mr. Meek's Linkedin Profile*)

65. Plaintiff submitted good-faith concerns of unauthorized practice of law (UPL) to the Virginia State Bar (VSB), including bar records, emails, and citations to Va. Code § 54.1-3904 and Rules 5.5(a) and 8.4(c).

66. After the Virginia State Bar declined to investigate her original complaint, Plaintiff submitted a professional misconduct complaint naming Intake Official James Bodell for conflict of interest, as he had previously dismissed the underlying matter without initiating any formal review. (Exhibit 50, June 20, 2025, VSB email to Plaintiff); (Exhibit 51, June 17, 2025, *Plaintiff's email titled "Formal Complaint Against Intake Counsel James Corbin Bodie")* Despite being the subject of the follow-up complaint, Mr. Bodell again responded directly on June 20, 2025, without recusal, referral to an independent reviewer, or acknowledgment of conflict. (*Exhibit 52, June 20, 2025, VSB's email to Plaintiff* titled *"Complaints about Emily Springston, Jessica Vormwald, Alison Landry, and Nerissa Rouzer")* He stated, "The VSB is not the appropriate forum to determine whether certain lawyers had a duty to intervene," thereby sidestepping the underlying question of unauthorized legal practice and reinforcing the perception of internal deference to institutional actors.

67. Subsequently, on June 27, 2025, Plaintiff received additional correspondence from Deputy Intake Counsel Jane A. Fletcher, reiterating the bar's refusal to take further action. The letter acknowledged that Plaintiff's concerns stemmed from ongoing federal civil rights complaints and concluded that "the Virginia State Bar does not review ongoing legal matters to ensure that an individual's civil rights and other legal protections are intact." This response—despite Plaintiff's citation to applicable bar rules and supporting documentation—highlights a structural limitation in the availability of state-level remedies when procedural misconduct intersects with ongoing civil rights investigations. The VSB's decision not to initiate independent review or conflict screening, while within its discretion, reinforces Plaintiff's position that judicial intervention remains the only viable forum for neutral and comprehensive redress. (Exhibit 53, June 27, 2025, *VSB's Email to Plaintiff titled "Complaint about multiple attorneys affiliated with the University of Virginia"*)

68. This regulatory breakdown exacerbated Plaintiff's procedural disadvantages and rendered institutional remedies unavailable. Judicial review is now the only viable forum to ensure lawful redress.

## H. Final Exhaustion of Internal Remedies (June 23-30, 2025)

69. On June 24, 2025, Plaintiff submitted a fiduciary titled, "*Formal Civil Rights Retaliation Notice—Request for Intervention Before Fiscal Year Close*" to Visitors member Leonard W. Wood, a fellow University of Pennsylvanian alumnus. The letter summarized her active OCR complaint (filed May 10, 2025) and detailed escalating retaliation, including postdated EOCR complaints, mid-semester credit reduction despite full self-funding, advisor withdrawal, FOIA noncompliance, and program removal threats absent new academic supervision. It cited 28 contemporaneous exhibits evidencing protected activity followed by

adverse action and raised concerns about unauthorized legal practice, supervisory failures

within UVA's legal office, and potential Rule 8.4 violations (Exhibit 54, June 19, 2025,

*Plaintiff's email to UVA Board of Visitors titled, "FW: Formal Civil Rights Retaliation Notice*

*– Request for Intervention Before Fiscal Year Close"*).

    70. Plaintiff requested: (1) a legal briefing by University Counsel or independent counsel,

(2) record preservation under litigation hold; and (3) formal Board review prior to the end of

FY2024–2025. The letter was submitted in good faith to promote proactive governance and

prevent reputational and legal harm during an active civil rights investigation.  This was

Plaintiff's penultimate internal escalation, followed day later by a final written notice to

Graduate Registrar Jayne Weber.

    71. On June 23, Plaintiff notified Weber—copied to the U.S. Department of Education

and Department of Justice—of the procedural and financial consequences of her advisor's

withdrawal, clarifying that the disruption stemmed from retaliation, not academic

performance. She requested: (a) appointment of an interim advisor, (b) allowance of

continued participation of Dr. Chung as a nominally "UVA faculty" for the purposes of her

qualification paper and dissertation defense, and (c) evaluation of tuition reimbursement for

involuntary disruption. Weber replied on June 24 with a generic referral back to the

department, offering no meaningful response, proposed safeguards, or acknowledgement of

retaliation.  As of this filing, UVA has issued no corrective action. (Exhibit 55, June 23-25,

2025, *email exchange with Jayne Weber requesting interim academic protections and tuition*

*adjustment following advisor withdrawal*)

    72. On Thursday June 26, 2025, the same day Plaintiff filed her original complaint in this

action, Dr. Matthew Bolton, who had previously withdrawn as Plaintiff's faculty advisor, sent

an invitation to Plaintiff for a one-on-one meeting scheduled for 1:00 PM for Friday June 27, 2025. (Exhibit 56, June 26, 2025, *Dr. Bolton's invitation for zoom meeting*)

73. On June 27, 2025—the same day Plaintiff filed her original federal civil rights complaint—University of Virginia President James E. Ryan announced his resignation, stating: "To make a long story short, I am inclined to fight for what I believe in… But I cannot make a unilateral decision to fight the federal government in order to save my own job." His statement, which was shared in a university-wide message and reported publicly, cited an unwillingness to enter a protracted conflict with federal authorities. (Exhibit 57, June 27, 2025, *Email from President Ryan to Plaintiff*); (Exhibit 58, UVA Magazine, *"UVA President Jim Ryan Resigns,"* June 27, 2025)

74. According to reporting by the Chronicle of Higher Education, Ryan's resignation followed mounting pressure from the U.S. Department of Education, and UVA's public messaging appeared calibrated to minimize reputational damage and deflect attention from ongoing federal scrutiny. (Exhibit 59, Chronicle of Higher Education, "University of Virginia President Reportedly Resigns Under Pressure from Trump Administration," June 27, 2025)

75. On June 27, 2025, in response to President Ryan's resignation, Professor Matthew Bolton circulated a New York Times article regarding the resignation and its relation to U.S. Department of Justice involvement. In his communication to UVA graduate students, Professor Bolton described the DOJ's role as "interference" and shared protest information. (Exhibit 60, June 27, 2025, *Dr. Bolton's email titled, "Fw: Protest in Response to DOJ's Interference with UVA"*)

76. On the same day, Plaintiff also submitted an ethics-based inquiry titled "Ethical Inquiry Regarding Graduate Program Director's Role in Protest Activity and Disability Bias," which raised concerns about academic leadership conduct and potential retaliation. The timing of this inquiry, alongside Plaintiff's formal OCR filing and President Ryan's resignation, further underscores the heightened institutional sensitivity to reputational and civil rights risks during that period. (Exhibit 61, June 27, 2025, Plaintiff's Ethics Email Submission)

77. On July 1, 2025, Plaintiff submitted a formal request to UVA's Office of General Counsel and Student Financial Services seeking a full refund of her $2,005 summer tuition, following the withdrawal of her faculty advisor and the University's failure to provide academic credit. She requested that the remaining balance be returned by July 5, 2025 and reserved the right to pursue legal remedies if unresolved. Despite having paid tuition in good faith and remaining committed to program completion, Plaintiff received only a partial refund of $802, with no explanation or itemized breakdown. (Exhibit 62, July 2, 2025, Student Financial Services' email to Plaintiff; Exhibit 63, May 14, 2025, UVA Pay transaction receipt) This refund was neither timely nor complete, and as of July 7, 2025, the remaining balance has not been returned or formally denied. The absence of proactive accommodation, due process, or financial clarity reflects a broader pattern of institutional retaliation and opacity following Plaintiff's protected civil rights activity.

78. On July 3, 2025, the University of Virginia issued a formal statement confirming that President James E. Ryan would step down from his role effective July 11, 2025. The statement also noted that President Ryan would remain at the university as a full professor

with joint appointments in the School of Law and the School of Education and Human Development. This transition was publicly confirmed by UVA leadership in a message from the Board of Visitors. (Exhibit 64, *"Community Message From UVA's Board of Visitors on Leadership,"* University of Virginia, July 3, 2025)

79. Plaintiff proactively contacted Dr. Sara Riggs and Dr. Roman Krzysztofowicz to request PhD supervision on July 6-7, 2025. In both inquiries, Plaintiff emphasized that she would not require financial support. She outlined her research focus on symbolic systems, adversarial language modeling, and the development of integrity filters for large language models. Dr. Riggs declined due to limited advising capacity; Dr. Krzysztofowicz did not respond.

80. In parallel with this federal action, Plaintiff is filing a petition for writ of mandamus in Virginia state court on July 9, 2025, seeking enforcement of multiple unresolved FOIA requests previously submitted to the University of Virginia. (Exhibit 63, *Petition for Mandamus- FOIA*) These records relate to the Plaintiff's protected civil rights activity and the university's internal handling of faculty oversight and administrative response. The FOIA delays form part of the broader institutional pattern of obstruction and non-disclosure documented in this complaint.

## VII. Application of the Winter Preliminary Injunction Standard

81. Before seeking judicial intervention, Plaintiff exhausted all internal graduate-student-accessible remedies that did not require waiver of federally protected rights or submission to procedurally imbalanced forums—specifically those lacking transparency, adversarial safeguards, or the availability of Virginia-licensed mediator oversight. Her sustained, good-faith efforts included formal disclosures, outreach to multiple faculty members, and

constructive requests for reassignment or academic restoration. These efforts were repeatedly met with procedural redirection, conditional remedies, or non-responsiveness. Only after Plaintiff initiated federal filings and increased public scrutiny did the University begin taking internal corrective steps—none of which restored Plaintiff's academic standing, research continuity, or civil rights protections. Judicial intervention remains the only forum capable of safeguarding her federal rights and ensuring full accountability.

82. The relief sought does not ask this Court to override academic judgment, but rather to ensure that federally protected rights are not undermined through procedural misconduct, retaliatory acts, or noncompliance with civil rights obligations—particularly within a university already subject to documented federal enforcement actions. Plaintiff seeks only the protection and restoration of rights secured under law, not the substitution of judicial discretion for legitimate academic standards.

83. Under Federal Rule of Civil Procedure 65 and the Supreme Court's decision in Winter v. Natural Resources Defense Council, 555 U.S. 7 (2008), a preliminary injunction is warranted when the movant shows: (a) likely success on the merits; (b) a likelihood of irreparable harm without relief; (c) that the balance of equities favors the movant; and (d) that an injunction is in the public interest.

## A. LIKELIHOOD OF SUCCESS ON THE MERITS

84. **Title IX Retaliation Claim:** Plaintiff filed a protected OCR complaint on May 10, 2025, and experienced a series of adverse academic actions within days—including advisor withdrawal, credit loss, removal deadlines, and refusal to reinstate standing. These adverse actions occurred in close temporal proximity to the protected activity and followed Plaintiff's documented civil rights disclosures. Moreover, Plaintiff's repeated good-faith outreach to

faculty for reassignment was ignored or declined, confirming institutional awareness of her protected status.

UVA has a documented history of federal civil rights violations, further strengthening Plaintiff's prima facie claim. Relevant OCR findings include:

(a) 2015 (OCR Review No. 11-11-6001): Title IX violations for failure to address sexual harassment complaints;

(b) 2017 (OCR Complaint No. 11-17-2144): Unlawful disability-related housing charges;

(c) 2021 (OCR Complaint No. 11-20-2345): Sex-based exclusion from a leadership program.

This established pattern of noncompliance—combined with the specific retaliatory actions taken against Plaintiff—supports a clear likelihood of success on the merits.

85. Section 504 and ADA Retaliation: Plaintiff's federal complaint alleged disability-based and caregiver-based retaliation under Section 504 and the ADA. She was targeted shortly after disclosing her role as primary caregiver to two disabled children. These adverse actions constitute retaliation.

86. As detailed in ¶¶39–40, on May 30, 2025, Plaintiff informed Graduate Director Dr. Bolton that she had invited Dr. Rupa Valdez, a national expert in disability systems, to join her dissertation committee. Dr. Bolton responded by questioning whether Dr. Valdez's disability-oriented work "counted" as engineering and disparaged research that did not involve technical system-building. His comments, followed by his withdrawal of support and

failure to assist in reassignment, suggest bias against disability-centered research and reinforce the inference of retaliation based on Plaintiff's protected disclosures.

87. Plaintiff alleges a violation of her procedural due process rights under the Fourteenth Amendment, enforceable through 42 U.S.C. § 1983. The University deprived her of protected academic and property interests—including continued enrollment, credit-bearing research standing, and committee representation—without adequate notice, opportunity to respond, or impartial adjudication. Critical procedural decisions were made by unlicensed individuals acting in legal-adjacent capacities, without appropriate oversight or qualifications under Virginia law. Additionally, arbitrary deadlines and conditions were imposed with no formal hearing or pathway for redress. The Virginia State Bar's refusal to independently investigate these concerns—despite facial violations of licensing and due process norms—further underscores a systemic breakdown in lawful procedural safeguards.

## B. IRREPARABLE HARM

88. Plaintiff faces imminent, irreparable harm in the form of constructive expulsion by July 30, 2025. This exclusion would permanently damage her career trajectory and cannot be adequately remedied by monetary relief.

89. Under Goss v. Lopez, 419 U.S. 565, 576 (1975), the loss of educational opportunity for a doctoral student nearing completion constitutes irreparable harm.

90. As a fully self-funded student, Plaintiff has made substantial financial and time investments that would be irreversibly lost upon dismissal.

91. Plaintiff made extensive, good-faith efforts to preserve professional relationships and protect reputations of University personnel, choosing internal resolution over external

exposure.  However, as retaliation escalated and protective measures failed to materialize, Plaintiff was compelled to seek federal and ethical oversight to prevent further harm.

92. Only after the unexplained departure of her sole remaining supportive faculty member and UVA's failure to act that Plaintiff notified external research sponsors.  This step was protective—not retaliatory—and underscores the absence of meaningful internal remedy.

## C. BALANCE OF EQUITIES

93. The equities weigh in Plaintiff's favor. She seeks only to preserve her academic standing during ongoing federal review.  Defendant faces minimal burden by maintaining the status quo.

## D. PUBLIC INTEREST

94. The public interest supports protecting civil rights complainants from retaliation, particular in institutions with repeat federal violations.  UVA has a documented pattern of noncompliance under Title IX and Section 504, necessitating judicial oversight.

95. The institutional use of unlicensed legal actors and VSB's refusal to investigate amplify the systemic risks to public accountability, especially when the complainant is a member of multiple protected classes.

96. Plaintiff's case affects not just her, but all underrepresented students—particularly disabled students and caregivers to disabled family members —who often face discrimination in academia.

97. This intersectional nature of her experience —gender, disability, and caregiver status—creates compounded disadvantages, not merely additive harm.  These factors require a more nuanced legal remedy.

98. Institutional failure to support individuals with intersecting marginalized identities reinforces exclusionary norms and suppresses diversity in academic and leadership pipelines.

99. In defense and engineering fields, which are historically male-dominated, such exclusion further limits innovation and equity in sectors of national importance.

100. Remedying intersectional discrimination is essential to creating inclusive academic spaces that uphold legal rights and contribution of all community members.

## X. CLAIMS FOR RELIEF:

### COUNT I: Title IX Retaliation
### 20 U.S.C. § 1681

101. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

102. Title IX prohibits retaliation against individuals who file complaints of sex discrimination or participate in civil rights proceedings. 20 U.S.C. § 1681(a).

103. Plaintiff filed a Title IX and Section 504 complaint with the U.S. Department of Education's OCR on May 10, 2025.

104. Defendant, with knowledge of the filing, subjected Plaintiff to the following adverse actions:

(a). Advisor withdrawal and termination of academic supervision;

(b). Mid-semester credit reductions despite full tuition payment;

(c). Imposition of a July 30, 2025, removal deadline absent new advisement;

(d). Selective enforcement of policies that disproportionately impacted Plaintiff as a self-funded student with an active federal civil rights complaint without evidence of

consistent application across similarly situated students or contextual consideration of Plaintiff's financial and academic position.

105. The temporal proximity to Plaintiff's protected OCR filing supports a prima facie case of retaliation.

106. Defendant's conduct violated Title IX and denied Plaintiff's equal access to education free from sex-based discrimination.

## COUNT II: Section 504 Retaliation and Discrimination
## 29 U.S.C. § 794

107. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

108. Section 504 prohibits retaliation and discrimination against qualified individuals and their associates.

109. Plaintiff has a documented disability (ADHD) and is the caregiver to two permanently disabled children.

110. Defendant receives federal funding and is subject to Section 504's requirements.

111. Plaintiff's OCR complaint included protected activity based on disability-related and caregiver bias claims.

112. Defendant retaliated with adverse actions described in Count I.

113. These acts denied Plaintiff equal educational access in violation of Section 504.

## COUNT III: Americans with Disabilities Act Discrimination
## 42 U.S.C. § 12132

114. Plaintiff re-alleges and incorporates all preceding paragraphs.

115. Title II of the ADA prohibits public entities from discriminating against qualified individuals with disabilities.

116. Defendant is a public entity subject to Title II requirements.

117. Plaintiff meets the eligibility criteria for UVA's Ph.D. program and is protected under the ADA both individually and as a caregiver.

118. Plaintiff's Spring 2024 research involved federally protected disability-centered UX/UI design for AI systems. Dr. Bolton pressured her to remove this focus, undermining both her research and disability scholarship.

119. Defendant's subsequent adverse actions constitutes unlawful discrimination under Title II.

120. These actions intensified after Plaintiff sought to include national disability scholar on her committee. Dr. Bolton dismissed the legitimacy of this work, undermining Plaintiff's research and protections under the ADA. He withdrew his support after Plaintiff engaged in good-faith protected activities intended to stop the escalating harm.

## COUNT IV: Deprivation of Due Process
### 42 U.S.C. § 1983

121. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

122. Plaintiff has a constitutionally protected property interest Ph.D. progress.

123. Defendant deprived her of this intent without adequate process by:

(a). Retroactive and selectively enforcing policy after allowing 12-credit registration;

(b). Mandating a credit reduction despite full payment and good-faith registration;

(c). Imposing arbitrary deadlines post-OCR filing;

(d). Delegating compliance determinations to non-Virginia-licensed personnel.

124. Specific actors— Ms. Springston, Ms. Hinton, and Ms. Thompson—exercised legal discretion affecting Plaintiff's rights without Virginia licensure.

125. In a June 12, 2025 email, Ms. Thompson confirmed that EOCR staff operated without licensed oversight while making quasi-adjudicative determinations. (Exhibit 37, June 12, 2025, email titled *"UVA EOCR: Response to Request for Mediated and Ethically Structured Interview"* ).

126. UVA's General Counsel failed to intervene despite notice of unlawful conduct.

127. This non-intervention constituted deliberate indifference under color of law.

128. The cumulative conduct violated Plaintiff's procedural due process rights.

129. These due process violations are actionable under 42 U.S.C. § 1983.

### COUNT V: Equal Protection Violation
### 42 U.S.C. § 1983

130. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

131. The Equal Protection Clause prohibits differential treatment by state actors without rational basis.

132. Defendant treated Plaintiff differently from similarly situated students based on her protected status and civil rights engagement.

133. These acts are actionable under 42 U.S.C. § 1983.

**COUNT VI: Declaratory Relief**
**28 U.S.C. §§ 2201-2202**

134. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

135. An actual controversy exists as to Defendant's violations of Title IX, Section 504, the ADA, and the Fourteenth Amendment.

136. Declaratory relief is warranted to prevent further harm and clarify the legal obligations owed to Plaintiff.

## XI. PRAYER FOR RELIEF

WHEREFORE, this Court having jurisdiction over these matters, Plaintiff MOON YOUNG KIM, requests that this Court issue declaratory and injunctive relief sufficient to restore her academic status, protect her civil rights during the pendency of federal investigation, and ensure institutional compliance with applicable law. Preserving Plaintiff's academic status through temporary injunctive relief would also promote judicial economy by minimizing downstream disputes over transcript corrections, re-admission, or monetary damages, and by allowing for orderly resolution of the federal civil rights claims now under review.

Plaintiff respectfully submits this motion under exigent conditions to prevent imminent irreparable harm, including constructive removal from her doctoral program as of July 30, 2025. Given the time-sensitive nature of the relief sought and the volume of evidentiary material involved, Plaintiff respectfully reserves the right to submit a supplemental memorandum and supporting exhibits upon the Court's request or in response to Defendant's filing.

## A. IMMEDIATE INJUNCTIVE RELIEF

1. Schedule an expedited hearing on this motion prior to July 30, 2025;

2. Issue a preliminary injunction enjoining Defendants and their agents from:

3. Removing Plaintiff from her Ph.D. program, either directly or constructively, during the pendency of this litigation and ongoing federal civil rights proceedings;

4. Taking any retaliatory action against Plaintiff based on her protected civil rights activities;

5. Implementing selective or discriminatory administrative measures that would impede Plaintiff's reasonable academic progress;

## B. ACADEMIC SUPPORT AND CONTINUITY

6. Order preservation of the status quo by:

(a). Maintaining Plaintiff's enrollment status and academic standing as they existed prior to the alleged retaliatory conduct;

(b). Tolling all academic deadlines, milestones, and time-to-degree requirements affected by Defendants' conduct until resolution of this matter;

(c). Preventing implementation of any policy changes that would materially affect Plaintiff's academic status during litigation;

(d). Direct Defendants to provide Plaintiff with qualified academic support by:

i. Appointing an interim faculty advisor who is not involved in the alleged discriminatory conduct;

ii. Ensuring Plaintiff has access to a complete and functional dissertation committee;

iii. Authorize Dr. Seokhyun Chung—Plaintiff's sole supportive committee member during a period of escalating faculty withdrawals—to continue serving on her dissertation and qualification paper committees in full capacity, notwithstanding his anticipated departure. Dr. Chung's role provided essential academic continuity during Plaintiff's protected civil rights activity, and his sudden departure, occurring in that same timeframe, raises concern that institutional conditions may have contributed to his exit. Plaintiff requests that the Court preserve Dr. Chung's continued role to protect procedural fairness and prevent further disruption.

## C. PROCEDURAL PROTECTIONS

7. Require Defendants to provide:

(a). Written notice at least sixty (60) days prior to any proposed changes to Plaintiff's academic status, funding, or committee composition;

(b). Written documentation of all material communications regarding Plaintiff's academic standing;

8. Order Defendants to:

(a). Reimburse remaining tuition paid for Summer 2025 coursework rendered inaccessible due to faculty withdrawal during the federal investigation;

(b). Take judicial notice of Plaintiff's May 10, 2025 OCR complaint as federally protected civil rights activity;

## D. GENERAL RELIEF

9.  Award Plaintiff her costs and reasonable expenses incurred in bringing this action;

10. Grant such other relief, both legal and equitable, as this Court deems just, proper, and necessary to remedy the violations alleged herein and prevent their recurrence.

Date: *July 9, 2025*

Respectfully submitted,

MOON YOUNG KIM
Plaintiff, Pro Se
530 Lincoln St, NW
(240) 364-4435
moonjun1@gmail.com