CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
July 31, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| Moon Young Kim, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 3:25-cv-00054 |
| The Rector and Visitors of the | ) | |
| University of Virginia, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Moon Young Kim filed an emergency motion seeking to enjoin Defendant The Rector and Visitors of the University of Virginia ("UVA" or "the University") from removing her from its doctoral program or altering her academic status during the resolution of her complaint. (Dkt. 20.) For the following reasons, the court will deny this motion.

### I.      Background

#### A. Factual History[1]

Kim is a self-funded doctoral candidate in the Systems & Engineering Department of the University of Virginia's School of Engineering and Applied Sciences. (Second Am. Compl. ¶ 14 (Dkt. 18).) She completed her bachelor's degree at the University of Pennsylvania and

---

[1] This section contains the findings of fact and conclusions of law the court relied on to resolve Kim's motion for a preliminary injunction. Fed. R. Civ. P. 52(a); *see Rullan v. Goden*, 782 F. App'x 285, 286 (4th Cir. 2019). The findings of fact are derived from Kim's second amended complaint, the exhibits Kim attached to her second amended complaint, and her motion for emergency relief. *See Whole Women's Health All. v. FDA*, No. 3:23-cv-00019, 2023 WL 5401885, at *1 n.2 (W.D. Va. Aug. 21, 2023).

obtained master's degrees from Harvard University and the University of Virginia.  (*Id.*)  Kim has ADHD and is the primary caregiver for two permanently disabled children.  (*Id.* ¶ 20.)

The events giving rise to Kim's complaint stem from her collaboration with the University's National Security Data and Policy Institute ("NSDPI") in the second semester of her Ph.D. program.  (*See* Dkt. 18-6 at 3.)  In January 2025, Kim first met with Jonathan Hathaway, Director of Research Programs at NSDPI, to discuss collaboration.  (Second Am. Compl. ¶ 21.)  During this meeting, Kim disclosed that she was a caregiver.  (*Id.*)  Kim claims that Hathaway dismissed her UVA master's degree as a "weekend education program" during the same meeting.  (*Id.*)

Nevertheless, on March 13, 2025, Hathaway emailed Kim asking for assistance in identifying South Korean research partners for a proposal for the Bilateral Academic Research Initiative ("BARI") Program, a federal program jointly sponsored by the U.S. Department of Defense, Office of the Secretary of Defense, and the Ministry of Trade, Industry and Energy of the Republic of Korea.  (Dkt. 18-9 at 2.)  During a call one week later, Hathaway indicated that NSDPI might hire Kim for the full duration of the BARI project.  (Second Am. Compl. ¶ 24.)  When Kim indicated that she had limited availability due to her caregiver responsibilities, Hathaway suggested that she could revise her dissertation to align with the BARI project.  (*Id.*)  On March 25, 2025, Kim reached out on behalf of NSDPI to Pohang University of Science and Technology's ("POSTECH") Artificial Intelligence of Things Laboratory, which expressed interest in the partnership.  (*See* Dkt. 18-12 at 6–7; Dkt. 18-18 at 12–13.)

Although she had not yet signed a contract or agreed to compensation for her work, Kim continued to collaborate with NSDPI on the BARI proposal. Kim provided original research relating to the project during a faculty meeting on April 23, 2025, where the faculty jointly decided on the proposal's three focal points. (Second Am. Compl. ¶¶ 28–29.) Following this meeting, Kim developed a preliminary working paper addressing these focal points, (*id.* ¶ 30), and Dr. Philip Potter, Executive Director of NSDPI, described Kim as "the glue holding the project together," (*id.* ¶ 31).

But Kim had grown concerned about the communications between NSDPI and POSTECH. On the afternoon of April 25, 2025, Kim met with Hathaway and raised concerns that NSDPI was "fail[ing] to engage substantively with POSTECH, despite her efforts in securing the partnership." (*Id.* ¶ 32.) Shortly after this meeting, Hathaway let Kim know that she would be receiving a short-term contract for her work. (*Id.*) Kim also claims that he informed her that she would need to change her dissertation topic to match the BARI project deliverables and that he justified that request "on the basis of her caregiver status." (*Id.*) Hathaway had emailed Kim approximately a week and a half earlier stating that it "would be great if [the project] could align with your PhD work and you could support the project through its duration." (*Id.* ¶ 27.)

Shortly after meeting with Hathaway on April 25, 2025, Kim also emailed her advisor, Dr. Matthew Bolton, asking whether he would be open to her changing her dissertation topic to "align with [his] contribution to the BARI project," acknowledging that doing so might "require [her] to significantly revise or redo [her] current proposal." (Dkt. 18-11 at 1–2.) Kim added that she was "happy to continue working diligently on both tracks until [she and Bolton]

receive[d] an official decision." (*Id.* at 2.) An hour and a half later, Bolton replied that Kim could "definitely align [her] project with BARI if that is what [she] want[ed] to do." (*Id.* at 1.)

But four days later, Kim changed her mind. On the morning of April 29, 2025, Kim emailed Hathaway informing him that she had completed a research outline for the BARI proposal and that she would send it to him once they finalized her contract. (Dkt. 18-12 at 2.) She also requested that the pair "prioritize this relationship more deliberately moving forward" and informed him that, "while [they] previously discussed a temporary six-month contract," her anticipated Spring 2026 graduation date and self-funding meant that "changing [her] dissertation at this stage would require better contractual terms." (*Id.*) Eleven minutes later, Kim responded to Bolton's email confirming that she could change her dissertation topic, noting that she would "only consider changing [her] dissertation topic if [NSDPI] were willing to fund the remainder of [her] education"; a "part-time, temporary six-month contract" was not, Kim emphasized, "sufficient to justify that kind of pivot." (Dkt. 18-11 at 1.)

Hathaway responded the next day. (Dkt. 18-12 at 1.) After praising Kim's contributions to NSDPI, he noted that he had offered her a role as an independent contractor because the organization "realize[d] [her] time is a finite resource." (*Id.*) He also emphasized that "[b]y no means do we want you to alter your dissertation topic, in fact quite the opposite." (*Id.*) He explained that the contract term was limited to six months because NSDPI would compensate Kim at a higher hourly rate than normal, but could only do so prior to her transition to the PhD Plus program in the spring semester of 2026. (*Id.*) He attached a rough draft of the proposed contract to his email and invited Kim to provide comments as desired. (*See id.* at 8–12.) Kim maintains that this email "failed to address the core issue[] that Mr.

- 4 -

Hathaway had relied on [Kim's] labor without formal acknowledgement, contract, or attribution." (Second Am. Compl. ¶ 35.)

Meanwhile, on April 28, 2025, Dr. Eniola Afolayan, the Program Coordinator for the PhD Plus program at UVA, reached out to Kim noting that she had not yet signed her award letter for the PhD Plus internship program with NSDPI. (Dkt. 18-13 at 4–5.) Kim responded the same day noting that she and NSDPI were "currently in discussions about a different contract." (*Id.* at 4.) The next day, Kim informed Afolayan that, as part of NSDPI's offer, she had been asked to change her dissertation topic and asked whether it was "common for UVA offices to require PhD students to completely change their research direction for a temporary, part-time internship." (*Id.* at 3–4.)

On April 30, the Director of Career and Professional Development in the Office of Graduate and Postdoctoral Affairs wrote Kim to assure her that there was no need to change her dissertation topic, and that there might have been "some miscommunication regarding the potential project(s) [she] could contribute to next spring." (*Id.* at 1–2.) That afternoon—and a mere eight hours after Hathaway had responded to her email with the draft contract—Kim emailed Dr. Philip Trella, Associate Vice Provost, a "confidential incident summary," which "outline[d] a series of academic and professional concerns related to [Kim's] recent involvement with" Hathaway. (*Id.* at 1.) The same day, Kim recorded a phone call with Bolton wherein she expressed her concerns. (*See* Dkt. 18-14.)

Two days later, on May 2, 2025, Kim emailed Hathaway, Potter, and her POSTECH contacts formally withdrawing from the BARI project. (Dkt. 18-15 at 3–4.) In her email, she noted that differences in culture and work expectations had proven greater than initially

anticipated and that she had determined stepping away from the project was the best course of action at that time. (*Id.* at 8.) She also apologized for referring to Hathaway as "Dr.," as she had recently discovered that he had not yet completed his doctoral degree. (*Id.* at 4.) Kim forwarded this email to Trella and asked if his office could "refer the matter to the appropriate leadership within the Provost's Office responsible for oversight of NSDPI." (Dkt. 18-16.)

Potter replied to Kim's withdrawal email noting that it had become clear that "significant issues have made this project untenable" and that he was shutting down the BARI project. (Dkt. 18-15 at 5.) He also informed Kim that NSDPI would not be using her work for other projects and asked for a phone call to debrief the situation. (*Id.*) Kim responded that she would prefer to maintain only written communication. (Dkt. 18-17 at 5.) Potter responded to Kim's email noting that "there appears to be tension around [Hathaway's] role, the relationship between this project and [Kim's] dissertation, intellectual property, and perhaps other areas." (*Id.*) Potter asked Kim to clarify those and other concerns and reiterated his appreciation for Kim's role in the early stages of the project. Kim responded clarifying that her decision to withdraw "was not driven by interpersonal conflict, but by a clear and early recognition that the working approach and assumptions guiding the proposal differed significantly from the academic and professional standards [she] ha[d] been trained to uphold." (*Id.* at 4.) She also noted that she had "encountered communication patterns and managerial behaviors that, while perhaps appropriate in certain operational environments, were deeply misaligned with the academic ethos of transparency, authorship integrity, and mutual respect [she] ha[d] come to expect from faculty, staff, and students at UVA." (*Id.*)

That afternoon, Potter responded to Kim's email and let her know that her response didn't "give [him] enough clarity to institute appropriate changes," although he acknowledged that she had said what she felt she could say. (*Id.*) Potter concluded: "I wish you luck in your future endeavors and imagine that we will cross paths again soon." (*Id.*) Two hours later, Kim forwarded this email to Trella, which she represented as Potter "appear[ing] to claim plausible deniability." (*Id.* at 3.) She also forwarded the email to Bolton, describing it as "plausible deniable [sic] and a veiled threat," where "[t]he crossing path is intel code that implies he still believes he will hold some influence over my future." (Dkt. 18-18 at 3.)

On May 5, 2025, Kim informed Bolton that she had submitted a report to the Respect Office at UVA and was escalating her complaint to the University's Office for Equal Opportunity and Civil Rights ("EOCR"), claiming that Potter's email "suggesting veiled coercion and possible future retaliation" left her "no choice but to go the formal route." (*Id.* at 2–3.) Bolton responded the next day suggesting that Kim could reach out to the University Ombuds or UVA's compliance office. (*Id.* at 2.)

Trella emailed Kim on May 8, 2025, in response to her emails regarding her withdrawal from the BARI project and Potter's response. (Dkt. 18-17 at 2–3.) Trella noted that Potter had attempted to address the issue with Kim and that the role of his office was "not investigatory in nature." (*Id.* at 2.) He encouraged Kim to report any activity arising from or relating to harassment or discrimination at UVA's Just Report It website, and to file a report for any disrespectful activity at an internal HR webpage. (*Id.* at 2–3.) He also referred her to the University Ombuds for further resources and support. (*Id.* at 3.)

Kim replied to Trella informing him that she had already chosen to proceed through EOCR. (*Id.* at 2.) She then forwarded Trella's response to Demetrice Baskerville, EOCR Civil Rights Response Coordinator, stating that she believed it "illustrate[d] a clear pattern of institutional deflection" and asking that the correspondence be added to the formal record of her complaint. (*Id.* at 1–2.)

On May 10, 2025, Kim filed a complaint with the U.S. Department of Education's Office for Civil Rights. (*See* Dkt. 18-5.) The complaint reported discrimination by the University and maintained that the "original complaint" had been submitted to Trella on April 30, 2025, but that the University's EOCR office had not opened an investigation because the complaint was not submitted through the EOCR website's intake form. (*Id.* at 2.) When asked on what basis she was discriminated against, Kim listed "disability" and "retaliation because you filed a complaint or asserted your rights." (*Id.*) Kim listed twelve actions which she felt represented discrimination: (1) Hathaway's improper use of the "Dr." title and his "minimiz[ation]" of Kim's master's degree, which Kim claimed reflected "disability-based caregiver bias" under Section 504 and "sex-based assumptions" as pertinent to Title IX; (2) Hathaway's lack of clarity around her work scope and authorship credit and compensation, which Kim claimed was discriminatory "in the context of [her] disability-related caregiving status, recent workforce re-entry, and gender-based marginalization in a male-dominated academic setting"; (3) Hathaway's request that Kim draft a proposal outline, which Kim claimed "[d]emonstrate[d] institutional marginalization" and was retaliatory; (4) Hathaway's imposition of pressure on Kim to change her dissertation topic, which she felt "constitute[d] academic coercion" based on her caregiver status; (5) the loss of her PhD Plus internship,

which she acknowledged she herself declined after submitting her incident summary to Trella, citing "retaliatory pressure and institutional neglect"; (6) Trella's failure to act on her complaint and Potter's "wish you luck" email, which Kim claimed "signaled retaliatory intent" and "an implicit reputational threat"; (7) the loss of the Google Fellowship opportunity, which Kim blamed on her professor's failure to respond to her email in which she said she would be reaching out to him separately to ask for a recommendation; (8) Trella's response to her complaint, which she felt "represent[ed] institutional deflection" and "obstruct[ed] [her] right to a fair review process"; (9) the Systems and Information Engineering Department's email launching a new initiative to highlight students on the department website, the timing of which (just hours after Kim's first complaint to EOCR) she felt "indicate[d] a reputational optics maneuver rather than a substantive initiative"; (10) EOCR's failure to open an investigation until the website intake form was completed and the tone of EOCR's Baskerville when conveying that information, which Kim found dismissive and "a misuse of procedural formality to delay inquiry"; (11) Baskerville's questioning of caregiving constraints and recommendation of mental health resources on the EOCR call, which Kim claimed was part of a "well-documented method of discrediting complaints"; and (12) the disappearance of some sent emails from Kim's UVA email account, including emails related to her complaint, which Kim suggested might be retaliatory action.  (*Id.* at 2–4.)

Kim takes issue with several other events arising around the time of the filing of her civil rights complaint.  First, Kim raises concerns about the University's cap on her credits for summer enrollment.  At some point in the spring, Kim had registered for twelve summer credits, which Bolton had approved.  (*See* Dkt. 18-24 at 5; Dkt. 18-29 at 6–7.)  But throughout

- 9 -

the duration of Kim's enrollment in her Ph.D. program, University policy has been that six credits is the maximum for summer course enrollment. (*See* Dkt. 18-24 at 1, 4.) The Systems & Information Engineering Department emailed all students about summer enrollment requirements on March 17 and May 5, 2025. (*Id.* at 4.) On June 2, 2025, Dr. Matthew Panzer, Associate Dean for Graduate Education and Post-Doctoral Affairs, emailed the department highlighting policy updates for the upcoming school year, including language changed in the "Academic Advising" policy "to clarify that MS and PhD students must secure an advisor to enroll." (Dkt. 18-23 at 1.) Though not highlighted in the email, the academic policies included the summer enrollment cap. On June 5, 2025, Chantel Gross, Student Services Generalist in the Systems & Information Engineering Department, emailed Kim regarding the summer enrollment cap during a start-of-semester check of enrolled students. (*See* Dkt. 18-24 at 5; Dkt. 18-29 at 2.) That email presumably informed Kim that she was overenrolled.

On June 9, 2025, Kim emailed Gross—copying EOCR, Bolton, Panzer, the Virginia State Bar, the Mississippi State Bar, the University's Office of General Counsel, and the U.S. Department of Justice—asking for clarification on the summer enrollment policy. (Dkt. 18-24 at 5.) She claimed that, although she had been permitted to register and pay for more than six credits, the cap was not enforced until the June 2 email, which was "weeks after the Summer 2025 add/drop period had closed" and after she had already registered and paid for the courses. (Dkt. 18-29 at 3–4.) Through a series of emails, Kim accused the Office of General Counsel and EOCR of "exercising the authority of their licensure to support policies—including the newly introduced mid-semester credit-hour limitation—that materially affect students amid an active federal civil rights complaint." (Dkt. 18-24 at 3.) Bolton responded

noting that Kim had no need to take twelve summer credits to graduate by Spring 2026.  (*Id.* at 1.)

Kim next claims that the departure from UVA of Dr. Seokhyun Chung, a member of her dissertation committee, constitutes retaliatory action.  On June 9, 2025, Bolton emailed Kim to let her know that Chung would be leaving at the end of the summer.  (Dkt. 18-25.) Bolton let Kim know that the departure would cause no short-term effects, but that in the long-term, she would need to find another committee member for the proposal and dissertation defense phases of her degree, neither of which would present a "major obstacle" to graduation.  (*Id.*)  Kim requested that Chung be "grandfathered" in but was instructed that she would need department approval to do so.  (*See* Dkt. 18-48.)  It is not clear whether she has sought such approval.

Kim also takes issue with the loss of her advisor, Bolton.  In the midst of emails about her summer credit limit and her civil rights complaints, Kim informed Bolton that she believed that "the overall pattern has contributed to what [she] now experience[d] as a hostile environment" and accused him of "[p]rocedural shifts" which could place her expedited graduation timeline at risk.  (Dkt. 18-22 at 3–4.)  Kim also let Bolton know that she was only comfortable communicating in writing for the remainder of their advisory relationship.  (Dkt. 18-26.)  On June 17, 2025, Bolton withdrew as Kim's advisor, explaining that he "[did] not feel like there [was] a communication channel (meetings or emails) that w[ould] allow [him] to fulfill [his] role as an adviser or address [Kim's] advising concerns and needs," as Kim had refused to address the substance of Bolton's requests for more information to help alleviate her concerns.  (Dkt. 18-28.)  He also noted that he normally met weekly one-on-one with his

advisees, and that Kim's own preferences for biweekly, written communications only made it difficult for him to advise her.  (*Id.*)  Finally, Bolton acknowledged that Kim had sent emails to external funding agencies and professional societies encouraging their review of Bolton's professional ethics, using Bolton's "good faith advising communications" with Kim as part of these reports, and emphasized that he could not continue advising a student "engaging in such behavior."  (*Id.*)  Later that morning, Dr. Gregory Gerling, Professor and Interim Chair of the Systems & Information Engineering Department, emailed Kim to inform her of next steps to secure an advisor.  (Dkt. 18-30.)  Gerling emphasized that "[i]t is school policy that PhD students must have an advisor to enroll" and that Kim would have to secure a new advisor by July 31, 2025, in order to remain in the PhD program after the completion of the summer term.  (*Id.*)  Kim contacted two professors to seek program supervision on July 6 and 7, 2025; one declined due to limited capacity, and the other did not respond.  (Second Am. Compl. ¶ 79.)  To date, Kim has not secured an advisor for her program.

Kim also claims she has been harmed by Bolton's withdrawal in that she was forced to drop her summer research credit, which she was taking under Bolton's advisement.  Follow Bolton's withdrawal as her advisor, Gerling informed Kim on June 17 that she could continue in the class and request that the instructor be changed to her new advisor, once she had secured one.  (Dkt. 18-30.)  Instead, Kim requested that the class be dropped on June 23, 2025, stating that it was "not the result of student inaction" but instead "stem[med] from [her] former advisor's decision to terminate the advising relationship after receiving written notice" of Kim's complaints.  (Dkt. 18-48 at 3–4.)  Kim did not attempt to find another advisor who could supervise her summer research.  Kim has received a partial tuition refund for summer

tuition, although it is unclear what credits she completed and what amount she believes she is owed.  (Dkt. 18-54 at 7.)

Next, Kim claims that she lost a Google-sponsored fellowship after she emailed a professor informing him that she would contact him about obtaining a letter of recommendation and he did not respond before the deadline.  (Second Am. Compl. ¶ 46.) But Kim did not, in fact, reach out to the professor as she indicated she would in that email. (*See id.*; Dkt. 18-20 at 1–5.)

Additionally, Kim claims that several sent emails relating to her civil rights complaints have disappeared from her UVA email.  She attaches numerous Freedom of Information Act requests and communications related to those emails.  (*See, e.g.*, Dkt. 18-36; Dkt. 18-37; Dkt. 18-38.)

Finally, Kim claims that she was deprived of her right to procedural due process when "[c]ritical procedural decisions were made by unlicensed individuals acting in legal-adjacent capacities, without appropriate oversight or qualifications under Virginia law" and "arbitrary deadlines and conditions were imposed with no formal hearing or pathway for redress." (Second Am. Compl. ¶ 87.)  Kim appears to be referring to the progress of her complaint with the University's EOCR with these allegations.  Kim specifically takes issue with EOCR's refusal to allow a mediator to observe interviews with the office; its refusal to respond to Kim exclusively in writing as requested; its rejection of Kim's request to hold the EOCR interview at a "neutral third-party location" and its subsequent insistence on a virtual interview; its forwarding of mental health and other university resources to Kim upon the filing of her complaint; its "[s]elective and decontextualized evaluation" of Kim's prior statements; its

- 13 -

postdating of Kim's civil rights complaints; FOIA non-compliance; and its employment of

officers who were not, to Kim's knowledge, admitted to the Virginia State Bar. (*Id.* ¶ 57.) Kim

also disagrees with the Virginia State Bar's refusal to investigate these concerns. (*Id.* ¶ 87.)

## B. Procedural History

On June 27, 2025, Kim filed a complaint against the University, alleging retaliation

under Title IX and Section 504, discrimination under the ADA and Section 504, Section 1983

claims for equal protection and due process violations, and a claim for declaratory relief. (Dkt.

1 at 36–40.) Less than two weeks later, Kim filed a first amended complaint as of right. (Dkt.

6.) A summons was issued the same day. (Dkt. 9.)

On July 16, 2025, the court issued an oral order informing Kim that her complaint did

not constitute a motion for emergency relief. (Dkt. 10.) To the extent Kim wished to file

such a motion, she was instructed to do so within seven days. (*Id.*) On July 18, 2025, Kim

filed a motion for leave to file a second amended complaint, (Dkt. 12), and a motion for leave

to amend her complaint pursuant to Fed. R. Civ. P. 15(a)(2), (Dkt. 13). The court granted the

former and denied the latter as duplicative. (Dkt. 17.) The court also reminded Kim that she

had not yet filed a motion for emergency relief and directed her to do so within five days. (*Id.*)

Kim's second amended complaint was docketed the same day. (Second Am. Compl.)

The complaint alleged six counts. First, Kim claimed Title IX retaliation. (*Id.* ¶¶ 101–06.)

Second, she claimed Section 504 retaliation and discrimination. (*Id.* ¶¶ 107–13.) Third, Kim

alleged discrimination under the Americans with Disabilities Act. (*Id.* ¶¶ 114–20.) Next, Kim

alleged two claims under 42 U.S.C. § 1983 for deprivation of due process and an equal

protection violation.  (*Id.* ¶¶ 121–30; *id.* ¶¶ 131–34.)  Finally, Kim sought declaratory relief

under 28 U.S.C. §§ 2201 and 2202.  (*Id.* ¶¶ 135–37.)

On July 25, 2025, Kim filed an "Emergency Motion for Limited Injunctive Relief to

Preserve Student Status on Leave of Absence Pending Federal Investigation." (Dkt. 20.)  The

motion asked the court to enjoin the University from removing Kim from her Ph.D. program

or "altering her academic status" in any way, including through dismissal, notations on her

transcript, revocation of her access to student records or systems, imposition of penalties, or

any other action which could preclude her future reinstatement to her doctoral program.  (*Id.*

at 2–3.)  Kim additionally requested "injunctive relief to preserve the status quo and prevent

irreversible academic and reputational harm" and a court order instructing the University to

designate Kim as a "student in good standing on formal Leave of Absence status."  (*Id.* at 3.)

Finally, Kim asked that the court preserve her "eligibility for full reinstatement without loss of

academic credit, standing, or access to tuition reimbursement" and "[a]cknowledge [her]

pending OCR and EEOC complaints, and her documented status as a caregiver and disabled

student entitled to protection" under Title IX, Section 504, and the ADA.  (*Id.*)

## II.    Standard of Review

Federal Rule of Civil Procedure 65(a) authorizes courts to issue preliminary injunctions.

"A preliminary injunction is an extraordinary remedy intended to protect the status quo and

prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d

224, 230 (4th Cir. 2017).  The court may grant a preliminary injunction only "upon a clear

showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555

U.S. 7, 22 (2008).  A preliminary injunction is "never awarded as of right." *Id.* at 24.

A plaintiff seeking a preliminary injunction must demonstrate that (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm without preliminary relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest. *Id.* at 20. The court must separately consider each *Winter* factor. *Di Biase*, 872 F.3d at 230.

### III.    Analysis

Based on Kim's second amended complaint and her motion for preliminary injunctive relief, the court finds that the *Winter* factors do not favor an award of such relief to maintain the status quo while Kim's lawsuit is ongoing. An analysis of each factor follows.

### A. Likelihood of Success on the Merits

To satisfy the first factor, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that [s]he is likely to succeed at trial." *Id.* (internal quotation marks omitted). This burden is high, and "merely providing sufficient factual allegations to meet the Fed. R. Civ. P. 12(b)(6) standard of *Twombly* and *Iqbal* does not show a likelihood of success on the merits." *J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 60 (D. Md. 2020) (cleaned up). For the following reasons, the court finds that Kim has not demonstrated that she is likely to succeed on any of her claims.

#### 1. Title IX Retaliation

To begin, Kim has not established that it is likely that she would succeed on her Title IX retaliation claim. To state a prima facie retaliation claim under Title IX, a plaintiff must establish (1) that she engaged in protected activity under Title IX; (2) that she suffered an adverse action; and (3) that said action was the result of her protected activity. *See Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018). While temporal proximity may be

sufficient to support an initial prima facie showing of the causation element, *see Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 579 (4th Cir. 2015), it does not create a triable issue when the defendant has offered a "convincing, nonretaliatory explanation" for its actions. *See S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 79 (4th Cir. 2016); *see Feminist Majority Found.*, 911 F.3d at 694 ("[P]laintiffs must show a retaliatory motive.").

Kim claims that she engaged in protected activity with the filing of her OCR complaint on May 10, 2025. (Second Am. Compl. ¶ 103.) She alleges that she was subject to the following adverse actions: (1) "Advisor withdrawal and termination of academic supervision"; (2) "Mid-semester credit reductions despite full tuition payment"; (3) "Imposition of a July 30, 2025, removal deadline absent new advisement"; and (4) "Selective enforcement of policies that disproportionately impacted [Kim] as a self-funded student with an active federal civil rights complaint without evidence of consistent application across similarly situated students or contextual consideration of [Kim's] financial and academic position." (*Id.* ¶ 104.) She states that the temporal proximity of those actions to her OCR filing "supports a prima facie case of retaliation." (*Id.* ¶ 105.)

Even assuming that the four actions Kim alleges constitute materially adverse actions and that Kim alleges temporal proximity sufficient to support a prima facie case, the court finds that Kim fails to show retaliatory motive such that she is likely to succeed on the merits of her claim. Although Kim claims that the University retaliated against her through various actions, her own evidence points to reasonable, nonretaliatory explanations for each action. The withdrawal of Kim's advisor after she accused him of creating a hostile work environment is a reasonable response that can be viewed as protecting Kim from her advisor's further

actions. While being required to find a new advisor could, if imposed on a very tight timeframe, constitute a materially adverse action, Kim was given a month and a half to do so and does not show that she would be denied such an advisor even with reasonable efforts to secure one. Furthermore, Kim's own evidence demonstrates that the credit limit was not a new policy, nor can she point to evidence that other students were treated dissimilarly. Finally, Kim's vague allegations of "[s]elective enforcement of policies" are unsupported by any evidence showing that the policies were not enforced equally among other, non-protected students. Because Kim has not shown evidence of a retaliatory motive, she is not likely to succeed on this claim.

2. Section 504 Retaliation

Nor is Kim likely to succeed on her claim of retaliation under Section 504 of the Rehabilitation Act. Absent direct evidence of retaliation, Kim must prove that she engaged in protected activity, that the University took adverse action against her, and that the adverse action was causally connected to her protected activity. *See S.B. ex rel. A.L.*, 819 F.3d at 78. Here, Kim is unlikely to succeed on her claim for Section 504 retaliation because the evidence suggests "legitimate and plausible nonretaliatory reason[s]" for the University's actions. *See id.* (finding such reasons sufficient to defeat claim for Section 504 retaliation). Specifically, the evidence appears to show that the University was merely enforcing already-existing policies for academic credits and advisor requirements, and that the timing with Kim's civil rights complaints was coincidental rather than intentional. Kim provides no evidence demonstrating that such actions were caused by the filing of her civil rights complaint, and so therefore cannot

show a likelihood of success on the merits. Like Kim's Title IX claim, her Section 504 retaliation claim is not likely to succeed on its merits.

    3. Section 504 and ADA Discrimination

Both the ADA and Section 504 of the Rehabilitation Act "prohibit discrimination against an individual because of his or her disability." *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018). The analysis of the claims is "substantially the same." *Id.* To establish a violation of either statute, a plaintiff must prove (1) that she has a disability; (2) that she was otherwise qualified to receive the benefits of a public service, program, or activity; and (3) that she was denied the benefits of such service, program, or activity, or was otherwise discriminated against on the basis of her disability. *Id.* The two statutes differ on causation: while the ADA requires proof that "the disability was a motivating cause of the exclusion," the Rehabilitation Act requires the plaintiff show that she "was excluded solely by reason of [her] disability." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461–62 (4th Cir. 2012).

Here, Kim has not demonstrated that she is likely to succeed on a claim of ADA or Section 504 discrimination. Specifically, the evidence presented does not establish that any action taken by the University was motivated by Kim's ADHD diagnosis; in fact, although Kim states that she was "open" about such a diagnosis, there is no evidence that the University knew of the diagnosis and discriminated against her on the basis of her ADHD when applying its academic policies.

Further, to the extent Kim alleges discrimination based on her status as a caregiver, she similarly does not demonstrate a likelihood of success on the merits of her claim. Although she alleges that she disclosed her caregiver status to Hathaway, there is no indication that she

- 19 -

was denied the benefits of any program or activity or that she was discriminated against on the basis of her caregiver status. While Kim claims that she was pressured to change her dissertation topic based on this status, the email communications between the parties indicate that the suggestion was merely intended to facilitate Kim's highly accelerated plan for graduation, and that the suggestion was by no means mandatory. Additionally, Kim presents no evidence demonstrating that any of the University's later actions were motivated by her caregiver status. Accordingly, Kim does not demonstrate that she is likely to succeed on the merits of her discrimination claims.

### 4.  42 U.S.C. § 1983 Due Process Claim

Nor does Kim adequately demonstrate that she is likely to succeed with her § 1983 claim of deprivation of due process. To succeed on a claim of procedural due process, a plaintiff must demonstrate three elements. First, she must prove that she had "a constitutionally cognizable life, liberty, or property interest." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013). Second, she "must show that the deprivation of that interest was caused by 'some form of state action.'" *Id.* (internal quotation marks omitted). Third, she must prove "that the procedures employed were constitutionally inadequate." *Id.* (quoting *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009)).

Kim does not allege an adequate due process claim, let alone one which is likely to succeed. Kim argues that she has been deprived of her "protected property interest [in] Ph.D. progress." (Second Am. Compl. ¶ 122.) She claims that she has been so deprived because the University enforced its policy to only allow six credits of registration over the summer term,

as well as because the University "[i]mpos[ed] arbitrary deadlines post-OCR filing" and "[d]elegat[ed] compliance determinations to non-Virginia-licensed personnel." (*Id.* ¶ 123.)

But Kim has not shown that she has been deprived of any Ph.D. progress at all. If anything, Kim demonstrates that she was forced to take only six credits over the summer term—a University requirement that, by her own evidence, would not hinder her ability to graduate by Spring 2026, which itself is a self-imposed deadline. Moreover, Kim cannot argue that she has been deprived of the ability to take more credits than allowed when the academic policy has consistently stated that she could only take six credits over the summer term; that Kim failed to heed the University's policies when enrolling does not render their enforcement an unconstitutional deprivation of her rights.

What's more, even had Kim alleged a deprivation of a protected right, she cannot cite any case law indicating that she is constitutionally entitled to review by Virginia-licensed bar members of her complaints, as reported to the University's internal EOCR. Nor is it clear which "arbitrary deadlines" Kim is referring to. Accordingly, Kim cannot show a likelihood of success on these claims.

5.  42 U.S.C. § 1983 Equal Protection Violation

Kim further claims that she was the subject of a violation of the Equal Protection Clause when the University "treated [her] differently from similarly situated students based on her protected status and civil rights engagement." (*Id.* ¶ 133.) To state a violation of the Equal Protection Clause, "a plaintiff must plausibly allege first that [s]he has been treated differently from others with whom [s]he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination" and "that the disparity was not justified under the

appropriate level of scrutiny." *Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020) (internal citations omitted).

Kim does not provide any evidence that any other student was treated differently or that the policies enforced by the University were not applied uniformly to other students. Nor does she show that the University applied policies unequally because of her protected status. Kim therefore cannot show a likelihood of success on this claim.

6. Declaratory Relief

Finally, Kim requests declaratory relief "to prevent further harm and clarify the legal obligations owed to [her]" and because "[a]n actual controversy exists as to [UVA's] violations of Title IX, Section 504, the ADA, and the Fourteenth Amendment." (Second Am. Compl. ¶¶ 136–37.) Because Kim does not show a likelihood of success on the merits of her other claims, she similarly does not show a likelihood of success on her claim for declaratory relief. Additionally, a separate count for declaratory relief is not appropriate as it is "a remedy available" to Kim, "not a separate cause of action." *Johnson v. D&D Home Loans Corp.*, No. 2:07cv204, 2007 WL 4355278, at *4 (E.D. Va. Dec. 6, 2007).

Because Kim does not show that she is likely to succeed on any of her claims, she does not meet her burden on this *Winter* factor, and the court may deny her motion for emergency relief without further consideration of the other factors. *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023). However, the court notes that, even on consideration of the remaining factors, Kim does not meet the high standard for the grant of emergency injunctive relief.

## B. Likelihood of Irreparable Harm

Even had Kim shown that the first *Winter* factor tipped in her favor, which she did not, she cannot demonstrate the second factor would do the same. A plaintiff seeking a preliminary injunction must also make a clear showing that future irreparable harm is likely if an injunction is not entered. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Moreover, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Here, Kim seeks emergency injunctive relief to avoid being dismissed from her Ph.D. program for failure to secure an academic advisor. She claims that such dismissal would "permanently damage her career trajectory and cannot be adequately remedied by monetary relief," (Second Am. Compl. ¶ 88), and that "substantial financial and time investments" in her education "would be irreversibly lost upon dismissal," (*id.* ¶ 90).

The court first notes that, "[i]n equity, one cannot complain of irreparable harm that they can themselves readily remedy." *Weathers v. Univ. of N.C. at Chapel Hill*, No. 1:08CV847, 2008 WL 5110952, at *4 (M.D.N.C. Dec. 4, 2008) (citing *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 244–45 (1933)); *see* 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed. 2025) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted."). Here, Kim may avoid dismissal from her program by finding another advisor. Over approximately six weeks, Kim has emailed two potential advisors, neither of

whom agreed to the position. While this court has no reason to believe that Kim's efforts have been unreasonable, neither has Kim presented sufficient evidence to the court demonstrating that she cannot at this stage find an advisor and remedy the harm for which she seeks relief.

Even setting aside that equitable principle, however, Kim's claims are too speculative for this court to find a likelihood of irreparable harm. To start, Kim does not claim that her student status could not be reinstated should she find another advisor, nor that any gap in her educational record could not be remedied by the ultimate grant of injunctive relief should her claims succeed at trial. *See Doe v. Wake Forest Univ.*, No. 1:23-CV-00114, 2023 WL 2239475, at *9–10 (M.D.N.C. Feb. 27, 2023) (finding plaintiff's suspension from college unlikely to cause irreparable harm); *see also Young v. E. Carolina Univ.*, No. 4:21-CV-29, 2021 WL 7285902, at *1 (E.D.N.C. Apr. 14, 2021) ("Plaintiff also fails to make a showing of irreparable harm absent entry of an injunction, in light of the numerous outstanding requirements that must be completed before he is eligible to graduate."). Nor does Kim allege with any specificity the career prospects that would be irreparably harmed by her dismissal from the program. *Compare Doe v. Rector & Visitors of the Univ. of Va.*, No. 3:19-cv-00038, 2019 WL 2718496, at *6 (W.D. Va. June 28, 2019) (finding irreparable harm where the plaintiff indicated that his job offer was "contingent on receiving [his] degree and providing a copy of [his] transcript . . . documenting that [he had] graduated"), *with Doe*, 2023 WL 2239475, at *9 (finding plaintiff's allegation that he would lose planned employment with "an unnamed future employer" too speculative to support likelihood of irreparable harm). Additionally, it appears Kim's potential dismissal would come at the conclusion of an academic term rather than in

the middle of ongoing classes, which further minimizes disruption to her academic trajectory and its potential impact on her grades or transcript.  Because Kim's allegation "rests only on [her] own speculation in the absence of any additional evidence," the court cannot find a likelihood—rather than a mere possibility—that Kim will suffer irreparable harm from being dismissed from her Ph.D. program at the conclusion of the summer term.  *See Doe*, 2023 WL 2239475, at *9.

The court therefore finds that Kim has failed to carry the burden of proof as to the second element of the *Winter* test.

### C.  Balance of Equities

Kim must also establish that the balance of equities tips in her favor.  While there is no question that Kim's academic trajectory will be disrupted by her dismissal, the injunction requested by Kim would also immediately impair the University's ability to enforce the academic policies which help to ensure structure and oversight of academic programs.  Kim does not offer evidence to the contrary, (*see* Second Am. Compl. ¶ 93), and thus has not met her burden as to this *Winter* factor.

### D.  Public Interest

Finally, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (internal quotation marks omitted).  Here, the public consequences of an injunction are "uncertain, or, more accurately, may—like the balancing of equities—depend on one's view as to the merits."  *Doe*, 2023 WL 2239475, at *10.  There is of course a public interest in ensuring that students are treated fairly, but the same interest also exists in allowing

universities to enforce their academic policies.  Because Kim does not point to any specific public interest factor that weighs in favor of granting the emergency relief, the court finds that Kim has not met her burden on this *Winter* factor.

### IV.    Conclusion

Because Kim does not meet her burden on the *Winter* factors, the court will deny her motion for a preliminary injunction (Dkt. 20).

An appropriate Order shall accompany this Memorandum Opinion.

**ENTERED** this 31st day of July, 2025.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE