CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
October 31, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
     DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| Moon Young Kim, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 3:25-cv-00054 |
| The Rector and Visitors of the | ) | |
| University of Virginia, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on Defendant The Rector and Visitors of the University of Virginia's ("UVA" or "the University") motion to dismiss Plaintiff Moon Young Kim's second amended complaint (Dkt. 26). Kim, proceeding *pro se*, contends that the University violated Title IX, Section 504 of the Rehabilitation Act, the Americans with Disabilities Act ("ADA"), and her constitutional due process and equal protection rights pursuant to 42 U.S.C. § 1983. (Dkt. 18.) Kim also seeks declaratory relief. (*Id.*) For the following reasons, the court will grant the University's motion to dismiss the complaint.

# I.    Background

## A. Factual History[1]

Kim is a doctoral candidate in the Systems & Engineering Department of the University of Virginia's School of Engineering and Applied Sciences ("SEAS"). (Second Am. Compl. ¶ 14 (Dkt. 18).) She is also a mother to two permanently disabled children. (*Id.* ¶ 20.) Kim has attention deficit/hyperactivity disorder ("ADHD"). (*Id.*)

Kim's allegations originate from her involvement with the University's National Security Data and Policy Institute ("NSDPI") during the second semester of her PhD program. (*See id.* ¶¶ 21–35.) Her communication with NSDPI began on January 13, 2025, when she met with the NSDPI Director of Research programs, Jonathon Hathaway, to "discuss potential collaboration." (*Id.* ¶ 21.) During this meeting, Kim "disclosed her caregiver status" to Hathaway. (*Id.*) Hathaway, according to Kim, proceeded to "disparage[] [Kim's] UVA Masters of Engineering degree" in front of Dr. John Robinson, another NSDPI leader. (*Id.*)

Nevertheless, Kim continued to work with Hathaway and NSDPI leadership in the following months. (*See id.* ¶¶ 23–35.) Their collaboration progressed in March of 2025, when Hathaway sought Kim's assistance in securing South Korean research partners for the Bilateral Academic Research Initiative ("BARI"), a program with potential funding from both the United States and Republic of Korea governments. (*Id.* ¶ 23.) In a call on March 20, 2025, Hathaway expressed interest in hiring Kim for the entirety of the BARI program. (*Id.* ¶ 24.)

---

[1] The facts in this section are derived from Kim's second amended complaint and the exhibits she attached to that pleading. (Dkt. 18.) For purposes of resolving this motion to dismiss, the court accepts the facts alleged in the second amended complaint as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When Kim underscored "her limited availability due to caregiver responsibilities," Hathaway "suggest[ed] that she revise her dissertation to align with BARI deliverables." (*Id.*)

A few days later, Kim reached out on behalf of NSDPI to Pohang University of Science and Technology's ("POSTECH") Artificial Intelligence of Things Laboratory regarding a partnership. (*See* Dkts. 18-12 at 6–7; 18-18 at 12–13.) In the following weeks, she continued to work with NSDPI. She provided her research during an April 23 faculty meeting and developed a preliminary working paper centered on the faculty's chosen focal points. (Second Am. Compl. ¶¶ 28–29.) Dr. Philip Potter, Executive Director of NSDPI, even described Kim as "the glue holding the project together." (*Id.* ¶ 31.) In an email exchange with Kim around the same time, Hathaway noted that it "would be great if [the BARI project] could align with your PhD work and you could support the project through its duration." (Dkt. 18-62 at 3.)

But Kim developed concerns about the NSDPI and POSTECH collaboration. Kim convened a meeting with Hathaway on April 25, 2025, to express her worry that NSDPI was "fail[ing] to engage substantively with POSTECH, despite her efforts in securing the partnership." (Second Am. Compl. ¶ 32.) Shortly after, Hathaway met with Kim and notified her that she would be receiving a short-term contract. (*Id.*) In the meeting, Kim claims that Hathaway "reiterated that in order to fulfill UVA's eligibility for the BARI program, [Kim] would need to realign her dissertation to match project deliverables—a shift he justified on the basis of her caregiver status." (*Id.*)

Kim turned to her advisor, Dr. Matthew Bolton, to ask if he would "be open to [Kim] switching [her] topic to align with [her] contribution to the BARI project," given that she may have to "significantly revise or redo" her then-current proposal. (Dkt. 18-11 at 2.) Kim noted

in her email that she was "happy to continue working diligently on both tracks until [she and Bolton] receive[d] an official decision." (*Id.*) Bolton quickly replied that Kim could "definitely align [her] project with BARI if that is what [she] want[ed] to do." (*Id.* at 1.)

Several days later, on April 29, 2025, Kim emailed Hathaway informing him that she had completed a research outline for the BARI proposal but that she would not send it until they finalized their contract. (Dkt. 18-12 at 2.) She also explained that since she was "on track" to graduate in Spring 2026 on an "expedited timeline," and given her "custody arrangements" and self-funding, she wanted "better contractual terms" before she changed her dissertation topic. (*Id.*) Eleven minutes after sending the email to Hathaway, Kim responded to Bolton's email confirming that she could change her dissertation topic, but only if NSDPI "were willing to fund the remainder of [Kim's] education." (Dkt. 18-11 at 1.)

The next day, Hathaway responded, complimenting Kim and acknowledging her NSDPI contributions. (Dkt. 18-12 at 1.) He explained that she was offered a short-term independent contractor role because NSDPI knew that "[Kim's] time is a finite resource," and because they could only compensate Kim at a higher hourly rate than normal for the six months before she transitioned to the PhD Plus program in the 2026 spring semester, at which time they would have to lower the rate. (*Id.*) In contrast to Kim's claims that Hathaway coerced her to change her dissertation topic, his email stated: "By no means do we want you to alter your dissertation topic, in fact quite the opposite. . . . [W]e are hoping any work at [NSDPI] will be a value add for your research." (*Id.*) The email included a rough draft of the contract and invited Kim's comments. (*Id.*)

That same week, on April 28, 2025, Kim asked the Program Coordinator for the PhD Plus program at UVA, Dr. Eniola Afolayan, about whether it was "common for UVA offices to require PhD students to completely change their research direction for a temporary, part-time internship." (Dkt. 18-13 at 3.) Kim explained that "as part of [NSDPI's] offer, [she had] been asked to shift [her] dissertation topic significantly." (*Id.* at 3–4.) The Director of Career and Professional Development in the Office of Graduate and Postdoctoral Affairs, Melanie Sinche, assured Kim that there was no need to change her dissertation topic, and that there might have been "some miscommunication regarding the potential project(s) [she] could contribute to next spring." (*Id.* at 1–2.)

On April 30, 2025, the same day that Sinche emailed Kim and Hathaway sent the draft contract, Kim emailed Dr. Philip Trella, Associate Vice Provost, a "confidential incident summary" that "outlin[ed] a series of academic and professional concerns related to [Kim's] recent involvement with" Hathaway. (*Id.* at 1.) Kim also "[took] down notes from" and contemporaneously recorded a phone call with Bolton in which she expressed her concerns with Hathaway "taking her ideas," offering her only a six-month contract, and "pressuring [her] to switch [her] dissertation topic." (*See* Dkt. 18-14 at 1–5.)

Two days later, Kim emailed Hathaway, Potter, and her POSTECH contacts formally "disengag[ing]" from the BARI project. (Dkt. 18-15 at 3–4.) Kim forwarded this email to Trella and requested that his office "refer the matter to the appropriate leadership within the Provost's Office responsible for oversight of NSDPI." (Dkt. 18-16 at 1.) Potter replied to Kim, informing her that "significant issues have made this project untenable" and that he was ending the BARI effort "from the Institute side." (Dkt. 18-15 at 5.) He noted that NSDPI

"won't be using [Kim's] work for other projects" and asked for a brief phone call to "understand where this went wrong." (*Id.*)  After Kim responded that she would prefer to maintain only written communication, Potter asked Kim to clarify the "tension around [Hathaway's] role, the relationship between this project and [Kim's] dissertation, intellectual property, and perhaps other areas." (Dkt. 18-17 at 5.)  Kim responded that her withdrawal "was not driven by interpersonal conflict, but by a clear and early recognition that the working approach and assumptions guiding the proposal differed significantly from the academic and professional standards [she] ha[d] been trained to uphold." (*Id.* at 4.)  She also explained that the "communication patterns and managerial behaviors" in her NSDPI encounters "were deeply misaligned with the academic ethos of transparency, authorship integrity, and mutual respect [she] ha[d] come to expect from faculty, staff, and students at UVA." (*Id.*)  Potter responded: "Unfortunately, this doesn't give me enough clarity to institute appropriate changes, but it seems that you have said what you feel that you can. I wish you luck in your future endeavors and imagine that we will cross paths again soon." (*Id.*)

Kim forwarded the Potter emails to Bolton, characterizing Potter's response as "plausible deniable [sic] and a veiled threat," where "[t]he crossing path is intel code that implies he still believes he will hold some influence over my future." (Dkt. 18-18 at 3.)  On May 5, 2025, Bolton responded that he would "share [her] situation with the graduate office, just so they know what is going on." (*Id.*)  Kim replied later that night that she had formally submitted a report to the Respect Office at UVA and was escalating her complaint to the University's Office for Equal Opportunity and Civil Rights ("EOCR"). (*Id.* at 2–3.)  Bolton

responded that the graduate office recommended Kim reach out to the University Ombuds or UVA's compliance office.  (*Id.* at 2.)

On May 5, 2025, Kim also forwarded the email exchange with Potter to Vice Provost Trella.  She described Potter as "appear[ing] to claim plausible deniability" and asked Trella to "review the matter with the seriousness it warrants."  (*Id.* at 3–4.)  Trella responded a few days later, explaining that the role of his office was "not investigatory in nature."  (Dkt. 18-17 at 2.)  He urged Kim to report harassment or discrimination on UVA's "Just Report It" website, to file a report for any disrespectful activity at a UVA HR webpage, and to contact University Ombuds for a confidential resource helpful for determining an appropriate course of action.  (*Id.* at 2–3.)  Kim responded that she has "already chosen to proceed through EOCR's formal channels."  (*Id.* at 2.)  She then forwarded Trella's emails to Demetrice Baskerville, EOCR Civil Rights Response Coordinator, stating that his response "illustrate[d] a clear pattern of institutional deflection" and requesting the emails be added to the formal record of her complaint.  (*Id.* at 1–2.)

On May 10, 2025, two days later, Kim filed a complaint with the U.S. Department of Education's Office for Civil Rights ("OCR"), reporting that the University discriminated on the basis of disability and retaliated against Kim for asserting her rights.  (Dkt. 18-5 at 2.)  Her filing explained that after emailing an "original complaint" to Trella on April 30, 2025, the University's EOCR office had not opened an investigation because the complaint was not submitted through the EOCR website's intake form.  (*Id.* at 2.)  Kim claimed that this "procedural delay effectively denied [her] timely access to institutional grievance resolution." (*Id.*)

When asked to describe the discrimination in her OCR complaint, Kim listed twelve

actions (*Id.* at 2–4):

1. Hathaway's misrepresentation of both his "Dr." and job title, as well as his "minimiz[ation]" of Kim's master's degree, all of which Kim claimed reflected "disability-based caregiver bias (Section 504) and sex-based assumptions (Title IX)";
2. Hathaway's "intentionally vague" communications about Kim's work scope, timing, responsibilities, authorship credit, and compensation, which Kim claimed was discriminatory "in the context of [her] disability-related caregiving status, recent workforce re-entry, and gender-based marginalization in a male-dominated academic setting";
3. Hathaway's request for Kim to draft a proposal outline, which Kim described as "unpaid intellectual labor" that was retaliatory in the context of her gender of "disability-related caregiving status";
4. Hathaway's attempts to "coerce [Kim] into changing her dissertation topic" to "match that of [BARI]," which she claimed "constitute[d] academic coercion" based on "dependent position as both a caregiver and graduate student intern";
5. Kim's loss of her PhD Plus internship which she "declined due to mismanagement and pressure" after Trella suggested that it was optional, which Kim characterized as "retaliatory pressure and institutional neglect";
6. Trella's failure to act on her complaint and Potter's "wish you luck" email, which Kim described as "signal[ing] retaliatory intent" and "an implicit reputational threat";
7. The loss of the Google Fellowship opportunity due to her professor's failure to respond to Kim's email stating that she would be in touch separately asking for a recommendation, which Kim claimed was "delayed and selective faculty engagement";
8. Trella's email response to her complaint that "referred her to reporting channels" intended for issues like disrespect, which she argued "circumvented the substance of [her] complaint . . . and obstruct[ed] [her] right to a fair review process";
9. The timing of a Systems and Information Engineering Department's email about a new initiative to highlight students on the department website, which she felt "indicate[d] a reputational optics maneuver" because it was sent 2 hours after her EOCR complaint submission;
10. EOCR's failure to open an investigation until the website intake form was completed and the EOCR coordinator Baskerville's "tone that seemed to dismiss the gravitas of [Kim's] complaint" during her intake call;
11. Baskerville's questioning Kim about her caregiving constraints and recommendation of mental health resources on the EOCR call, which Kim claimed was intended to discredit her complaint; and

12. The disappearance of several sent emails from Kim's UVA email account,
including emails related to her civil rights complaint, which Kim believed was
intentional retaliatory action.

Kim also alleges that a series of events transpired around the time of the filing of her

civil rights complaint, spurred by the University's retaliation. First, the Systems & Information

Engineering Department emailed all students about summer enrollment requirements on

March 17 and May 5, 2025, noting that the preexisting University policy imposes a cap of six

credits for summer course enrollment. (Dkt. 18-24 at 1, 4.) Kim nevertheless registered for

twelve summer credits and obtained Bolton's approval before the May 19 registration date.

(*See* Dkt. 18-29 at 6–7.) On June 5, 2025, Chantel Gross, a Student Services Generalist in the

Systems & Information Engineering Department, emailed Kim regarding her over-enrollment

in summer credits pursuant to the Department's regular beginning-of-the-semester review of

each student's enrollment. (*See* Dkt. 18-24 at 1, 5; Dkt. 18-29 at 2.) Several days later, Kim

emailed Gross—along with EOCR, Bolton, several state bar associations, the U.S.

Department of Justice, and the University's Office of General Counsel—asking for

clarification on the summer enrollment policy and claiming that the policy had not been

enforced until that June. (Dkt. 18-24 at 5.) Gross, Bolton, and other University leadership

replied, each reiterating that the policy has long been in place and emphasizing that Kim was

still on track to graduate, so her six summer credits did not impede her degree progress. (*Id.*

at 1–5.)

Kim also claims that the departure of Dr. Seokhyun Chung from UVA, a member of

her dissertation committee, constitutes retaliatory action by the University. (Second Am.

Compl. ¶ 51.) On June 9, 2025, Bolton notified Kim that Chung would be leaving UVA at

the end of the summer, explaining that Kim would need to find another committee member. (Dkt. 18-25 at 1.)  However, he assured her that this would not pose a "major obstacle" to graduation and noted that she could seek department approval for Chung to be retained as a UVA faculty member on the committee following Chung's departure from UVA.  (Dkt. 18-48 at 1.)  Kim later emailed Jayne Weber, the Graduate Engineering Registrar, requesting that Chung be grandfathered in.  (*Id.* at 2.)  Weber responded that it must first be approved by Kim's department, then approved by the Office of Graduation Programs.  (*Id.*)

Additionally, Kim attributes Bolton's withdrawal as her advisor on June 17, 2025, to the University's retaliation.  (Dkt. 18-28 at 1.)  Bolton terminated the advisory relationship about a week after Kim emailed him "document[ing] concerns" about a "hostile environment," (Dkt. 18-22 at 3–4), and requesting to only communicate in writing for their weekly meetings, (Dkt. 18-26 at 2).  Bolton explained that he was withdrawing because of the lack of a "communication channel (meetings or emails) that will allow [him] to fulfill [his] role as an adviser or address [Kim's] advising concerns and needs."  (Dkt. 18-28.)  He described the difficulty in advising a student through biweekly, written communications rather than the typical weekly one-on-one meetings.  (*Id.*)  Lastly, he stated that he could not advise a student who had sent emails to "external funding agencies and professional societies encouraging review of [Bolton's] professional ethics" and used Bolton's "good faith advising communications" with her as part of such reports.  (*Id.*)

The morning of Bolton's withdrawal, Dr. Gregory Gerling, Interim Chair of the Systems & Information Engineering Department, emailed Kim to inform her of next steps to secure an advisor.  (Dkt. 18-30.)  Gerling reiterated the school policy that PhD students must

- 10 -

have an advisor to enroll, and that Kim would have to secure a new advisor by July 31, 2025, to stay in the PhD program after the completion of the summer term. (*Id.*) A few weeks later, on July 6 and 7, 2025, Kim contacted two professors about advising her. (Second Am. Compl. ¶ 79.) One professor declined due to limited capacity, and the other did not respond. (*Id.*)

Stemming from the termination of her advising relationship with Bolton, Kim claims that she was forced to drop her summer credit enrollment. (*See id.* at 77; Dkt. 18-48 at 3–4.) However, Gerling informed Kim in his email that she could simply request to change her summer enrollment to a section with her new advisor once she obtained a different one. (Dkt. 18-30.) Before Kim had even reached out to potential replacement advisors, on June 23, 2025, she requested that the registrar's office drop her summer research credit. (Dkt. 18-48 at 3.) In her email, contrary to Gerling's instructions, she explained that her request "stem[med] from [her] former advisor's decision to terminate the advising relationship after receiving written notice" of her complaints. (*Id.* at 3–4.) Kim has received a partial tuition refund for summer tuition after she submitted a request for a full refund on July 1, 2025. (Dkt. 18-54 at 7.) It is unclear how many credits Kim had already completed.

Finally, Kim claims that major procedural decisions throughout her EOCR filing process "were made by unlicensed individuals acting in legal-adjacent capacities, without appropriate oversight or qualifications under Virginia law." (Second Am. Compl. ¶ 87.) Kim challenges EOCR's declining her requests to (1) provide an outside mediator to observe the preliminary interviews with the EOCR; (2) correspond with Kim exclusively in writing; and (3) hold the EOCR preliminary interview at a "neutral third-party location." (*Id.* ¶ 57.) She also criticizes the office's sharing of mental health and other university resources to Kim upon

the filing of her complaint; its "[s]elective and decontextualized evaluation" of Kim's prior statements; its "postdating" of Kim's civil rights complaints; its failure to comply with FOIA; and its employment of individuals who were not admitted to the Virginia State Bar. (*Id.*)

### B. Procedural History

On June 27, 2025, Kim filed a complaint containing a series of claims against the University: retaliation under Title IX and Section 504, discrimination under the ADA and Section 504, equal protection and due process violations under 42 U.S.C. § 1983, and a request for declaratory relief. (Dkt. 1 at 36–40.) On July 9, 2025, Kim filed a first amended complaint as a matter of course. (Dkt. 6.) The court responded on July 16, 2025, by issuing an oral order instructing Kim to file a separate motion for emergency relief within seven days if she wished to do so. (Dkt. 10.)

On July 21, 2025, the court granted the plaintiff's motion for leave to file a second amended complaint and denied her second motion for leave to amend her complaint as duplicative. (Dkt. 17.) Kim's second amended complaint included six claims against the University. (Second Am. Compl.) Count I alleges Title IX retaliation. (*Id.* ¶¶ 101–06.) Count II alleges Section 504 retaliation and discrimination. (*Id.* ¶¶ 107–13.) Count III alleges discrimination under the Americans with Disabilities Act. (*Id.* ¶¶ 114–20.) Counts IV and V, brought under 42 U.S.C. § 1983, allege deprivation of due process and violation of equal protection. (*Id.* ¶¶ 121–30; *id.* ¶¶ 131–34.) Lastly, Count VI seeks declaratory relief under 28 U.S.C. §§ 2201 and 2202. (*Id.* ¶¶ 135–37.) Kim asks for "declaratory and injunctive relief sufficient to restore her academic status, protect her civil rights during the pendency of federal investigation, and ensure institutional compliance with applicable law." (*Id.* at 43.) She

requests various forms of injunctive relief related to her academic status and enrollment, including "[a]ppointing an interim faculty advisor" and "[m]aintaining Plaintiff's enrollment status and academic standing as they existed prior to the alleged retaliatory conduct."[2] (*Id.* at 44.) Additionally, she seeks monetary reimbursement for the "remaining tuition paid for Summer 2025 coursework" and "expressly preserves her right to seek damages" on her claims. (*Id.* at 43, 45.)

Several days later, on July 25, 2025, Kim filed an emergency motion for limited injunctive relief. (Dkt. 20.) The court denied the emergency motion on July 31, 2025. (Dkt. 24.)

Then, on August 11, 2025, the University filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6). (Dkt. 26.) The University argues that Kim's second amended complaint should be dismissed with prejudice because (1) the University is entitled to Eleventh Amendment immunity from the § 1983 claims, (2) the University is not a person for purposes of § 1983, (3) the complaint fails to allege the required elements of the discrimination and retaliation claims, and (4) declaratory relief is neither appropriate nor a separate cause of action. (Def.'s Br. (Dkt. 27).) Kim responded on August 22, 2025, opposing the motion to dismiss and detailing her associational discrimination claim under the ADA. (Pl.'s Resp. (Dkt. 29).) The defendants replied on August 28, 2025, asserting that Kim had forfeited all her claims except the single associational discrimination ADA claim. (Def.'s Reply (Dkt. 32).)

---

[2] On October 1, 2025, Kim filed a notice of supplemental information informing the court that she "has been admitted as a graduate student at Stanford University's School of Professional Development and is presently enrolled in credit-bearing coursework in Computer Science." (Dkt. 55.) Since then, the parties have not clarified whether Kim is still enrolled in or affiliated with UVA in any capacity. But to the extent that Kim is no longer enrolled at UVA and does not intend to be enrolled in the future, her claims for injunctive relief regarding her program status and continued enrollment are likely moot. *See Am. Humanist Ass'n v. Greenville Cnty. Sch. Dist.*, 652 F. App'x 224, 228–31 (4th Cir. 2016).

Amidst the motion to dismiss filings, Kim also filed a motion for recusal, motion to change venue, and motion to stay. (Dkt. 31.) The defendants filed a reply to these motions on September 8, 2025, (Dkt. 40), and Kim responded several days later (Dkt. 44). The court denied the motions in an opinion issued on September 26, 2025. (Dkt. 52–53.)

## II.    Standard of Review

Rule 12(b)(1) allows a defendant to file a motion to dismiss for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A defendant may bring a facial challenge to subject matter jurisdiction by arguing "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). Here, the University raises a facial challenge[3] as to Counts IV and V by contending that the Eleventh Amendment bars the plaintiff's § 1983 claims. (Def.'s Br. at 10–11.)

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual allegations "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

---

[3] If the defendant's motion does not specify whether the challenge to subject matter jurisdiction is facial or factual, the court may draw a reasonable inference. *See Yanez v. Walker*, No. 5:24-cv-00025, 2024 WL 5190040, at *3 (W.D. Va. Dec. 20, 2024) (presuming that the defendant's sovereign immunity defense is a facial challenge to the court's subject matter jurisdiction).

When the complaint, like this one, is filed by a *pro se* litigant, the court must liberally construe the pleadings. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). This rule "allows courts to recognize claims despite various formal deficiencies, such as incorrect labels or lack of cited legal authority." *Wall v. Rasnick*, 42 F.4th 214, 218 (4th Cir. 2022). However, application of the liberal construction rule "does not transform the court into an advocate" for a *pro se* litigant. *Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 391 (4th Cir. 1990).

In reviewing a motion to dismiss for failure to state a claim, the court must consider the facts from the complaint as true and "draw all reasonable inferences in favor of the plaintiff." *Iqbal*, 556 U.S. at 678; *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020). The court's review is generally limited to the complaint itself, Fed. R. Civ. P. 12(d), as well as documents attached to the complaint or incorporated into the complaint by reference. Fed. R. Civ. P. 10(c); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). The University notes that Kim, in her response to the motion to dismiss, relies on allegations and exhibits not raised in the second amended complaint. (Def.'s Reply at 4–5 (Dkt. 32).) The court agrees with the University that Kim may not further amend her second amended complaint in her response brief. *See S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d 175, 184–85 (4th Cir. 2013). Thus, when deciding the motion to dismiss, the court will only consider the factual allegations and exhibits included in the second amended complaint.

- 15 -

## III.     Analysis

### A.  Due Process and Equal Protection Claims (Counts IV and V)

Kim has advanced two constitutional claims under 42 U.S.C. § 1983.  Both claims of due process and equal protection violations will be dismissed as a matter of law for the following reasons.

First, the University is not considered a "person" for purposes of § 1983.  *Dowdy v. Univ. of Virginia*, No. 7:11-cv-00549, 2011 WL 6102339, at *2 (W.D. Va. Dec. 6, 2011) (citing Va. Code Ann. § 23.1-2200 (West); *Bowers v. Rector & Visitors of the Univ. of Va.*, No. 3:06-cv-00041, 2007 WL 853815, at *1 (W.D. Va. Mar. 16, 2007)).  Section 1983 only "creates a cause of action against any *person* who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States."  *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013) (emphasis added).  The University is instead an "alter ego[] of the state" that may not be sued under § 1983.  *Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1139 n.6 (4th Cir. 1990); *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989).

Further, the Eleventh Amendment renders the University immune from Kim's claims for retroactive monetary relief.  *See Edelman v. Jordan*, 415 U.S. 651, 663 (1974); *Huang*, 902 F.2d at 1138–39.  State sovereign immunity doctrine protects state officers, employees, and alter egos sued in their official capacities from private parties' claims for damages.  *See Huang*, 902 F.2d at 1138–39; *Litman v. George Mason Univ.*, 186 F.3d 544, 547 (4th Cir. 1999) (recognizing that, as a "state-created university," George Mason University possessed Eleventh Amendment immunity, then determining that immunity had been waived in that particular case).  While a state may waive Eleventh Amendment immunity, the court only finds

- 16 -

waiver "where stated 'by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction.'" *Edelman*, 415 U.S. at 673 (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171 (1909)).  No waiver is present in this case.

Finally, regardless of which type of relief is sought or which type of defendant Kim brings her constitutional claims against, both claims must fail because Kim does not allege sufficient facts to make out a claim under the Due Process Clause or the Equal Protection Clause.  The court will address the insufficiency of these claims in turn.

1. 42 U.S.C. § 1983 Due Process Claim (Count IV)

Kim's claim that the University's actions deprived her of due process is untenable.  To succeed on a claim of procedural due process, a plaintiff must show that (1) she had "a constitutionally cognizable life, liberty, or property interest," (2) "the deprivation of that interest was caused by 'some form of state action,'" and (3) "the procedures employed were constitutionally inadequate."  *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013) (quoting *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009)).  Kim asserts a "protected property interest [in] Ph.D. progress" that the University deprived by "retroactive[ly] and selectively" enforcing their summer term credit limit policy to require Kim take only six summer credits, "imposing arbitrary deadlines" following Kim's OCR filing, and "delegating compliance determinations to non-Virginia-licensed personnel."  (Second Am. Compl. ¶ 122–23.)

To begin, Kim cites no cases or law to support her contention that she has a property right to continued enrollment in her public education.  Courts recognize legitimate claims of

entitlement to government benefits where state statutes, regulations, express or implied contracts, or mutually explicit understandings create such a right. *See Doe v. Va. Polytechnic Inst. & State Univ.*, No. 7:21-cv-00378, 2024 WL 1417977, at *6 (W.D. Va. Apr. 2, 2024). However, the Commonwealth of Virginia has not created a property interest in a continued public university education. *Id.* at *9 (collecting cases). And Kim does not allege that the University has established such a right with Kim by contract or by mutually explicit understanding.

But even if Kim has a constitutionally cognizable property interest in her continued PhD enrollment, she has not adequately alleged that she was deprived of such enrollment. "Whether a deprivation of constitutional rights has occurred is not dependent upon the subjective feelings or beliefs of a plaintiff." *Tigrett v. Rector and Visitors of Univ. of Va.*, 290 F.3d 620, 628 (4th Cir. 2002). Rather, "a plaintiff must have been, in fact, deprived" of a constitutionally protected property interest. *Id.* The "credit reduction" required of Kim, pursuant to a university-wide enrollment cap of six summer credits, did not interfere with her ability to graduate by Spring 2026, the graduation date that she set for herself. (Dkt. 18-24 at 1, 4; *see also* Dkt. 18-22 at 1–2.) Kim also fails to include any factual allegations to support her claims that this longstanding academic policy was "selectively" enforced, (Second Am. Compl. ¶¶ 84, 104), or that the University imposed "arbitrary deadlines," (*id.* ¶ 87).

For Kim's final alleged deprivation, "delegating compliance determinations to non-Virginia-licensed personnel," Kim seems to be referencing (1) the University EOCR office's refusal to allow a Virginia-licensed mediator to attend her "preliminary interview" (*Id.* ¶ 57; Dkt. 18-32 at 2), and (2) her understanding that "no Virginia-licensed attorney oversees EOCR's legal determinations" (Dkt. 18-47 at 3). Kim does not provide any law suggesting

that she is constitutionally entitled to a mediator during the preliminary EOCR interview.

Kim's assigned Civil Rights Investigator, Hinton, explained that Kim was "welcome to have

an advisor of her own choosing present" to "provide support and advice," but that they were

declining her unique mediator request because of "the neutrality of EOCR's role" and the fact

that the investigator already serves in a neutral role.  (Dkt. 18-32 at 2.)  Kim's complaint also

lacks any law or plausible allegation that she has a constitutional entitlement to have the

EOCR's determinations reviewed by Virginia-licensed attorneys.  The Senior Compliance

Director explained to Kim that the EOCR has team members licensed in other states as

attorneys, and that given the nature of their non-legal complaint resolution work, a licensed

attorney is not required in the first place.  (*Id.* at 3.)  Kim does not have a legal entitlement to

special procedures that differ from the EOCR's typical procedures.

2.  42 U.S.C. § 1983 Equal Protection Violation (Count V)

To plead a violation of the Fourteenth Amendment's Equal Protection Clause, a

plaintiff must plausibly allege that (1) "[s]he has been treated differently from others with

whom [s]he is similarly situated"; (2) such treatment "was the result of intentional or

purposeful discrimination"; and (3) "the disparity was not justified under the appropriate level

of scrutiny."  *Fauconier v. Clarke*, 966 F.3d 265, 277 (4th Cir. 2020) (internal citations omitted).

Although the court affords Kim flexibility as a *pro se* litigant, her complaint is bereft of anything

but conclusory claims that the University "treated [her] differently from similarly situated

students based on her protected status and civil rights engagement."  (*Id.* ¶ 133.)  She does not

include any factual allegations about similarly situated students or disparities in treatment

between Kim and those other students.  Instead, her own evidence suggests that the University

has treated her as any other student, pursuant to preexisting policies that apply universally to the entire School of Engineering or to the University at large. (*See, e.g.*, Dkt. 18-24 at 1–4; Dkt. 18-30 at 1; Dkt. 18-23 at 1.)

Thus, Kim's two § 1983 claims will be dismissed. Dismissals based on Eleventh Amendment immunity, "like dismissals for lack of jurisdiction, should normally be without prejudice." *Albert v. Lierman*, 152 F.4th 554, 563 n.9 (4th Cir. 2025) (quoting *Merritts v. Richards*, 62 F.4th 764, 772 (3d Cir. 2023)). However, when a plaintiff could not possibly plead around sovereign immunity, courts have chosen to dismiss the action with prejudice. *See, e.g.*, *Magnate, LLC v. U.S. Env't Prot. Agency*, 678 F. Supp. 3d 767, 778 n.12 (W.D. Va. 2023); *Amisi v. Riverside Reg'l Jail Auth.*, 469 F. Supp. 3d 545, 555 n.2 (E.D. Va. 2020) (dismissing with prejudice because "no set of facts could overcome . . . sovereign immunity"). Here, while Kim could overcome sovereign immunity if she sought only prospective declaratory and injunctive relief, *see Edelman*, 415 U.S. at 677, she could not amend such claims to circumvent the fact that the University is not a "person" under § 1983. Thus, to the extent Kim's constitutional claims are brought against the University rather than individual persons, these claims are dismissed with prejudice.

## B. Title IX and Section 504 Retaliation Claims (Counts I and II)

Kim brings two retaliation claims: one under Title IX of the Education Amendments of 1973, and one under Section 504 of the Rehabilitation Act. (Second Am. Compl. ¶ 101–05, 107–13.) The court finds that Kim has not adequately alleged the requirements for a retaliation claim under either statutory provision.

Title IX prohibits a federally funded institution from "retaliat[ing] against a person *because* [she] complains of sex discrimination" or other "protected activity." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018). Section 504, similarly, prevents retaliation against a person because of "protected activity" related to her disability. *See S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 78 (4th Cir. 2016). Plaintiffs must adequately allege the following elements to state both a Title IX and Section 504 retaliation claim: (1) the plaintiff "engaged in protected activity"; and (2) because of her protected activity, the plaintiff "suffered an adverse action attributable to the defendant educational institution."[4] *Feminist Majority Found.*, 911 F.3d at 694 (addressing a Title IX retaliation claim); *see Hooven-Lewis v. Caldera,* 249 F.3d 259, 271 (4th Cir. 2001) (applying nearly identical elements to a Section 504 retaliation claim). "Protected activity" includes only "oppositional conduct that is prompted by a reasonable belief that [the institution] is not in compliance with its Title IX [or Section 504] obligations." *Lamb v. Liberty Univ., Inc.*, No. 6:21-cv-00055, 2022 WL 731526, at *3 (W.D. Va. Mar. 10, 2022).

Assuming that Kim's filing of OCR and EOCR complaints was in fact "protected activity," the University's alleged retaliatory conduct must nevertheless be "materially adverse" to satisfy the Title IX elements, meaning that it must "dissuade a reasonable person from making or supporting a charge of discrimination." *Feminist Majority Found.*, 911 F.3d at 694 (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)) (cleaned up). Kim alleges a series of "adverse actions" for both retaliation claims:

(a) Advisor withdrawal and termination of academic supervision;

---

[4] The Fourth Circuit applies Title VII retaliation analysis to Title IX retaliation claims. *See Feminist Majority Found.*, 911 F.3d at 694. Accordingly, this court, in part, relies on and cites Title VII precedent for its Title IX analysis.

(b) Mid-semester credit reductions despite full tuition payment;
(c) Imposition of a July 30, 2025, removal deadline absent new advisement [sic];
(d) Selective enforcement of policies that disproportionately impacted Plaintiff as a self-funded student with an active federal civil rights complaint without evidence of consistent application across similarly situated students or contextual consideration of Plaintiff's financial and academic position.

(Second Am. Compl. ¶ 104; *see id.* ¶ 112.)

The mid-semester credit reductions and July removal deadline, actions (b) and (c), were enforced pursuant to the University's existing academic policies—longstanding policies that apply to all students in Kim's PhD program. Thus, universal enforcement of already-existing University policies would not plausibly dissuade a reasonable person from making a charge of discrimination. As to action (d), Kim's complaint is devoid of facts that could plausibly allege "selective enforcement" of University policies or differential treatment of similarly situated students. Finally, for action (a), although the withdrawal of one's advisor could be "materially adverse" under certain circumstances, it does not suffice as an adverse action in this case based on the allegations in Kim's complaint. Kim was given until July 31, 2025, over a month after Bolton's withdrawal in mid-June, to find another advisor. (Dkt. 18-30 at 1.) In her second amended complaint, Kim alleged that she reached out to only two other professors to secure a new advisor.[5] (Second Am. Compl. ¶ 79.) The alleged facts do not suggest that Bolton's withdrawal, with an option and sufficient time for Kim to find a new advisor, constitutes a materially adverse action.

Additionally, even if the University actions are materially adverse, Kim's second amended complaint lacks plausible allegations of a causal connection between her protected

---

[5] In Kim's response in opposition to the University's motion to dismiss, she asserts that she also reached out to a third potential advisor—Professor Valdez. (Pl.'s Resp. at 6.) The court does not treat allegations raised for the first time in an opposition brief as facts when evaluating the motion to dismiss the second amended complaint.

activity—lodging complaints about the University's discrimination—and the University's "adverse actions." Kim emphasizes the temporal proximity between her OCR filing and the contested University actions. (*Id.* ¶ 104.) But without "additional facts that would plausibly allege a causal relationship," this proximity does not suffice for Kim's initial pleading burden on either retaliation claim. *See Vega v. Amurcon Realty Co.*, No. 6:24-cv-00020, 2025 WL 978225, at *15 (W.D. Va. Mar. 31, 2025) (holding that the plaintiff did not meet his initial burden for pleading ADA retaliation because his allegations of the close temporal relationship between protected conduct and his discharge did not suffice to show causation).

In fact, Kim's own exhibits include the Defendant's neutral, non-retaliatory reasons for taking certain actions. For example, Bolton stated in his June 17 e-mail that he was terminating the advising relationship based on Kim's "request[] to end all in-person meetings," the lack of "communication channel" conducive to an advising role, and Kim's "emails to external funding agencies and professional societies encouraging review of [his] professional ethics." (Dkt. 18-28 at 1.) Bolton's communicated reasons, as reflected in Kim's other exhibits, show that Kim in fact asked Bolton to end all in-person meetings and sent emails to various agencies about Bolton. (*See* Dkt. 18-26 (Kim's June 10 request to end all in-person meetings); Dkt. 18-29 (Kim's June 11 email to Bolton claiming that his response to her email "risks chilling protected disclosures" and copying the U.S. Department of Education Office of Civil Rights, the U.S. National Science Foundation Office of Inspector General, and several other agencies).) Additionally, Kim's allegations that the six-credit summer enrollment policy and the July 31 advisor deadline were newly imposed or newly enforced in her case are too vague and speculative to state a claim of causal connection. Her own exhibits contradict her

allegation that these policies were new. (*See* Dkt. 18-29 at 5 (explaining that the 6-credit summer enrollment cap was not new and was in fact communicated to all engineering students several times in the past few months leading up to the summer term); Dkt. 18-30 at 1 (directing Kim to the existing school policy requiring PhD students to have an advisor before enrolling in that term's classes).)

## C. Section 504 and ADA Discrimination Claims (Counts II and III)

Both Title II of the ADA and Section 504 of the Rehabilitation Act proscribe discrimination based on disability. 29 U.S.C. § 794(a); 42 U.S.C. § 12132. The Fourth Circuit has held that discrimination claims under both statutes "can be combined for analytical purposes because the analysis is essentially the same." *Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012) (internal quotation marks omitted). To state a discrimination claim, a plaintiff must plausibly allege that (1) she has a disability; (2) she is otherwise qualified to receive the benefits provided by a public entity; and (3) she was denied those benefits or was otherwise discriminated against on the basis of her disability. *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018). The only difference between the ADA and Section 504 elements is that the ADA requires less stringent proof for causation. *Id.* Under the ADA, the plaintiff need only demonstrate that "the disability was a motivating cause of the exclusion," whereas Section 504 requires the plaintiff to show exclusion "solely by reason of [her] disability." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461–62 (4th Cir. 2012) (quoting *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468–69 (4th Cir. 1999)).

Kim alleges associational discrimination under the ADA. (Second Am. Compl. ¶ 22, 117, 120; Pl.'s Resp. at 3.) For her associational discrimination claim, Kim cites a Title I

provision that governs associational discrimination in employment.  (Pl.'s Resp. at 3 (citing 42 U.S.C. § 12112(b)(4)).)  While there is no explicit Title II associational discrimination claim available under the statute, the Fourth Circuit has nevertheless recognized an associational standing claim under Title II.  *A Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356, 364 (4th Cir. 2008) (allowing the claim despite no express statutory language because of Congress' intent for "the forms of discrimination prohibited by Title II [to] be identical to those set out in the applicable provisions of titles I and III" (cleaned up)).

However, Kim does not sufficiently allege associational discrimination under any provision of the ADA, as the complaint does not support a plausible claim that any University employee denied her benefits or otherwise discriminated against her because of her children's disabilities.  Her claims that she was "singled out for special scrutiny"[6] and subject to "materially different conditions," (Pl.'s Br. at 5), are bare allegations with no factual support.  In fact, Kim's own alleged facts and exhibits undermine her claims of discrimination: in response to Kim's communications that her time was limited due to her childcare responsibilities, both Bolton and Hathaway suggest ways to accommodate Kim's limited schedule and her expressed interest in the NSDPI collaboration.  (*See, e.g.*, Dkt. 18-12 at 1; Dkt. 18-14 at 12.)  Additionally, Kim presents no facts tending to show that any of the University's later actions surrounding her EOCR complaint and PhD enrollment were

---

[6] In using the phrase "special scrutiny," Kim may be referencing her call with Bolton on April 30 in which, according to her transcript, he mentioned that he is "part of the [graduate office] discussion around . . . special scrutiny for self-funded students to make sure the school is not exploiting them."  (Dkt. 18-14 at 12.)  Based on the court's review of the transcript, Bolton is discussing the graduate office's efforts to support self-funded students—which is irrelevant to Kim's ADA associational discrimination claim.

motivated by her status as a mother of two disabled children.  Accordingly, neither of Kim's discrimination claims survive the Rule 12(b)(6) motion.

### D. Declaratory Relief (Count VI)

Kim's final claim is for "[d]eclaratory relief" under 28 U.S.C. §§ 2201–02.  (Second Am. Compl. ¶¶ 135–37.)  However, declaratory relief is a remedy rather than a separate cause of action.  *See Gale v. Select Portfolio Servicing, Inc.*, No. DKC 20-1289, 2021 WL 165132, at *13 (D. Md. Jan. 19, 2021); *CGM, LLC v. BellSouth Telecomm., Inc.*, 664 F.3d 46, 55–56 (4th Cir. 2011). Since Kim has not adequately stated a claim upon which relief can be granted in the preceding counts, any request for declaratory relief must also fail.

## IV.    Conclusion

Because Kim fails to state a claim upon which relief can be granted against the University, the court will **GRANT** the University's motion to dismiss the second amended complaint.  (Dkt. 26.)  The court will **DISMISS** Counts I, II, III, and VI of the second amended complaint **without prejudice.**  Kim is **GRANTED** leave to amend her complaint, limited to the claims of Title IX retaliation, Section 504 retaliation and discrimination, ADA discrimination, and any requests for declaratory relief.  Kim may file an amended complaint within **21 days** of the date of this Order.  If Kim does not file an amended complaint by that date, the court will dismiss the remaining claims with prejudice.

The court will **DISMISS** Counts IV and V against the University **with prejudice**, as the court concludes that Kim cannot correct the legal deficiencies in those claims via amendment.  Kim cannot bring such claims against the named Defendant in the future.

An appropriate Order shall accompany this Memorandum Opinion.

**ENTERED** this __31st__ day of October, 2025.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE