CLERKS OFFICE US DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED
November 09, 2026
LAURA A. AUSTIN, CLERK
BY: /s/ Nik Sams
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

MOON YOUNG KIM,

*Plaintiff*,

v.

THE RECTOR AND VISITORS OF THE UNIVERSITY OF VIRGINIA, ET AL.,

*Defendants*.

CASE NO. 3:25-CV-00054

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

This case stems from the breakdown in the relationship between Moon Young Kim, a former PhD student at the University of Virginia ("UVA"), and Matthew Bolton, a professor who served as Kim's faculty advisor. After Kim requested a new advisor, and Bolton withdrew as her advisor, Kim failed to secure a new one. Because PhD students at UVA are required to have an advisor to stay enrolled, Kim dropped out of her self-funded PhD program. Dkt. 99. She now sues Bolton and Gregory Gerling (the former chair of Bolton's department), alleging various constitutional violations. She also sues UVA, alleging disability discrimination and retaliation claims.

Bolton, Gerling, and UVA move to dismiss Kim's Fourth Amended Complaint. Dkt. 103. Though Kim has spent many hundreds of pages setting out her case, Defendants are correct that she fails to state any cause of action. Accordingly, their motion to dismiss must be granted.

## BACKGROUND

Kim is a former doctoral candidate in UVA's School of Engineering and Applied Sciences ("SEAS"). Dkt. 99 ¶ 11. Bolton is a SEAS professor and was Kim's PhD advisor for most of her time at SEAS. *Id.* ¶ 14. Gerling is the Chair of the Systems and Information Engineering

Department and was Bolton's supervisor. *Id.* ¶ 13; *see, e.g.,* Dkt. 99-6 at 4.

Kim has attention deficit hyperactivity disorder ("ADHD") and is the mother of children with disabilities. Dkt. 99 ¶ 1. Based on her ADHD, she sought an accommodation for her schoolwork from UVA. Dkt. 99 ¶ 21. On or before June 4, 2024, UVA's Student Disability Access Center ("SDAC") granted her an accommodation in the form of reasonable modification of deadlines, providing her with fifty percent extra time on all exams. *See* Dkt. 99-4 at 3.

On June 4, 2024, Kim met with SDAC's Courtney MacMasters to "re-discuss" potential accommodations. *Id.* During this meeting Kim "[n]oted that 50% has been great for qualitative classes, but for math or coding classes, 50% hasn't quite been enough." *Id.* As a result, Kim and MacMasters "discussed adding 1.75 time for math-based courses as an accommodation" and the "process for communicating with profs about this." *Id.* Kim also asked about accommodations for exams she expected to take the following year, in May of 2025. Kim reported that she "spoke with Prof. Barnes who mentioned they have changed exams from oral to written for some disabled students in the past." *Id.* MacMasters "spoke with Moon about some options if she sticks with oral (sitting down, permission to have computer and extra paper, more time to respond, etc.) but discussed that we can't fundamentally alter [the] objection of the exam." *Id.* "She understood this." *Id.* Kim was approved for the reasonable modification of deadlines, fifty percent extra time on all exams, and an extra twenty-five percent (for a total of seventy-five percent) extra time on math-based exams. *See id.*

The following year, between January 13 and April 30, 2025, Kim participated in a research program with UVA's National Security & Data Policy Institute ("NSDPI"). *See* Dkt. 99-6 at 3–4. The director of research at NSDPI was Jonathan Hathaway. *Id.* Kim's experience with NSDPI was not a smooth one, and on May 10, 2025, Kim filed a complaint with UVA's Office for Civil

Rights Discrimination ("OCR") alleging twelve discriminatory actions related to her work with NSDPI. Dkt. 99-6. Of these twelve alleged discriminatory acts, only two reference "disability-based" bias. Only one alleges a discriminatory action by Gerling, and none allege a discriminatory action by Bolton. The twelve allegations were that:

1. Hathaway "minimized [Kim's] UVA Master's in Engineering" after she "disclosed the fact that [she has] disabled children;"

2. Hathaway "extract[ed] uncompensated labor under conditions of sustained ambiguity, while publicly praising [her] contributions;"

3. Hathaway "was unable to independently lead an appropriate topic discussion and write an outline" and did not give Kim credit for providing notes to him;

4. Hathaway "repeatedly tried to coerce [Kim] into changing [her] dissertation topic from smishing (or SMS phishing) analysis;"

5. Philip Trella, Vice Provost at UVA, encouraged Kim to withdraw from her internship "[f]ollowing [her] submission of a detailed incident summary documenting coercion, misrepresentation, and ethical violations;"

6. Trella and Philip Potter, the Director of NSDPI, implicitly threatened Kim's reputation by failing to act on the April 30, 2025 report she made "regarding the conduct, oversight, and academic pressure [she] experienced while contributing to a research initiative at NSDPI;"

7. Dr. Matthew Burkett, a SEAS professor, responded to an email from Kim making an introduction to another student and "stat[ing] in P.S. of that same email that [she] would be emailing him regarding a recommendation" by acknowledging the introduction but not the recommendation;

8. Trella, after receiving Kim's complaint, directed Kim "to platforms unrelated to the nature of the complaint. These included a student conduct reporting tool designed for violence and hazing and UVA ombudsman, a non-investigatory, confidential office;"

9. Gerling "sent a department-wide email at 4:53 PM launching a new initiative to feature graduate students on the department website, "[l]ess than two hours after [Kim] submitted [her] formal complaint to EOCR;"

10. Demetrice Baskerville, a UVA OCR official, "stated during [a] May 9 intake call that EOCR could not open an investigation until a specific intake form was submitted;"

11. Baskerville "repeatedly questioned" Kim's "caregiving constraints and suggested they might indicate an inability to do the work, rather than accommodation;" and

12. "[E]mail(s) had disappeared from [Kim's] UVA email account."

Dkt. 99-6 at 3–5.

On May 16, 2025, Kim requested an update from UVA's Student Financial Services office on her financial aid. Dkt. 99-8 at 4. Kim specifically sought confirmation that her aid was being processed through normal procedures and was not affected by her active civil rights complaint with OCR. *Id.* On June 10, 2025, Rose Tyree, the Director of Customer Service at Student Financial Services, responded to Kim as follows:

> Hi Moon,
>
> Thank you for your email, and I'm sorry for the delayed response. After you enrolled in summer courses and we received your FAFSA, we reviewed your eligibility for summer financial aid. However, at the time of the review, you had not completed the Student Activity Guide (SAG), which is required for graduate and doctoral students to indicate interest in summer and/or PLUS loan funding. As a result, no summer loan was initially awarded.
>
> Since then, you've completed the SAG and indicated interest in summer financial aid. You are eligible for approximately $6,000 in Unsubsidized Direct Loan funding for the summer term. If you'd like us to proceed with awarding this loan, it will be posted in SIS for you to accept.
>
> Please let us know how you'd like to proceed.

*Id.* As Kim puts it now, this message was a "partial response" that "addressed only summer-term aid eligibility and did not address Plaintiff's 2025–2026 academic-year inquiry." Dkt. 99 ¶ 26.

On June 7, 2025, Kim emailed Bolton to tell him that his advising was contributing to a hostile environment. *See* Dkt. 99-9 at 3–4. Kim told Bolton that shifting timelines, delayed responses, and post-registration changes had created a hostile environment and put Kim's graduation timeline at risk. *Id.* The next day, on June 8, 2025, Bolton replied. *Id.* at 2–3. Bolton comprehensively addressed Kim's concerns and suggested ways in which Kim might meet her "very ambitious timeline" for graduating in Spring 2026. *Id.* He also wrote the following:

> This is the first time that I have heard that my advising may be

> contributing to a hostile environment. I take this very seriously, but such a characterization does not align with my intentions or my perceptions of our interactions. If there are specific actions or decisions I have made that you believe have contributed to this, I would really appreciate some clarification. I want to ensure that any misunderstandings are addressed directly and factually.

*Id.*

On June 10, 2025, Kim told Bolton that she would only communicate with him in writing for the remainder of their advisory relationship. *See* Dkt. 99-12 at 2. Kim wrote that

> Given the sensitive nature of ongoing matters related to my protected disclosures, formal civil rights complaint, and the recent attempt to reduce my credit load mid-semester, I would prefer to shift our upcoming Teams meetings to written communication, effective immediately.
>
> This will help ensure clarity, transparency, and accurate documentation of all exchanges, and support appropriate institutional accountability moving forward.

*Id.*

On June 12, 2025, Kim emailed Laura Barnes "to formally request a change of advisor." Dkt. 99-14 at 2. Kim wrote that "a productive, trust-based advising relationship is no longer possible with Dr. Bolton" and that "I would greatly appreciate your support as I work to complete my degree under more supportive conditions." *Id.*

On June 17, 2025, Bolton informed Kim that he could no longer serve as her advisor. *See* Dkt. 99-34 at 3. Dr. Bolton's message read:

> Hi Moon,
>
> Based on the events that have transpired since June 7th, 2025, I am afraid I can no longer serve as the adviser of your Ph.D.
>
> You have requested to end all in-person meetings. One-on-one meetings are critical for successful advising because they enable dynamic, real-time interactions that are critical for student mentoring, particularly early in the dissertation process. For this reason, I regularly meet with all my advised PhD students: usually

> once a week, but this has historically been biweekly for you based on your preferences. I have engaged with you in good faith over email to directly address your advising concerns. I also specifically asked you for information that could help me alleviate these concerns. Your responses have been accusatory and have not addressed the substance of my messages. Thus, I do not feel like there is a communication channel (meetings or email) that will allow me to fulfill my role as an adviser or address your advising concerns and needs.
>
> Furthermore, you have sent emails to external funding agencies and professional societies encouraging review of my professional ethics. You have used my good faith advising communications with you as part of these activities. I interpret this conduct as an unwarranted attempt to damage my professional reputation. I cannot continue communicating with a student that is engaging in such behavior.
>
> You will be contacted shortly by department leadership who will advise you on next steps.

*Id.* Kim refers to this message as the "termination" or the "termination of the doctoral advising relationship." Dkt. 99 ¶ 66. She also refers to the penultimate paragraph as the "external communications" paragraph. *Id.* ¶ 67.

Later that same day, Gerling informed Kim that she would need to secure a new advisor by July 31, 2025 to stay enrolled. *See* Dkt. 99 ¶ 37. That message read as follows:

> Dear Moon,
>
> I'm writing [to] follow up on Professor Bolton's email to outline the department process and requirements for a graduate student who does not have an advisor.
>
> It is school policy that PhD students must have an advisor to enroll. It is the student's responsibility to secure the agreement of a faculty member to be their PhD advisor. I recommend that you review the Systems Engineering faculty webpage to identify department faculty who are conducting research in areas similar to your own, as this is an important factor in advising a dissertation.
>
> . . . .
>
> You must secure a new advisor by July 31, 2025 in order to remain in the Systems Engineering PhD program after the completion of the

> summer 2025 term. The department will request that the Engineering Graduate Registrar applies a discontinuation of your PhD plan effective after the completion of the summer term if an advisor is not secured. This discontinuation can be removed once a new PhD advisor contacts me and affirms their role by July 31, 2025.

Dkt. 99-32 at 2. Gerling's email appeared to contain hyperlinks to the referenced "school policy" and "Systems Engineering faculty webpage". *Id.* Kim characterizes this message as a "forty-four-day advisor-replacement deadline accompanied by the threat of program discontinuation." Dkt. 99 ¶ 66.

After Bolton informed Kim he could no longer serve as her advisor, he emailed Chantel Gross, a department staff member, to ask "[i]f there is anything I need to do to make this official." Dkt. 99-35 at 2. Gerling was copied. *Id.* Gross responded: "I'm not aware of anything additional that needs to be done . . . . Once [the] temporary advisor has been determined by the department, let me know and I can make the update." *Id.* Gerling then jumped in, adding Amy Clobes and Priya Date to the email thread and writing:

> Hi Chantel,
>
> We have a situation here where we need to follow the procedures exactly. Therefore, I am not sure about assigning a temp advisor.
>
> Amy and Priya, can you comment on this?
>
> Moreover, as far as moving forward, please do not assign her an advisor if she contact[s] you. This would need to go through me for approval. In fact, you should probably forward any email communications to me, so that I'm fully in the loop.
>
> Thanks,
>
> -Greg

*Id.* at 4. Kim refers to this message as describing a "surveillance and gating mechanism imposed over Plaintiff's communications and advisor search." Dkt. 99 ¶ 66. Gross responded:

> Hi Greg,
>
> We actually do not have specific procedures that I'm aware of. All that I have done in the past when a student switches advisor[s] is remove the current advisor then the program director acts as the temporary advisor with the understanding that the student has 1 year to locate a new advisor. I removed the others just to give you an FYI.
>
> I haven't seen anything in writing, this is just what's been followed.

Dkt. 99-35 at 4. Gerling wrote back that "[t]his is not the procedure. Please work with Amy and Priya. They fully understand the formal procedures we need to take. It is very important that we work with them. Thank you[.]" *Id.*

That same day, June 17, Kim submitted a report to OCR "to formally report escalating retaliatory conduct by [UVA] in response to my protected civil rights disclosures and FOIA activity." Dkt. 99-30 at 3. Kim's report stated that Bolton "unilaterally sever[ed] our advising relationship" "without prior academic warning, mediation, or procedural due process." *Id.* Addressing the "external communications" paragraph in Bolton's message, Kim wrote that "[t]hese 'external communications' include protected civil rights disclosures, institutional misconduct documentation, and FOIA requests related to digital recordkeeping." *Id.* She further addressed Gerling's message informing her that she had to find a new advisor, stating that "to the best of my knowledge, the departmental policy requiring a student to have an advisor in order to remain enrolled was first invoked in a June 2, 2025 SEAS-wide communication." *Id.*

On June 30, 2025, Kim asked Dr. Rupa Valdez to be her advisor, and on July 4, 2025, Valdez replied that she could not take on additional advisees due to her other commitments. *See* Dkt. 99-25 at 2–3. Approximately a week later, on July 6, 2025, Kim asked Dr. Sarah Riggs if she would serve as her advisor. Dkt. 99-26 at 2–3. Riggs declined due to a lack of capacity. *Id.* On July 7, 2026, Kim inquired with Dr. Roman Krzysztofowicz to see if he would take her on, which

he declined on July 10, 2026 for the same reasons as Riggs. Dkt. 99-27 at 2–3. Kim did not re-enroll at UVA in the Fall 2025 semester or thereafter, and this lawsuit followed.

## LEGAL STANDARD

To survive a motion to dismiss, a plaintiff's complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A court must accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Kensington Volunteer Fire Dep't, Inc.*, *v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012). The court's review is generally limited to the complaint itself, Fed. R. Civ. P. 12(d), and documents attached to the complaint or incorporated by reference, Fed. R. Civ. P. 10(c). *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached pursuant to Rule 10(c), the exhibit prevails." *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991). Although a complaint "does not need detailed factual allegations," a plaintiff must provide "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action" in order to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "Threadbare recitals" and "conclusory statements" do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The allegations of a *pro se* plaintiff "must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2009) (citation modified). *Pro se* claims should be "liberally construed." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (citation modified). But that principle has limits. Courts do not need to discern the unexpressed intent of the plaintiff or take on "the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." *Beaudett v. City of Hampton*, 775

F.3d 1274, 1278 (4th Cir. 1985).

## Discussion

### I. ADA & Rehabilitation Act Claims

Kim brings claims both under the ADA and Rehabilitation Act for intentional discrimination, failure to accommodate, associational discrimination, and retaliation. "To the extent possible," courts "construe similar provisions in the two statutes consistently." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002). Given this, the Court will address Kim's ADA and Rehabilitation Act claims together.

#### A. Intentional Discrimination

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act prohibits the same discrimination in "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "[D]espite the different language these statutes employ, they require a plaintiff to demonstrate the same elements to establish liability." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012).

Discrimination claims under the ADA and Rehabilitation Act may be alleged via direct evidence or through the *McDonnell Douglas* burden-shifting framework. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015).[1] Direct evidence of discrimination is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on" the contested decision. *Bandy v. City of Salem*,

[1] Title VII discrimination and retaliation claims can be proved "either through direct and indirect evidence of retaliatory animus, or through the burden-shifting framework of *McDonnell Douglas*." *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Title VII concepts are often applied to ADA and Rehabilitation Act cases.

59 F.4th 705, 711 (4th Cir. 2023). If such evidence is absent, courts will apply the *McDonnell Douglas* approach. *See, e.g., Hooven-Lewis v. Caldera*, 249 F.3d 259 (4th Cir. 2001). Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *See Hannah P. v. Coats*, 916 F.3d 327, 342 (4th Cir. 2019). In the context of a student excluded from an educational program, that means the student must allege that (1) she has a disability, (2) she is otherwise qualified to participate in the educational program, and (3) she was excluded from the program on the basis of her disability. *See id.*[2] If the student establishes a *prima facie* case, the burden shifts to the school to provide a legitimate, nondiscriminatory reason for its conduct. *Id.* If the school provides such a reason, the student bears the ultimate burden of persuasion to show that the proffered reason was a pretext for discrimination. *Id.*

Defendants do not contest that Kim has a disability. Nor do they contest that she is otherwise qualified to participate in the SEAS PhD program. Kim's allegations therefore turn on whether she has adequately pled that she was excluded from UVA because of her disability.

To begin with, Kim has not adequately pled that UVA excluded her at all. Kim concludes that UVA "terminated" her when Bolton withdrew as her advisor. *See, e.g.,* Dkt. 99 ¶ 41. But that characterization does not match the facts she pled or the evidence she attached to her Fourth Amended Complaint. As Kim's exhibits detail, Bolton's withdrawal did not "terminate" Kim from her program; instead, Kim had roughly a month and a half after Bolton's withdrawal to find a new advisor. *See, e.g.*, Dkt. 99-32 at 2. Moreover, Kim's obligation to find an advisor applied to all SEAS PhD students equally, regardless of ability. Kim acknowledges that under generally

---

[2] The ADA and Rehabilitation Act have different standards for causation. To succeed on a claim under the Rehabilitation Act, the plaintiff must establish she was excluded "solely by reason of" her disability. *Baird ex rel. Baird v. Rose*, 192 F.3d 464, 468. The ADA requires only that the disability be "a motivating cause" of the exclusion. *Id.* at 469.

applicable University policy, "[a] doctoral student cannot maintain enrollment, register for dissertation hours, or submit a dissertation for defense without a faculty advisor of record." Dkt. 99 ¶ 41. She also acknowledges, through her own allegations, that she reached out to only three potential advisors across a span of eleven days, despite having forty-five days to do so and having been directed by Gerling to the faculty directory on the very same day Bolton withdrew. *See* Dkt. 99-32 at 2.

To obscure that reality, Kim alleges that the forty-five-day window was not, as it appears, a neutral application of generally applicable University policy, but instead was a targeted manipulation of that policy intended to exclude her. Her allegations do not plausibly support that theory. According to Kim,

> The contemporaneous Gerling-Gross exchange establishes four facts in a single record: (a) an established departmental practice provid[ing] graduate students whose advisors withdrew with a temporary advisor and a one-year window to identify a permanent replacement; (b) Defendant Gerling was aware of that practice as of June 17, 2025; (c) Defendant Gerling expressly rejected application of that practice to Plaintiff's case; and (d) no written formal procedure supported the alternative treatment Defendant Gerling imposed. The departure from established practice is direct evidence of differential treatment on the basis of Plaintiff's protected activity and disability status.

Dkt. 99 ¶ 40. But Gerling stressed that UVA "need[ed] to follow [its] procedures exactly," and directed Gross to colleagues who were authorities on the established practice. *See* Dkt. 99-35 at 4. Gross acknowledged that she "ha[d]n't seen anything in writing" supporting her understanding, and that she wasn't "aware of" the "formal procedures" Gerling referenced. *Id.* Kim's description of that exchange thus twists her own cited evidence beyond what it can plausibly bear.

Kim further fails to allege, either directly or via burden shifting, that she was excluded on

the basis of her disability.[3] Kim asserts in a conclusory manner that UVA discriminated against her based on her disability when it "precleared the termination through University Counsel[,] coordinated the timing[,] instituted the gating mechanism[,] and converted a registered accommodation into a basis for termination." Dkt. 99 ¶ 74. In Kim's view, "Bolton received the written communication accommodation request, forwarded it to counsel, and then cited it as a conduct issue justifying termination." *Id.* ¶ 76. "Gerling knew of Plaintiff's disability[,] rejected the established one year temporary advisor practice[,] and imposed the gating mechanism." *Id.* ¶ 77.

As discussed, what Kim describes as "the established one-year temporary advisor practice" does not plausibly allege any such practice, much less one that was not followed because of her ADHD. But more importantly here, she also fails to plead any "written communication accommodation request" that could tie her grievances to her disability status. What Kim characterizes as an accommodation request is the following message:

> Dear Dr. Bolton,
>
> Given the sensitive nature of ongoing matters related to my protected disclosures, formal civil rights complaint, and the recent attempt to reduce my credit load mid-semester, I would prefer to shift our upcoming Teams meetings to written communication, effective immediately.
>
> This will help ensure clarity, transparency, and accurate documentation of all exchanges, and support appropriate institutional accountability moving forward.

Dkt. 99-12 at 2. As will be discussed with regard to Kim's failure to accommodate claim, *infra*, this message is plainly not an accommodation request. She explicitly tied the request "to shift our upcoming Teams meetings to written communication" to her "protected disclosures, formal civil

---

[3] Although the ADA and Rehabilitation Act have differing standards for causation, *see* n.3, *supra*, Kim fails to plead causation under either.

rights complaint, and the recent attempt to reduce my credit load mid-semester," not her ADHD or her children's disabilities. *Id.* In Kim's own words, she didn't ask for this because of anything to do with her disability status, but rather to "ensure clarity, transparency, and accurate documentation of all exchanges, and support appropriate institutional accountability moving forward." *Id.* Kim plainly desired to create a record for litigation, and that record clearly shows that she never requested an accommodation based on her ADHD or her children's disabilities.

Because she fails to adequately allege that UVA excluded her from its PhD program based on her disability, Kim's intentional discrimination claim must be dismissed.

### B. Failure to Accommodate

To establish a failure to accommodate claim, a student plaintiff must show that (1) she is an individual with a qualifying disability, (2) her school had notice of that disability, (3) she could perform the essential functions of a student with a reasonable accommodation, and (4) her school refused to make a reasonable accommodation. *Cf. Herkert v. Bisignano*, 151 F.4th 157, 168 (4th Cir. 2025).

Federal grantees and public entities must make "reasonable," but not "substantial" or "fundamental" modifications to accommodate people with disabilities. *Halpern*, 669 F.3d at 464 (citing *Alexander v. Choate*, 469 U.S. 287, 300 (1985)). An institution may reasonably accommodate a student without providing the exact accommodation that she requests. *Cf. Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 414 (4th Cir. 2015). A modification is not reasonable if it "imposes undue financial and administrative burdens" or "requires a fundamental alteration in the nature of the program." *Sch. Bd. v. Arline*, 480 U.S. 273, 287 n.17 (1987). "A modification to 'an essential aspect' of the program constitutes a 'fundamental alteration' and therefore, is an unreasonable accommodation." *Halpern*, 669 F.3d at 464 (quoting *PGA Tour, Inc.*

*v. Martin*, 532 U.S. 661, 682–83 (2001)).

Before an institution's duty to provide reasonable accommodations is triggered, the student must make an adequate request, thereby putting the school "on notice" of her disability. *Cf. Lashley v. Spartanburg Methodist College*, 66 F.4th 168, 179 (4th Cir. 2023). Although a student does not need to use the phrase "reasonable accommodation," there must be a "logical bridge" connecting the student's disability to the "changes [s]he requests." *Cf. Kelly v. Town of Abingdon*, 90 F.4th 158, 168 (4th Cir. 2024).

Kim pleads that the "June 10[,] 2025 written communication request was an exercise of the Student Disability Access Center approved accommodation," and that "[t]he Department had previously provided analogous oral-to-written format conversions for qualifying exams to other students." Dkt. 99 ¶ 82. "Instead of engaging the interactive process," Kim claims, "UVA forwarded the request to counsel, cited it as a conduct issue in the termination letter, and recorded it as the primary reason for the adverse action in the Graduate Success Tracker." Dkt. 99 ¶ 83. In Kim's view, "[t]he University's conversion of Plaintiff's exercise of a registered accommodation into a stated basis for termination constitutes failure to accommodate in violation of Section 504 and Title II." *Id.* ¶ 84.

Again, Kim misrepresents her own exhibits. Although she alleges that she had an "approved accommodation" for written communication that allowed her to demand an end to meetings with her advisor "effective immediately," *see* Dkt. 99-12 at 2, the SDAC accommodation record she attached to her complaint indicates that she was only approved for "reas[onable] mod[ification] of deadlines," meaning "50% extra time on exams" and "75% extra time on math-based exams. Dkt. 99-4 at 3. Directly contradicting her claims of an "approved accommodation," that record states that when Kim raised the issue of changing exams "from oral to written," SDAC

staff told her that they "can't fundamentally alter [the] objective of the exam" and noted that Kim "understood this." *Id; accord Sch. Bd.*, 480 U.S. at 287 n.17; *Halpern*, 669 F.3d at 464. Thus, the Court cannot credit Kim's assertion that she had an "approved accommodation" replacing all virtual or in-person meetings with written communication.

Alternatively, Kim presses the theory that her email to Bolton was a request for an accommodation, which was unreasonably ignored. Again, her claims are contradicted by her exhibits. Nothing about Kim's email seeking to "ensure accurate documentation of all exchanges, and support appropriate institutional accountability moving forward" can be plausibly understood as requesting an accommodation for her ADHD. Nothing in the email could sustain a "logical bridge" between her ADHD and the request for written communication. *Kelly* at 168. Because Kim fails to allege either an adequate request or an inadequate accommodation, she has not pled a failure to accommodate claim.

### C. Associational Discrimination

Kim also alleges associational discrimination based on her status as the mother of children with disabilities. *See* Dkt. 99 ¶ 73. Although Title II does not explicitly provide for an associational discrimination claim, the claim is viable in this circuit. *See A Helping Hand, LLC v. Baltimore Cnty.* 515 F.3d 356, 364 (4th Cir. 2008) (Congress intended for the forms of discrimination prohibited by Title II to be "identical" to those set out in the application provisions of Titles I and III). To state an associational disability discrimination claim, Kim must allege that (1) she was qualified to participate in UVA's PhD program, (2) she was excluded from the program, (3) UVA knew she had a relative with a disability, and (4) the exclusion occurred under circumstances raising a reasonable inference that the relative's disability was a determining factor in the exclusion. *See Leitner v. Liberty Univ., Inc.*, 2020 WL 7128972, at *7 (W.D. Va. Dec. 4,

2020).

Kim alleges that UVA discriminated against her on the basis of her status as the mother of children with disabilities, which she claims is evidenced by UVA having "precleared the termination through University Counsel[,] coordinated the timing[,] instituted the gating mechanism[,] and converted a registered accommodation into a basis for termination." *See* Dkt. 99 ¶¶ 73–78.

As with her personal disability discrimination claim, Kim fails to allege exclusion. Kim's incorporated exhibits undercut the notions that she was "terminated" by Bolton's withdrawal or that Gerling prevented her from securing a new advisor. *See supra.* But regardless, she also fails to allege causation. Kim pleads no facts whatsoever raising a reasonable inference that her children's disability had anything to do with Bolton's withdrawal, Gerling's request to be forwarded any of Kim's emails, or any other aspect of her "termination". The closest she comes to doing so is the mention of "disability-based caregiver bias" in her OCR complaint. *See* Dkt. 99-6. But that fleeting mention—in two of twelve allegations, both of which lack any plausible tie to her children's disabilities and neither of which are alleged to have had anything to do with Bolton or Gerling—is still well short of raising a reasonable inference of associational discrimination. Accordingly, her associational discrimination claim must be dismissed.

### D. Retaliation

Under the ADA, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203. The standards for pleading

retaliation under the ADA and the Rehabilitation Act are the same.[4] *See S.B. ex rel. A.L. v. Bd. of Educ.*, 819 F.3d 69, 78 n.6 (4th Cir. 2016). A retaliation plaintiff may offer direct evidence of retaliation or proceed under the *McDonnell Douglas* burden shifting framework. *Id.* at 78. Direct evidence of retaliation requires "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested . . . decision." *Rhoads v. FDIC*, 257 F.3d 373, 391–92 (4th Cir. 2001) (citing *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 607 (4th Cir. 1999)). Under the burden shifting method, a plaintiff must plead that (1) she engaged in protected activity; (2) she suffered a materially adverse action; and (3) there is a causal connection between the protected activity and the materially adverse action that is attributable to the defendant. *See Herkert v. Bisignano*, 151 F.4th 157, 164–66 (4th Cir. 2025). If Kim carries this burden, UVA must articulate a legitimate nonretaliatory reason for its actions, at which point the burden shifts back to Kim to demonstrate that the proffered reason is a pretext for forbidden retaliation. *See S.B.*, 819 F.3d at 78; *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001).

Kim has not alleged evidence reflecting a discriminatory attitude that bears directly on any contested decision. *Cf. Rhoads*, 257 F.3d at 391–92. Although Kim characterizes Bolton's reliance on her "external communications" as direct evidence of ableist retaliation, it is not. Bolton said:

> Furthermore, you have sent emails to external funding agencies and professional societies encouraging review of my professional ethics. You have used my good faith advising communications with you as part of these activities. I interpret this conduct as an unwarranted attempt to damage my professional reputation. I cannot continue communicating with a student that is engaging in such behavior.

---

[4] ADA and Rehabilitation Act retaliation claims are "assessed through the same lens as a Title VII retaliation claim." *Wilson v. Montgomery Cnty. College Bd. of Trustees*, 2021 WL 1102341, at *4 (D. Md. Mar. 23, 2021); *see also Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012) (ADA is "[m]odeled after Title VII").

Dkt. 99-34 at 3. This does not plausibly reflect a discriminatory attitude. Bolton does not mention Kim's disability, or her status as a mother of children with disabilities, at all. There is no subtext that could plausibly be understood to refer to Kim's disability or her status as a mother of children with disabilities. Instead, Bolton straightforwardly refers to criticism that Kim sent to Bolton's professional network encouraging review of his professional ethics—a neutral, non-discriminatory reason for him to want to withdraw as Kim's advisor.

Accordingly, Kim's claims must be reviewed under the *McDonnell Douglas* burden shifting framework and they fail at every step. Because Kim fails to allege protected activity, adverse action, and causation, her retaliation claims must be dismissed.

***Protected Activity***

A general complaint of unfair treatment is insufficient to establish protected activity under the ADA and Rehab Act. The ADA protects from retaliation individuals who have raised complaints "under this chapter", 42 U.S.C. § 12203, and the Rehab Act does the same. *See Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002). The Acts therefore do not protect opposition to all violations of all laws, but only opposition to disability discrimination. *See Reynolds v. American Nat. Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012); *McNair v. Computer Data Sys., Inc.*, 172 F.3d 863 (4th Cir. 1999) (Retaliation statutes protect "opposition neither to all unlawful . . . practices nor to practices the [plaintiff] simply thinks are somehow unfair"). To plead that she engaged in conduct protected by the ADA, Kim "need not establish that the conduct she opposed actually constituted an ADA violation." *Frelich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002). "But a complainant must allege the predicate for a reasonable, good faith belief that the behavior she is opposing violates the ADA." *Id.* Here Kim has failed to allege a reasonable, good faith belief that Defendants violated either the ADA or Rehab Act.

Kim alleges that she "engaged in protected activity by filing the May 10, 2025, Office for Civil Rights complaint and by sending related written inquiries invoking Section 504 and Title IX protections." Dkt. 99 ¶ 64. But neither the OCR complaint nor any of Kim's "related written inquiries" describe anything near a violation of the ADA or Rehab Act. The OCR complaint does not raise Kim's ability level or ADHD at all. To the extent the ADA is implicated, it is only through Kim's association with her disabled children, as reflected in her allegations of "disability-based caregiver bias." *See, e.g.,* Dkt. 99-6 at 3. But simply using the words "disability-based" and "bias", without more, does not establish protected activity. *Cf. Curay-Cramer v. Ursuline Acad.*, 450 F.3d 130, 137 (3d Cir. 2006) (Plaintiff's "subjective state of mind is also irrelevant for purposes of determining whether she engaged in protected conduct"). And Kim's allegations cannot be said to reflect any reasonable belief that UVA discriminated against Kim based on her status as the mother of children with disabilities. *See id.* (alleging that Hathaway "minimized [Kim's] Master's in Engineering;" that his "communications around compensation, authorship, and performance expectation remained intentionally vague;" that he "was unable to independently lead an appropriate proposal topic," even though Kim "provided brief notes" to him; and that he "tried to coerce" Kim into changing her dissertation topic).

To the limited extent that Kim's OCR complaint gestures towards disability discrimination, it offers zero evidence (and her lawsuit here does not add any more) that any of the treatment she protests was caused by her status as a person with ADHD or as the mother of children with disabilities. Accordingly, Kim's OCR complaint was not protected activity under the ADA or Rehab Act.

It is not clear what other "related written inquiries" Kim relies on to plead protected

activity.[5] *See* Dkt. 99 ¶ 64. But to the extent Kim relies on the "external communications" about Bolton—*i.e.*, the emails she sent his funders and partners questioning his professional ethics—those cannot serve as protected activity for the basis of an ADA or Rehab Act claim either. For one thing, Kim has not pled that these emails alleged violations of either the ADA or the Rehab Act. Bolton's email characterized them as urging his funders and professional societies to review his professional ethics. *See* Dkt. 99-34 at 2. But even if they had referenced disability discrimination, they would not be protected as legitimate opposition activity. "In reviewing retaliation claims, courts recognize the need to balance the desire to encourage [students] to oppose unlawful discrimination" with a school's interest "in maintaining a harmonious, productive" school environment. *Cf. Freilich* at 216. Disruptive behaviors not tending to oppose unlawful discrimination—such as Kim's emails to Bolton's funders questioning his professional ethics—are not protected. "Quite to the contrary, we have recognized that protection of 'opposition' activity is not absolute, and that consideration must be given to the legitimate operational concerns" of the institution. *McNair*, 172 F.3d at 863 ("[W]e have never concluded that repeated complaints to the employer's client, in direct contravention of explicit instructions to cease such communications, are protected."); *see also Laughlin v. Metro Washington Airports Auth.*, 149 F.3d 253, 259 n.4 (4th Cir. 1998). Applying the same balancing here, Kim's "external communications" to Bolton's funders were not protected activity under the ADA and Rehabilitation Act. To the contrary, they appear to be Kim's attempt to retaliate against Bolton for refusing her unreasonable demands.

***Adverse Action***

[5] To the extent that Kim relies on her "EOCR Supervisory Inquiry," Dkt. 99-11, that inquiry fails as protected activity for the same reason as her OCR complaint: it does not raise or rely on any reasonable, good faith belief that the ADA or Rehabilitation Act was being violated.

In addition to pleading protected activity, which she has failed to do, Kim must also plead a materially adverse action. *See Herkert*, 151 F.4th at 165–66. An action is materially adverse if it would "dissuade a reasonable person from making or supporting a charge of discrimination." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018). Kim alleges four "independently [and] materially adverse actions," including:

(1) termination of the doctoral advising relationship;

(2) the forty-four-day advisor-replacement deadline accompanied by the threat of program discontinuation;

(3) the surveillance and gating mechanism imposed over Plaintiff's communications and advisor search; and

(4) the twenty-five-day Student Financial Services delay following Plaintiff's May 16, 2025 non-retaliation notice, followed by a partial response addressing only summer-term aid.

Dkt. 99 ¶ 66.

The "termination of the doctoral advising relationship" is not an adverse action based on the facts Kim alleges. As an initial matter, it is hard to see how Bolton's withdrawal could have dissuaded Kim from protected activity when Kim herself sought to remove (or to use her word, "terminate") Bolton as her advisor on June 12, 2025, five days before Bolton withdrew on June 17. *See* Dkt. 99-14 at 2. But setting that aside, Bolton's withdrawal was not sufficiently adverse to dissuade a reasonable person from engaging in protected activity. Kim had between June 17 and July 31—roughly a month and a half—to find another advisor. As pled, Kim reached out to only three professors across the span of eleven days to seek a new advisor. *See* Dkts. 99-25, 99-26, 99-28, 99-28. On these facts, Kim has not alleged an adverse action.[6] *Cf. Kim v. Rector &*

[6] Kim's alleged facts distinguish her case from *Emeldi v. University of Oregon*, which she cites for the proposition that an advisor's withdrawal constitutes adverse action. *See* Dkt. 99 ¶ 66 (citing 698 F.3d 715 (9th Cir. 2012)). In *Emeldi*, a professor resigned from a student's dissertation committee after the student complained about sex discrimination by the professor. *See* 698 F.3d at 721–23. The professor then told other faculty members that the student should not receive a

*Visitors of Univ. of Virginia*, 2025 WL 3046192, at *11 (W.D. Va. Oct. 31, 2025) (Yoon, J.) ("The alleged facts do not suggest that Bolton's withdrawal, with an option and sufficient time for Kim to find a new advisor, constitutes a materially adverse action.").

The "forty-four-day advisor-replacement deadline" describes UVA's policy that all PhD students must have an advisor to be enrolled. *See* Dkt. 99-32 at 2. But benefits of a student's enrollment do not typically, if ever, include immunity from the application of basic enrollment policies. *Cf. Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) ("[B]enefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies."). Those policies are generally applicable to all University students, and their application to Kim cannot be considered an adverse action. *See Kim*, 2025 WL 3046192, at *11 ("[U]niversal enforcement of already-existing University policies would not plausibly dissuade a reasonable person from making a charge of discrimination.").

Nor can Gerling's request to Gross that he be kept "fully in the loop" be considered adverse action. *See* Dkt. 99-35 at 4. So too with Gerling's statement to Gross that he would have to approve Kim's new advisor. *Id.* Although Kim now refers to this as the "surveillance and gating mechanism," these labels alone are insufficient to allege that Gerling's actions were materially adverse. It is not surprising to a reasonable person that Gerling, having been aware of Kim's

---

degree. *Id.* at 723. The student asked fifteen professors if they would be willing to serve on her committee, which none did. *Id.* The Ninth Circuit relied on those facts, which are more extreme than those Kim alleges, to find an adverse action. Here, Kim alleges she asked only three professors to serve as her advisor, and, unlike *Emeldi*, she pleads no sabotage among the possible candidates. To the contrary, on the day that Bolton withdrew, Gerling encouraged Kim to review the department website to identify faculty members who might serve as her new advisor. *See* Dkt. 99-32 at 2. As of the date of this Opinion, that website listed twenty-nine professors in the department. *See* UVA Engineering, Systems and Information Engineering Faculty (Nov. 9, 2026), https://tinyurl.com/37j8x84a; *see also United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on state and federal government websites.").

various complaints, would want to be "fully in the loop" about her advisor search. Nor is it surprising that Gerling, as the chair of a department seeking to "follow our procedures exactly," Dkt. 99-35 at 4, would have to approve a new advisor. Kim does not allege that this was some heightened bar for her receiving a new advisor.

That leaves Kim's assertion that the "partial response" she received from Student Financial Aid on June 10, 2025 was an adverse action. It was not. The email read:

> Hi Moon,
>
> Thank you for your email, and I'm sorry for the delayed response. After you enrolled in summer courses and we received your FAFSA, we reviewed your eligibility for summer financial aid. However, at the time of the review, you had not completed the Student Activity Guide (SAG), which is required for graduate and doctoral students to indicate interest in summer and/or PLUS loan funding. As a result, no summer loan was initially awarded.
>
> Since then, you've completed the SAG and indicated interest in summer financial aid. You are eligible for approximately $6,000 in Unsubsidized Direct Loan funding for the summer term. If you'd like us to proceed with awarding this loan, it will be posted in SIS for you to accept.
>
> Please let us know how you'd like to proceed.

Dkt. 99-8. A reasonable person would not be dissuaded from protected activity based on the email, which provides a neutral, reasonable explanation for Kim's student financial aid award and responds to her inquiry with no plausible connection to her allegedly protected activity. Kim's allegation that the response took too long and was not as comprehensive as she deemed appropriate does not make it materially adverse. It makes Kim's allegation unreasonable.

Because Kim has failed to allege any adverse action, her retaliation claims must fail.

***Causation***

Finally, Kim must also plead a causal link showing that UVA took adverse action against her because she engaged in protected activity. *See Dimaano v. Va. Center for Behavioral*

*Rehabilitation*, 2024 WL 3823795, at *15 (E.D. Va. Aug. 13, 2024). As evidence of a causal connection between protected activity and adverse action Kim cites (1) "the 'external communications' paragraph pre-approved by Associate University Counsel Rouzer;" (2) "the Graduate Success Tracker statements that 'Council recommended that Bolton can drop her' and that Defendant Bolton 'reached his threshold when she emailed his professional and funding agencies about his behavior;'" and (3) "a temporal proximity of thirty-eight days between the Office for Civil Rights filing and the termination." Dkt. 99 ¶ 67. None of these are sufficient.

The first two plainly reference the "external communications," or Kim's emails to Bolton's "professional and funding agencies about his behavior." Dkt. 99 ¶ 67. Kim has surely sufficiently pled that Bolton's withdrawal was caused by her "external communications"; however, those communications were not protected activity, and Bolton's withdrawal was not an adverse action. *See supra*. Where, as here, there is no protected activity or adverse action, there can be no causation.

Lacking any concrete evidence of causation, Kim relies on the temporal proximity between her OCR complaint and Bolton's withdrawal. *See* Dkt. 99 ¶ 67. Temporal proximity can indicate causation in an otherwise well-pleaded complaint. *See Staley v. Gruenberg*, 575 F. App'x 153, 156 (4th Cir. 2014). But temporal proximity alone is insufficient when the complaint is devoid of any facts that would plausibly allege a causal relationship between protected activity and adverse action. *Id.* Here, Kim alleges no facts giving rise to the inference that Bolton withdrew as her advisor because she engaged in protected activity under the ADA or Rehab Act. Accordingly, she cannot state a claim based on temporal proximity alone.

Kim does not attempt to show any causal relationship between protected activity and her other alleged adverse actions—the "forty-four-day advisor-replacement deadline," the

"surveillance and gating mechanism," and the "twenty-five-day Student Financial Services delay". But construing her complaint liberally, none of the facts she alleges could support a causal relationship between her pleaded protected activity and these actions. No facts plausibly allege that the Student Financial Services email was delayed or a "partial response" because of Kim's protected activity. Nor do any facts pled plausibly allege that Kim was singled out for a shortened "advisor-replacement deadline" or for "surveillance" and a "gating mechanism" because of protected activity. Accordingly, she fails to plead causation.

In sum, Kim's retaliation claim fails to plead any protected activity, any adverse action, or any causal relationship between protected activity and an adverse action. For each of those reasons, her claim must be dismissed.

## II. Section 1983 Claims

Kim also brings claims alleging constitutional violations by Bolton and Gerling under 42 U.S.C. § 1983. But these fail too, both facially and because of qualified immunity.

### A. First Amendment Retaliation

Kim alleges that Bolton and Gerling are state actors who took adverse actions against" her because she filed "a complaint with a federal civil rights enforcement agency", violating her First Amendment rights. Dkt. 99 ¶¶ 86–88.

"The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). A plaintiff seeking to recover for First Amendment retaliation must allege that (1) she engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct.

*See id.* at 686.

Even assuming that Kim did engage in activity protected by the First Amendment, she fails to plead adverse action for all the reasons discussed alongside her ADA and Rehab Act retaliation claims. *See supra*. "[F]or purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine*, 411 F.3d at 500. Although Kim does not plead specific adverse actions in this count, she states that Bolton and Gerling "took adverse actions against" her "as documented in the FOIA records." Dkt. 99 ¶ 87. The Court will therefore consider the same adverse actions Kim alleged in her ADA and Rehab Act retaliation claims. None of those actions would deter a person of ordinary firmness from exercising their First Amendment rights, for the same reasons they would not deter a person from engaging in protected opposition to discrimination under the ADA and Rehab Act.

Regardless, Kim's claim fails for the additional reason that Bolton and Gerling are protected by qualified immunity. That doctrine protects government officials sued in their personal capacities from liability in § 1983 actions if the right was not clearly established at the time of the alleged violation. *See, e.g., Pearson v. Callahan*, 555 U.S. 223, 231 (2009). A right is clearly established when at the time of challenged conduct, the contours of the right are sufficiently clear that a reasonable official violating the right would understand that he is violating it. *See, e.g., Ellinger v. Napier*, 2023 WL 2873393, at *4 (W.D. Va. Apr. 10, 2023). In simple terms, the legal question must be "beyond debate". *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Kim argues that qualified immunity does not apply because the right she asserts was clearly established in *Constantine v. Rectors & Visitors of George Mason University*, 411 F.3d 474 (4th Cir. 2005). That case did involve a First Amendment retaliation claim asserted by a student against

a university. But in a qualified immunity analysis, the right at issue must be considered not at its "most general or abstract level, but at the level of its application to the specific conduct being challenged." *Herron v. Va. Commonwealth Univ.*, 366 F. Supp. 2d 355, 361 (E.D. Va. 2004). Kim alleges facts notably distinct from *Constantine*. In that case, the plaintiff student complained to university officials about an exam and the procedures available to challenge her grade. *See* 411 F.3d at 499. She then wrote an article in the school newspaper about it. *Id.* UVA then denied her request to re-take the exam, denied her request to have a different professor re-grade the exam, and refused her request for a hearing.

Kim's case is different. None of the adverse actions Kim alleges—the withdrawal of an advisor, the requirement that a PhD student have an advisor, the department chair being copied on emails, or an alleged partial response from a financial aid office—were raised in *Constantine*. *Constantine* does not apply to the specific conduct being challenged here. *Cf. Herron*, 366 F. Supp. 2d at 361. Because *Constantine* did not draw any "bright lines" that Bolton and Gerling are alleged to have transgressed, it does not defeat qualified immunity. *See Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

For these reasons, Kim's First Amendment retaliation claim will be dismissed.

### B. Procedural Due Process

To succeed on a procedural due process claim, Kim must show that (1) she had "a constitutionally cognizable life, liberty, or property interest," (2) "the deprivation of that interest was caused by 'some form of state action,'" and (3) "the procedures employed were constitutionally inadequate." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013) (quoting *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009)). Kim asserts a "property interest in continued enrollment in the doctoral program" that she was

deprived of "through the sudden termination[,] the shortened deadline[,] the departure from established practice[,] and the gating mechanism all coordinated with University Counsel." Dkt. 99 ¶¶ 92, 95.

Property interests are not created by the Fourteenth Amendment itself. Instead, a property interest in a government benefit arises when an individual has a "legitimate claim of entitlement to it," as created and defined by "existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Kim has not identified an independent source of her asserted property right.[7] The Commonwealth of Virginia has not created such an interest. *See Doe v. Va. Polytechnic Inst. & State Univ.*, 2024 WL 1417977, at *6 (W.D. Va. Apr. 2, 2024). And Kim does not allege that UVA has established one by contract or mutually explicit understanding.

But even assuming that Kim does have a property interest in her continued enrollment, she has not adequately alleged that she was deprived of that interest. "Whether a deprivation of constitutional rights has occurred is not dependent upon the subjective feelings or beliefs of a plaintiff." *Tigrett v. Rector and Visitors of Univ. of Va.*, 290 F.3d 620, 628 (4th Cir. 2002). The question is whether a plaintiff was, "in fact, deprived" of a constitutionally cognizable interest. *Id.* Here, Kim was not deprived of continued enrollment. Rather, she was given the opportunity to proceed with her PhD program as long as she met the same requirement applicable to every PhD student: that she have an advisor. Kim's failure to meet that requirement does not mean that she was deprived of enrollment, particularly on the facts she alleges. *See, e.g.,* Dkts. 99-25–27. In fact, if anything, Kim deprived herself of enrollment through her unreasonable, demanding, erratic, and retaliatory behavior.

---

[7] The lone case Kim cites assumes the interest is cognizable without holding as much. *See Regents of the Univ. of Mich v. Ewing*, 474 U.S. 214, 222–23 (1985).

Moreover, even if Kim had an interest, and she was deprived of it, she received all the process she was due. Kim had forty-five days to secure a new advisor to enroll in the Fall 2025 semester, pursuant to formally established procedures. She does not plead that she faced any kind of disciplinary process or proceeding that would necessitate additional process.

But again, regardless of the foregoing analysis, Kim's claims fail in the face of qualified immunity. "If the contours of the constitutional right asserted are not sufficiently clear, the defending state actor has an absolute defense of qualified immunity." *Herron v. Va. Commonwealth Univ.*, 366 F. Supp. 2d 355, 361 (E.D. Va. 2004). "The inquiry as to whether the law is clearly established is a demanding one." *Allen v. Cooper*, 895 F.3d 337, 356 (4th Cir. 2018) (citation modified). Here it is not even clearly established that Kim has a cognizable property interest in continued enrollment. *See Doe v. Va. Polytechnic Inst. & State Univ.*, 2024 WL 1417977, at *6 (collecting cases and observing the Fourth Circuit's "assuming" approach to such interests). It is certainly not clearly established that Bolton and Gerling deprived Kim of that interest, and even less so that the deprivation was without due process. Accordingly, Bolton and Gerling are entitled to qualified immunity, and Kim's claim must be dismissed.

## III. Declaratory Relief

Kim's final claim is for "[d]eclaratory relief". Dkt. 99 ¶ 99. In support Kim states only that "[a]n actual controversy exists as to Defendants' violations of Section 504[,] Title II[,] the First Amendment[,] and the Fourteenth Amendment. Declaratory relief is warranted." *Id.*

Declaratory relief is a remedy, not a separate cause of action. *See Gale v. Select Portfolio Servicing, Inc.*, 2021 WL 165132, at *13 (D. Md. Jan. 19, 2021); *CGM, LLC v. BellSouth Telecomm., Inc.*, 664 F.3d 46, 55–56 (4th Cir. 2011). Because Kim has failed to state a claim upon which relief can be granted, her request for declaratory relief also fails.

## CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion to dismiss, Dkt. 103. Because Kim has had five opportunities to plead her case and has failed to state a claim, further amendment is futile and dismissal will be with prejudice. *See, e.g., Chenevert v. Kanode*, 2023 WL 6279906, at *10 (W.D. Va. Sep. 26, 2023), *aff'd*, 2024 WL 2815172 (4th Cir. June 3, 2024) (dismissing with prejudice after three failed attempts to state a claim).[8] The Court will deny as moot all other pending motions, including Kim's motion to lift the stay of discovery, Dkt. 126, and for a preservation order, Dkt. 128. A separate order will issue.

The Clerk of Court is directed to send a copy of this memorandum opinion to all counsel of record.

It is **SO ORDERED**.

Entered this 9th day of November, 2026.

Norman K Moon

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[8] *See also* Dkt. 95 (following Third Amended Complaint, "the Court will allow Plaintiff to amend her complaint one final time").